DEFENDANT'S EXHIBIT
tabbies®
E

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RHONDA MITTS,            )
    Plaintiff,        )
              ) No. 16 cv 5788
  vs.                )
              )
COSTCO WHOLESALE       )
CORPORATION,            )
    Defendant.      )

The deposition of RHONDA MITTS called for the examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before MARIA MICELI, CSR, at 230 West Monroe on the 5th of October 2016, at the hour of 10:00 a.m.

REPORTED BY: MARIA MICELI, CSR
LICENSE NO.: 084-003859

---

APPEARANCES:

BENJAMIN & SHAPIRO, LTD., by
MR. MICHAEL A. KACZMAREK
180 North LaSalle Street - Suite 2600
Chicago, Illinois, 60601
(312) 641-5944
mkaczmarek@benshaplaw.com
  On behalf of Plaintiff;

LIPE LYONS MURPHY NAHRSTADT & PONTIKIS,
by MR. BRADLEY NAHRSTADT
230 West Monroe Street - Suite 2260
Chicago, Illinois, 60601
(312) 702-0584
bcn@lipelyons.com
  On behalf of Defendant.

---

INDEX
WITNESS
RHONDA MITTS
  By Mr. Nahrstadt      4

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| R. MITTS Deposition | |
| Exhibit No. 1 | 37 |
| Exhibit No. 2 | 46 |
| Exhibit No. 3 | 48 |
| Exhibit No. 4 | 49 |
| Exhibit No. 5 | 50 |
| Exhibit No. 6 | 51 |
| Exhibit No. 7 | 52 |
| Exhibit No. 8 | 54 |

---

(Witness sworn.)

MR. NAHRSTADT: Can you please state your name and spell your last name for the record?

THE WITNESS: Sure. Rhonda Elaine Mitts, M-I-T-T-S.

MR. NAHRSTADT: Let the record reflect that this is the deposition of Rhonda Mitts taken pursuant to notice to all parties. Let the record further reflect that this deposition is being taken pursuant to all applicable rules.

      RHONDA MITTS,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

      EXAMINATION

BY MR. NAHRSTADT:

Q. Mrs. Mitts, have you given a deposition before?

A. No.

Q. I'm going to ask you a series of questions about an incident that happened at a Costco store. I'm going to ask you the questions, obviously, out loud and in the form of words and I need you to respond the same way, okay?

A. Okay.

Q. It's very hard for the court reporter to take down uh-huhs and un-huns and shakes of the head and shrugs of the shoulders, so we got to make sure that we both are speaking out loud. I would ask that you would wait, even if you think you know what I'm asking, wait until I ask my question before you answer the question and I'll do my very best to make sure I let you finish your answer before I ask the next question, okay?

A. Okay.

Q. If I ask you something that you don't understand, just let me know and I will either rephrase it or try and ask it in a different way so you understand what I'm asking you, okay?

A. Okay.

Q. I'm not here to trick you. I just want to know what you remember, what you saw, what you did that day. So if there's something that you don't understand, just let me know and I'll try and clear it up for you.

A. Okay.

Q. If you want to take a break at any time, just let me know and we'll be happy to accommodate you, okay?

5

A. Thank you.

Q. What's your date of birth?

A. 1/5/75.

Q. And your social security number?

A. 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.

Q. And what's your home address?

A. 2019 Providence Way, Joliet, Illinois, 60431.

Q. Is that a house?

A. Yes.

Q. How long have you lived there?

A. 10 years.

Q. And you're married?

A. Yes.

Q. Who are you married to?

A. Michael Mitts.

Q. How long have you been married?

A. 23 years.

Q. What's your occupation?

A. I am a client service rep.

Q. For which company?

A. Blue Cross/Blue Shield.

Q. How long have you had that job?

A. Just under two years.

6

Q. Do you have any children?

A. Yes.

Q. How many?

A. Four.

Q. And what are their names and ages?

A. I have Calin (phonetic), who is 21. Ashleigh, and that's spelled A-S-H-L-E-I-G-H, she is 20. And we have Andrew who is 12 and Matthew who is 8.

Q. What's your highest level of education?

A. One year of college.

Q. Where did you go to high school?

A. Boone County High School in Florence, Kentucky.

Q. Do you have any other education other than the graduation from high school and then one year of college?

A. No, just went to Northern Kentucky University for one year and then I had a few classes at Joliet Junior College.

Q. Have you ever been convicted of a felony or crime involving dishonesty?

A. No.

Q. Now my understanding is you did not work

7

outside the home on the day of this accident, is that true?

A. Correct.

Q. So you're not making a claim for lost wages, right?

A. Correct.

Q. So we're here to discuss an incident that happened on July 13th of 2014. Do you recall that date?

A. Yes.

Q. And what day of the week was that?

A. A Sunday.

Q. What was the weather like that day?

A. That, I don't recall. I know it was not raining. It may have been overcast, but definitely not raining.

Q. Sometime on that date you decided to go to Costco?

A. Yes.

Q. When did you decide to make a trip to Costco?

A. It was early afternoon around 3:00, 3:30 in the afternoon.

Q. Which Costco did you decide to visit?

8

A. Naperville, Route 59.

Q. Is that the closest Costco to your home?

A. It's one we would travel to most often.

Q. Did you have anything in mind in particular that you were going to get when you were there or just a general shopping trip?

A. It was a general shopping trip.

Q. Had you been to that Costco before?

A. Yes.

Q. How many times?

A. We've lived here for 10 years, we probably frequented it at least once every couple of months in the 10-year time.

Q. So in order to shop there you have to be a member of Costco, right?

A. Correct.

Q. How long have you been a Costco member?

A. With this Costco we had a card since September of 2006.

Q. When was the last time you had been in the Naperville Costco before the date of your accident?

A. That, I don't recall.

Q. So what time do you think you arrived at

9

the Naperville Costco on July 13 of 2014?

A. I would say around 3:00.

Q. And was anybody with you?

A. My husband, Michael.

Q. Anyone else with you at that time?

A. No.

Q. When you went to the Costco in Naperville on July 13 of 2014, what were you wearing?

A. I had a pair of capris, short-sleeved shirt and a pair of Croc sandals.

Q. Do you know what the sole of those sandals are made from?

A. The Croc material, it's a rubbery substance. Typical of what nurses would wear. I know they wear them for a long time.

Q. How long had you had those shoes before the date of the accident?

A. I don't recall when I purchased them. It was probably earlier that spring or summer.

Q. So earlier in the year in 2014?

A. Right.

Q. Do you still have those shoes?

A. I believe I do in my closet.

Q. How often would you wear them before the

10

day of the accident?

A. Quite often. They're very comfortable.

Q. Would you say it was an everyday -- did you wear them every day or just about every day?

A. Especially on weekends if we were going out casually and the weather was warm enough, if not, I would wear gym shoes.

Q. I don't have a pair of Crocs. Do you wear socks with those shoes?

A. No, they're sandals.

Q. So you just slip your feet in them and off you go?

A. Correct.

Q. When you got to the Naperville Costco, did you go get a cart?

A. Yes.

Q. Who got the cart, was it you or your husband?

A. I don't remember who pulled the cart. I know at one point I was pushing the cart.

Q. So at some point in time when you were in the store you were pushing the cart?

A. Yeah.

Q. And did you spend some time in the store

11

shopping before the accident happened?

A. Yes.

Q. How much time had you spent shopping?

A. We had probably been there for at least 20 minutes or so.

Q. So where did the accident happen?

A. It was in the cooler area where the milk and eggs were located.

Q. So in the milk and egg cooler itself?

A. Right.

Q. And that's a big room that basically has eggs and milk stacked in it and you walk in and get what you need and come out?

A. Correct, like a garage looking setting.

Q. How big would you think that that cooler is?

A. I don't -- I could not probably tell you for sure because it's been a while. I tried going back to that store at one point just to see and I, you know, from a distance, I don't know, maybe 20x20.

Q. So do you not frequent that store since the accident?

A. I have been in twice.

12

Q. Do you still shop at Costco?
A. I do.
Q. But you shop at a different store?
A. Yes.
Q. What store do you shop at now?
A. Bolingbrook.
Q. When do you think the last time it was that you were in the Naperville Costco?
A. My husband was looking for a pair of jeans about a month ago and they did not have them at the Bolingbrook location, so we did stop back over there to see if they had the jeans there.
Q. So in September, August, September --
A. August, September, yes.
Q. -- 2016?
A. Yes.
Q. So what time did your accident happen?
A. It was around 3:30.
Q. And where is the milk and egg cooler located in that store?
A. It's in the far left back corner kind of the store.
Q. So you have to, essentially, traverse the entire store in order to get back to the milk and

13

eggs?
A. Yeah, uh-huh.
Q. So tell me what happened when you entered the milk and egg cooler?
A. I was going in to get eggs and milk and the eggs were on the back wall and I was headed back that way and at that time is when I slipped as I was walking into the cooler area.
Q. Were you already in the cooler when you slipped?
A. Yes, I had already entered into the cooler area.
Q. How far into the cooler were you?
A. Between 5 and maybe 10 feet in. I'm not sure.
Q. Did you have your cart with you at the time?
A. No.
Q. Were you carrying anything in your hands?
A. No.
Q. What were you doing right before you fell, immediately before you fell, what were you doing?
A. I was just looking to go to the eggs

14

area.
Q. So eggs are on the back wall of the cooler?
A. Uh-huh.
Q. You were looking --
MR. KACZMAREK: Is that a yes?
THE WITNESS: Yes.
MR. NAHRSTADT: Thanks, Mike.
BY MR. NAHRSTADT:
Q. So you were looking straight ahead at the eggs as you walked into the cooler and right before you fell?
A. Yes.
Q. Where was your husband at the time that you fell?
A. We had left the cart outside of the cooler area and he was standing by the cart because my purse was there.
Q. So he did not come into the cooler with you?
A. At the time, no, not until after the fall.
Q. Did you ever make it to the eggs?
A. No.

15

Q. You fell before you got to the eggs?
A. Yes.
Q. Was anyone else in the milk and egg cooler at the time that you fell?
A. I don't recall any customers. There was a Costco representative that was giving samples outside of the cooler area.
Q. Let me ask you a little bit about that, Mrs. Mitts. You say there was a Costco representative. How do you know they were a Costco representative?
A. They were there giving samples out.
Q. So you were assuming that they were a Costco representative because they were giving out samples?
A. Correct.
Q. If I told you that the person that was giving out samples was not an employee of Costco, would you have any reason to dispute that?
A. No, because it could have been a contractor as well.
Q. What was she giving out, do you remember?
A. I believe it was some sort of animal treat, dog treat.

16

Q. Did you -- strike that.

Was the person who was giving out the samples a man or a woman?

A. A female.

Q. And would you be able to tell what her age was?

A. I would have said she's probably early 50s.

Q. Did you talk to her at all before you went in the cooler?

A. Not before.

Q. Other than the individual who was giving out samples, was there anyone else around the cooler when you went in?

A. Where the cooler is located there are other aisles as well and there were customers in that area. I don't recall any customers being in the cooler area with me at the time.

Q. How far away from the entrance to the milk and egg cooler was the woman who was giving out the samples?

A. She was on the outside, the furthest away from where the, I guess, the cooler area was. So not as soon as you're approaching it, but the

17

other end of it, the other side of it, the entrance.

Q. So as you come up to the milk cooler, there's an opening to get into it, right?

A. Correct.

Q. And she was not before you got to the opening, but past the opening?

A. Correct.

Q. And how far would you say she was past the opening?

A. She was right outside of where that area was.

Q. So right outside the door or the --

A. Within a few feet, yes.

Q. You gotta make sure that you let me finish before you start, okay, so that the court reporter doesn't hate both of us by the time this is over.

A. Sure.

Q. So she was just beyond the opening into the milk cooler?

A. Yes, within a few feet.

Q. Towards the back of the store?

A. Yes.

18

Q. Did anyone see you fall?

A. I don't know that anyone -- other than my husband, he did see me fall. That wasn't something we were asking people at the time of the injury.

Q. Understand.

So as far as you know, the only person who saw you fall was your husband?

A. Correct.

Q. What caused you to fall in the milk and egg cooler?

A. I slipped on a liquid substance that was on the floor.

Q. Do you know what that substance was?

A. I don't. It was sticky and tacky. When I was -- after I had fallen, my leg was sticky and tacky kind of feeling.

Q. So your leg itself was sticky and tacky?

A. Was wet from the substance that appeared to be like -- and when I say sticky, I'm not talking glue sticky, I'm talking a substance like milk if it's not going to be as -- it's not going to be like water, I don't believe. I mean, I believe that milk would be a stickier substance

19

due to the sugar content and there was a tackiness to it.

Q. But you don't know what the substance actually was?

A. That's correct.

Q. And when you say that your leg was sticky, was it your leg itself or was it your pants?

A. Well, I had capris on, so my -- you know, it only went to about the knee area. The left calf, which is the side that I landed on, that side of my calf was wet.

Q. Do you know where the substance that you slipped on came from?

A. I don't.

Q. Do you know how long that substance had been on the floor prior to the time you fell?

A. I don't.

Q. How large was the area that was covered by the substance you fell in?

A. I can't say how big the substance on the floor was.

I can tell you that once I had fallen, the area that was wet on my calf was the length of

20

my calf.

Q. So, essentially, from the knee down to the ankle?

A. Right, general, that area.

Q. Mrs. Mitts, was it the whole calf or just a part of your calf that was wet?

A. The outside of the calf.

Q. Did you see the substance that you slipped on before you fell?

A. No.

Q. Did any representative of Costco know of the existence of the substance at any time before you fell?

A. I don't know.

MR. KACZMAREK: Objection, calls for speculation.

BY MR. NAHRSTADT:

Q. If you know. Strike that. Let me rephrase it.

Do you know if anyone from Costco knew of the existence of the substance on the floor of the milk and egg cooler before you fell?

A. I could not say that they did.

Q. Do you know if anyone complained to

21

Costco about the substance on the floor of the milk and egg cooler before you fell?

A. I do not know that.

Q. So describe for me, if you will, how you fell?

A. I was walking into the cooler to approach the egg area. My foot hit the liquid substance and I felt my foot slide out from underneath me. I felt my body twisting trying to catch my balance and I came down landing on my left hand or arm. And at the time that I tried to catch it, I felt a snap in my arm. When I came to rest on the floor, I was on my left side or to the back.

Q. So which foot slid out from underneath you?

A. I believe it was the right, but again, that's the foot that was bruised from the impact of the floor, but I could not say that it may have been -- you know, again, it was very quick when it happened. And I just recall trying to catch myself and my body twisting. So I was entering facing the eggs, but when I ended up falling and being on my back, I'm now facing almost back out of the cooler area.

22

Q. So when you came to rest, you came to rest on your back?

A. On the left side of my back, yes.

Q. On the left side facing towards the outside of the cooler?

A. Correct, yeah, it was a twist.

Q. So when you twisted and fell, you essentially fell backwards?

A. I was falling forward and sideways, so again where I caught myself I ended up sliding.

Q. And as soon as you went down and tried to break your fall with your left arm, that's when you felt the snap?

A. Correct.

Q. And how long were you on the floor?

A. I don't recall.

Q. Once you slipped and fell and wound up on the floor, did your husband come into the cooler at that point?

A. Yes.

Q. And did you say anything as you were falling?

A. I don't recall.

Q. So after you fell and you were on the

23

floor, tell me what your husband did?

A. He was asking the lady who was giving the samples out to call for help. He asked me if I was okay and was trying to help me get up. At that point I was crying because I had felt the snap and I felt the pain.

Q. Did he help you get up from the floor?

A. Yes.

Q. When he asked the lady who was handing out samples to get some help, what did she do?

A. She said she would call for help and she had also walked in that area to -- the area that I was in as well.

Q. So she came into the milk cooler?

A. Yes.

Q. Did she offer any assistance?

A. She actually was helping me. She said to sit down, there was Silk milk on the right-hand side and so we were waiting. While we were waiting for someone to come she had asked me to sit down on the boxed area where the Silk milk was. I sat down briefly, but the area was kind of starting to kind of collapse because, again, it's boxes, so I stood back up at that point.

24

Q. And did she do anything else?

A. I don't recall. I know my husband was asking for ice because the arm was starting to swell.

Q. Did she bring ice?

A. She did not.

Q. Did she say anything to you when she came in, other than to sit down on the Silk milk?

A. I don't recall her saying anything.

Q. Did you say anything to her?

A. No, at that point, no.

Q. Did you say anything to the woman who was passing out the samples at any time about what happened?

A. No, I did not. Or I should say I don't recall saying anything at that moment.

Q. Did you see any Costco employees in the milk and egg cooler prior to your fall?

A. Prior, no.

Q. How far away would you say your husband was when you fell?

A. We had parked the cart right outside of the cooler area, so again, I had entered in a few feet. I would say he was within probably 10 feet

25

of where I was, approximately.

Q. Did any Costco employees come to the milk and egg cooler after you fell?

A. There was a female, I believe she was a manager, assistant manager, someone who was of authority at some point had come.

Q. Do you know when that was?

A. I don't.

Q. Were you still in the milk and egg cooler when the female manager arrived?

A. I don't recall if we had stepped outside of the area or if we were still in that general cooler area.

Q. You do remember at some point in time you stepped out of the milk and egg cooler?

A. Yes, we were headed out of the store, the female representative, manager, she was saying that we needed to go to her office to take pictures and take a report.

And at this point I'm crying and I'm telling her that my arm is broken, I felt it snap. My husband was still asking for ice. And at some point two other Costco employees came with ice packs, the breakable instant cold packs and they

26

did not know how to open them and they were asking her. She told them to throw them on the floor.

And so she threw them and the two ice packs went flying across the floor in front of other customers that were walking and my husband told her, you know -- at one point we got one of the packages to break open and I did have that pack on my arm when we left.

She wanted us to go to her office and my husband said, no, we're going to take her to the emergency room because at this point I was crying uncontrollably in the pain. He said that we would come back and fill out any paperwork that they needed to us fill out at that point.

Q. Do you know the name of the female manager?

A. I don't. And she did not sign the incident report.

Q. Do you know the name of the other two employees that came with the ice packs?

A. I don't. They were younger.

Q. Had you seen the female manager before she came to the scene of your fall?

A. No.

27

Q. How about the other two employees, had you ever had any contact with them before?

A. No.

Q. When the female manager got there, were you still in or around the milk and egg cooler?

A. I believe I was still in that area. I'm not sure if it was inside or outside that area.

Q. Do you know how long after you fell she arrived?

A. I don't recall the time.

Q. How long was it between the time that you fell and the time that you and your husband left the store?

A. I'm going to say within probably -- within 10 minutes probably. I know we checked in at the hospital at like 3:58.

Q. When the female manager from Costco came to you, what did you say to her?

A. I believe I told her that my arm -- I felt my arm had been broken and that I was in pain.

Q. Did you say anything else to her?

A. No, she was wanting us, again, to go into her office to fill out paperwork and for her to

28

take pictures and my husband was insistent at that time because of my injury that I be seen by someone and be treated.

Q. And what did she say to you?

A. I don't recall what she said to me other than she was making generalized comments to us that this paperwork needs to be filled out.

Q. So you don't remember her saying something anything other than you need to go to the office, we need to take picture, we need to fill out a report?

A. I don't recall.

Q. Did you say anything to her about what caused you to fall?

A. I don't. I know that -- I don't know if it was myself or my husband. I know that the lady giving the samples out observed the wet area on the floor as well, so I'm not sure who it was that told her of the substance on the floor.

Q. You don't know who told the woman who was giving out the samples about the substance on the floor?

A. No, the manager. The woman who was giving the samples came into the cooler and she

29

observed the area of wetness.

Q. Do you know how she observed that; did someone point it out to her, did she see it, do you know?

A. I don't know. I know I was saying that my leg was wet.

Q. Did she say anything to you, the woman who was giving out the samples, did she say anything to you about what she saw on the floor?

A. No.

Q. How do you know that she saw something on the floor?

A. Because at one point she saw that, you know, my husband -- I believe it was my husband, was pointing out the fact -- or I was saying -- I don't remember if it was myself, but I know that I was saying my leg was wet and there was a wet spot on the floor. Or a smear.

Q. At any time after your fall, did you see anyone from Costco cleaning up what was on the floor?

A. No.

Q. Did you see anyone with a bucket or a mop or paper towels come into the milk cooler to clean

30

up the floor?

A. No.

Q. At the time that you fell, did you have a cell phone?

A. I had a cell phone, yes.

Q. Did you have it with you?

A. It would have been in my purse.

Q. Did you take a picture of the area where you fell?

A. At the time we did not.

Q. Did your husband have a cell phone?

A. He did.

Q. Was it with him?

A. Yes.

Q. And he didn't take a picture?

A. Not at the time of the accident.

Q. Did he take a picture later?

A. Yes.

Q. When was -- strike that.

When did your husband take a picture of the -- was it of the milk cooler?

A. Yes.

Q. When did he do that?

A. When we -- we told them that we were

31

going to the emergency room to be treated.

When we left the emergency room, we came back to Costco to fill out the accident report as we told them we would. And my husband went back in the milk area and there was a new spill on the other side of the cooler area that was milk. It was white. It was milk.

So in the time that I had fallen and the time that we had left and came back there was another spill on the other side of the cooler area with milk. And no, when I walked in there were no wet floor or caution signs.

Q. When you say when you walked in, when you walked in to the cooler right before you fell?

A. In that general area, yes.

Q. There were no caution signs or wet floor signs?

A. Correct.

Q. When you went back to Costco and your husband took the picture, it was -- the spill that he saw was on the opposite side of the cooler from where you fell, is that right?

A. Right.

Q. It looked like there was some milk on the

32

floor?

A. Correct.

Q. Do you know how long the milk that was on the floor when your husband took the picture had been there?

A. I don't.

Q. Do you know if anyone at Costco knew that the milk was on the floor before your husband took the picture?

A. I could not say if they did or not. I know he brought it to their attention when he talked with the manager to fill out the paperwork. He advised her that he had just went back there to the cooler area and there was a new spill on the floor. And she said, oh, okay. And I guess she was going to send someone back to clean that up.

Q. Do you know if she sent someone to clean it up?

A. I don't know. I stayed in the car after we left the emergency room. I did not come back in with him. And she actually came out to the car to have me sign my accident report.

Q. So when you came back, you stayed in the car, your husband went into the store?

33

A. Correct, uh-huh.

Q. When you got up from the floor after the accident, were your clothes wet at all?

A. Again, I had capris on, so the area that I felt was wet was the lower left calf. There could have been some on the pant, I don't know. I don't recall that, but the leg was wet.

Q. And how long did it take for your leg to dry out?

A. I could not tell you exactly because that wasn't something that I was observing. I was more concerned with my arm at the time.

Q. Did you use anything to wipe off your leg after the fall?

A. I don't recall using anything.

Q. I think you said that when you got up from the floor you felt pain in your arm?

A. Yes.

Q. Tell me, which arm was that?

A. Left.

Q. And where was the pain located?

A. It was in the center of the arm.

Q. So when you say center of the arm, let's see if we can describe that; between the elbow and

34

the wrist?

A. Between the elbow and wrist, yes.

Q. On the left?

A. Yes.

Q. How would you describe the pain?

A. I felt snapping and I felt very strong pain to the point that I was crying in pain.

Q. If you rated it on a scale of 1 to 10, what would you rate it as?

A. Probably at that moment a 9.

Q. When you got up from the floor after the fall, were you experiencing pain anywhere other than in your left arm?

A. My right foot and ankle.

Q. How would you describe that pain for me?

A. Again, feeling like a sprain or swelling, tenderness. I know I felt like I was having trouble walking, kind of like if you turned your ankle, there was a little bit of a discomfort there with walking.

Q. Did you think you twisted your right foot and ankle in the fall?

A. I assumed that I did. I know that the right ankle and foot area was bruised.

35

Q. Was it bruised when you got up from the floor?

A. It was not bruising like it did later, no. But by the time I got to the emergency room they could see swelling and bruising.

Q. How would you rate the pain in your right foot and ankle at that time when you got up from the floor?

A. That was maybe more of a 5 or 6.

Q. How would you describe the lighting in the milk and egg cooler?

A. It was warehouse lighting. It wasn't dim.

Q. Do you know what kind of lighting it was?

A. I don't.

Q. What's the floor of the milk and cooler made out of?

A. It's a concrete with a clear coating or a epoxy type sealant on it.

Q. Had you slipped and fallen in that Costco store at any time prior to July 13 of 2014?

A. No.

Q. Had you ever had any problems with the floors in that store before the date of your

36

accident?

A. No.

Q. At any time after your accident, did you smell the substance that you slipped in?

A. No.

Q. Did you taste the substance that you slipped in?

A. No.

Q. You have no idea what it was?

A. I don't. I could speculate what I believe it is, but to say for sure, no.

(Whereupon, R. MITTS Deposition Exhibit No. 1 was marked for identification.)

BY MR. NAHRSTADT:

Q. This is what I marked as Exhibit 1. Take a look at that. Let me know when you've had a chance to look at it, okay?

A. Okay.

Q. Can you tell me what's depicted in that photograph?

A. There's the Silk milk I described on the right, the egg area in the back and the milk on the left.

37

Q. So the milk and egg cooler in the Naperville store?

A. Yes.

Q. I'm not going to get close, I don't want to hover over you.

Can you point out in that picture where you fell?

A. Sure. I was generally in this area here.

Q. So it looks like on the right-hand side past this garbage can, is that the Silk milk?

A. Yes.

Q. So you were kind of across from the Silk milk?

A. In that general area, yes.

Q. Basically in line with the first pallet of eggs that's on the right?

A. Correct.

Q. And again, it's probably about what, 10, 15 feet into the cooler?

A. Yeah, I mean, again, without seeing this on scale, I'm not sure.

Q. So you would say that it was -- your fall took place on the right side of the cooler as opposed to the left side?

38

A. Yes.

Q. And then when your husband went back and took the picture of the milk that was on the floor after your accident, that was on the left side of the milk cooler?

A. In fact, there's something white here, so that could be the same spill, who knows.

Q. Do you know when this picture was taken?

A. I don't.

Q. Do you know what that white is?

A. No, but I would assume next to milk, it would be milk.

Q. But you're just guessing that's that milk, right?

A. I am guessing, yes.

Q. Hold onto that. I think I'm done. Let me just check.

I think I might have asked you this Mrs. Mitts, if I did, forgive me. After you fell and you were talking to the Costco employees, about how long did that take, how long were you taking to the Costco employees?

A. After the accident before we left?

Q. Yes.

39

A. Again, like I said, we may have been in there -- I don't recall time because at that moment the pain I think -- I was letting my husband handle a lot of it. Maybe 10 minutes.

Q. What did you do with what you had in the cart at the time of the fall?

A. They were nice enough to hold those groceries for us to come back for.

Q. Set them aside and come back after you went and got medical treatment?

A. Yes.

Q. After you finished talking to the Costco employees, what did you do?

A. We left and went to the Edward Naperville ER.

Q. Did you say anything to anyone employed by Costco about the fall between the time that you fell and the time that you left the store?

A. I'm sorry, can you elaborate what you mean by talking to them?

Q. Sure. I think you said that when you spoke to the female manager you told her that your arm hurt, you heard it snap and your arm hurt and you wanted to go get medical treatment?

40

A. Yes.

Q. You said that she was kind of insistent that you go to the office, have some pictures taken and fill out a report?

A. Yes.

Q. Did you talk to anyone else associated with Costco about your fall?

A. I, myself, did not.

Q. Did you hear your husband talk to anyone else associated with Costco about your fall?

A. I know, again, the sample lady, there was conversation there. There were a couple other people that were walking around bringing the ice packs, I'm not sure what conversation took place.

Again, at this point I've got people looking at me because I'm crying and we're walking down the main aisle to go back out. And I was in pain, so I was not listening as much to the conversation around me as I was focused on let's -- I need to get medical treatment.

Q. And that's what you were saying; I'm hurt, I need to get medical care, I want to go?

A. Yes.

Q. So I'm assuming that your husband went

41

with you to Edward Hospital?

A. Yes.

Q. How long were you there?

A. I don't remember the time how long, I would say with an ER visit you're usually there for an hour or two with X-rays and anything, so probably about that time. I don't recall what time we came back to Costco. I know it was before they would have closed.

Q. Do you know when you left Costco?

A. 3:45. I don't know exactly. It would have been between probably 3:30 and 4:00 because I checked in at the ER at 3:58, according to their records.

Q. What time does Costco close?

A. I believe 6:00, but I don't recall, you know, at that time if there were different hours.

Q. But you definitely made it back --

A. Yes.

Q. -- to Costco on Sunday night before they closed?

A. Yes.

Q. And who did you see at the ER at Edward Hospital?

42

A. His name was Dr. Murphy -- no, I'm sorry. The was the doctor -- I don't recall his name. I would have to look and see what name it was again.

Q. Dr. Schubel?

A. Scubel, thank you.

Q. Peter Schubel?

A. Yes. Murphy was the doctor that did the surgery.

Q. And did they perform any tests on you at the ER?

A. They took some X-rays.

Q. And what did the X-rays show, do you know?

A. That there was a break in the radius.

Q. On the left side?

A. And they also did X-rays of the right foot and ankle.

Q. What did the X-rays of the foot and ankle show?

A. There was no breaks in that area.

Q. Did they give you any medication at the ER?

A. They did give us a prescription.

Q. What was that for?

43

A. Pain.

Q. Do you know what type of medicine it was?

A. I have the -- it was hydrocodone.

Q. Did you start taking that immediately?

A. I do believe they gave it to me in the emergency room. Or they gave me something in the emergency room, I'm not sure exactly what they would have given to me, but I took this home with me to be used as needed.

Q. Did you need to use the hydrocodone?

A. I believe I may have used a few for the first day.

Q. So when you were at Edward Hospital, where were you experiencing pain?

A. Where was I experiencing pain?

Q. Uh-huh.

A. On the left arm and right foot and ankle area.

Q. And the left arm, again, was between the elbow and the wrist?

A. Yes.

Q. Were you experiencing pain anywhere other than your left arm and your right foot and ankle?

A. I don't recall.

44

Q. Did she give you a diagnosis when you were at Edward Hospital?

A. Yes.

Q. What was that diagnosis?

A. The medical terminology I cannot tell you, but basically a break of the left radius.

Q. Did they give you a diagnosis of your right foot and ankle?

A. I believe he was just calling it a sprain. I don't know what they listed it as from a medical standpoint.

Q. And then after you left the emergency room you went back to Costco?

A. Yes.

Q. And it was you and your husband who went back?

A. Yes.

Q. When you went back, you stayed in the car?

A. Yes.

Q. Your husband went inside?

A. To fill out the paperwork.

45

(Whereupon, R. MITTS Deposition Exhibit No. 2 was marked for identification.)

BY MR. NAHRSTADT:

Q. Let me show you what we've marked as Exhibit 2 for identification. Take a look at that and let me know when you've had a chance to look at that, okay?

A. Uh-huh. Okay.

Q. Do you recognize that document?

A. Yes.

Q. Can you tell me what that is?

A. That is the accident report. My husband filled out the information and I signed it when they brought it out to the car to me. I did not fill out this form.

Q. So when you went back to Costco after visiting the emergency room, you didn't speak to anyone about what had happened?

A. No.

Q. Your husband went in, filled out the form that we've marked as Exhibit 2, and then they brought it out to the car and you signed it?

A. For me to read and sign.

46

Q. So you read it before you signed it?

A. Yes.

Q. Is there anything on the form that we've marked as Exhibit 2, other than your signature that's in your handwriting?

A. No.

Q. And you can recognize your husband's handwriting, I take it?

A. Yes.

Q. It's his handwriting, he filled out the report?

A. Yes.

Q. Have you spoken with anyone employed by Costco about the accident since July 13 of 2014?

A. I have not.

Q. Have you spoken with anyone other than your treating physicians or your husband about the accident since July 13 of 2014?

A. I believe, you know, my family. Obviously, my children, my dad is aware. We avoided conversation with people. I mean, people would ask what had happened and I would tell them that I fell. I would not go into details with them because we knew that this was something -- we

47

were waiting for Costco to call us and talk to us about the incident and that didn't happen.

I believe the manager may have tried calling that night and was advising us, again, that we should hear from someone from their insurance department or the corporate office at some point and no one ever called after that.

(Whereupon, R. MITTS Deposition Exhibit No. 3 was marked for identification.)

BY MR. NAHRSTADT:

Q. I'm going to show you what we marked as Exhibit 3 for identification. Tell me if you recognize that document.

A. That is a picture that my husband took.

Q. That's a picture of the milk and egg cooler at the Naperville Costco?

A. Yes.

Q. Do you know when that was taken?

A. It was taken when we came back, when he went to go to complete the paperwork with the manager.

Q. So the evening of July 13 of 2014?

A. Yes.

48

Pages 45 to 48

Q. And that is the photograph of what appears to be a white substance on the floor of the milk and egg cooler over towards the left side?

A. The left side, yes.

Q. That was not a picture that was taken at the time you fell, right?

A. Correct.

Q. That does not depict what was there at the time you fell?

A. Correct.

(Whereupon, R. MITTS Deposition Exhibit No. 4 was marked for identification.)

BY MR. NAHRSTADT:

Q. Let me show you what we've marked as Exhibit 4 for identification. Tell me if you recognize that document.

A. Yes.

Q. Can you tell me what that is?

A. That is me after surgery and being admitted after the surgery in the hospital.

Q. When was that taken?

A. This was taken -- I don't know if it was

49

the night of -- after my surgery, the 17th, or if it was on the 18th of July, 2014.

Q. And who took the picture?

A. My husband.

(Whereupon, R. MITTS Deposition Exhibit No. 5 was marked for identification.)

BY MR. NAHRSTADT:

Q. Let's show you what we marked as Exhibit 5 for identification. Tell me after you've had a chance to look at that.

A. Yes.

Q. Can you tell me what that is?

A. That is me in the emergency room when -- I don't believe that the doctor at this point had come in yet because I'm sitting in the chairs, not necessarily on the bed of the emergency room.

Q. And what -- that was taken on July 13 of 2014?

A. Yes.

Q. And who took that picture?

A. My husband.

Q. Basically, it's a picture of your left arm in your lap?

50

A. Yes, holding it.

(Whereupon, R. MITTS Deposition Exhibit No. 6 was marked for identification.)

BY MR. NAHRSTADT:

Q. Let me show you what we've marked as Exhibit 6 for identification. Tell me when you've had a chance to look at that.

A. Yes.

Q. Can you tell me what that is?

A. That is my right foot bruising.

Q. When was that photo taken?

A. I'm not sure of the exact date. We can check the date and time stamp on his phone, but this is a picture that would have been taken at my home showing where the bruising is getting worse.

Q. Was this the day of the accident or do you think it was taken after the accident?

A. I'm not sure if it was the night of the accident or if it was maybe the next morning or next day.

Q. And that was taken by your husband?

A. I believe so.

51

(Whereupon, R. MITTS Deposition Exhibit No. 7 was marked for identification.)

BY MR. NAHRSTADT:

Q. Show you what we've marked as Exhibit 7 for identification, Mrs. Mitts. Let me know when you've had a chance to look at it.

A. Yes.

Q. Can you tell me what that is?

A. Again, that's my right foot bruising.

Q. When was that picture taken?

A. The date I would have to, again, look on my phone. I believe this is one that I took on my phone, but within either the day after the accident or -- I don't know if it was the night of, but at least maybe the day after, I'm not sure.

Q. Fair to say --

A. Within a couple of days of the accident.

Q. Both Exhibit 6 and Exhibit 7 --

A. Yes.

Q. -- were taken within a couple days of the accident?

A. Yes.

52

Q. How long did it take for the bruising that's depicted in Exhibit 6 and Exhibit 7 to go away?

A. I don't recall the exact amount of time, but probably within a week, week and a half it was slowly starting to fade.

Q. And how long did you have pain in your right foot and ankle?

A. I know because of the sprain or the feeling of a sprain, I was limping for a few days until it felt like the area started to heal or the swelling started going down.

Q. And how long would you say it took before it -- the swelling and the pain completely went away?

A. It was probably at least a week, week and a half.

Q. After that week or week and a half when the swelling subsided and the pain went away, did you have any other issue with your right foot or ankle?

A. No.

53

(Whereupon, R. MITTS Deposition Exhibit No. 8 was marked for identification.)

BY MR. NAHRSTADT:

Q. Let me show you what we marked as Defendant's Exhibit 8 for identification. Take a couple minutes and look at that, right, when you've had a chance to look at it, let me know.

A. Okay.

Q. I'm going to ask you specifically about your answers to interrogatories, numbers 17 and 18.

A. Okay.

Q. Just kind of use that as a roadmap for us to talk about your medical care and treatment.

A. Sure.

Q. So it says in Interrogatory 17 that you suffered a fractured left arm and twisted right foot as a result of the accident, right?

A. Yes.

Q. What kind of treatment did you get for the right foot injury?

A. I didn't seek any treatment.

Q. And they didn't give you a boot or wrap

54

it or do anything for you?

A. They had told me that I could wrap it with, like, an Ace bandage just to give it some support.

Q. Did you wind up doing that?

A. I did.

Q. How long did you wear the Ace bandage for?

A. For a few days trying to keep the swelling down.

Q. Did they give you any crutches or any other assistive device?

A. No.

Q. It looks like -- strike that.

I think you told me that on the -- at the time of the incident you would rate the pain in your right foot and ankle as a 5 or a 6 out of 10, is that right?

A. Yeah.

Q. And on the day of the accident when you were discharged from the ER, how would you rate the pain in your foot and ankle?

A. It was still the same leaving the ER, I mean, yeah, like I said, I know there was a limp

55

because of when you've twisted an ankle, if you've ever done that, you know that it's difficult to walk on, so...

Q. And did the medication that they gave you help at all with the pain in your foot and ankle?

A. I think it helped a little, but I tried to stay off of it mainly more than anything, too.

Q. How long would you say that you were off the foot and ankle?

A. Again, you know, it took about a week for it to heal. Thankfully, I had older children who were able to help, so I did keep my arm up because, again, the arm was not completely stable.

They did a soft cast, so I didn't want to do too much that would cause more injury to that. And then also to try to keep some of the swelling down off of the foot.

Q. So when you left the emergency room on the day of the incident, your left arm was in a soft cast?

A. Correct.

Q. And the plan was at some point in time for you to have surgery on your arm?

56



A. I was told to go and consult with the orthopaedic surgeon in order for them to -- the ER doctor had told me that he believed, obviously, we are going to need surgery because of the type of fracture, but I was to go and follow up with the orthopaedic department for them to schedule and to, I guess, make their final decision on what that treatment course would be.

Q. So how long did you wear the soft cast for?

A. Until we could get in to see the orthopaedic doctor and I believe it was a few days before we were able to see him. I don't recall the exact date that we had seen him. I know that we did surgery on July 17th, so he would have been seen, obviously, before then.

Q. And July 17, 2014, that's the day you had surgery on your arm?

A. Correct.

Q. Did Dr. Murphy perform that surgery?

A. Yes.

Q. Where was that done?

A. It was, I believe, we did it at Edward. I'm sorry. I'm pretty sure it was Edward.

57

Q. I'm pretty sure it was, too.

A. Yeah.

Q. Do you know the type of surgery that he performed?

A. There was a long name to it. Basically they were removing the splintering and then lining the bone back up and placing a plate with six screws.

Q. So you have a plate and six screws in your arm?

A. Yes.

Q. Still there?

A. Yes.

Q. Are there any plans to have it removed?

A. At this point, no. The doctor had mentioned that some people have trouble with it. I haven't experienced anything that I feel that I want to go back through surgery for to remove it. So I would rather -- unless something in the future happens, but right now there's no plans to remove it.

Q. At the time you left the ER on the day of the accident, how would you describe the pain in your left arm?

58

A. I was still -- I mean, they had given me something to help with the pain, so it was much better than when we were leaving Costco. I would still say it was probably in the 6 or 7 range at that time.

Q. So 6 to 7 out of 10?

A. Yeah.

Q. And between the time of the accident -- strike that.

Between the time that you left the emergency room and the sometime that you went in for surgery on July 17, how would you describe the pain in your left arm?

A. It was manageable, you know. My fear was them waiting too long and the bone naturally trying to heal and causing more problems. They did try to get me, obviously, in pretty quickly to try to take care of that.

Q. It looks like four days, right, four days after the accident?

A. Yeah, it was the 17th, which was my husband and I, our anniversary.

Q. Not the way you would expected to be spending your anniversary, right?

59

A. No, unfortunately.

Q. Between the time that you were discharged from the ER and time of the surgery that the pain was manageable, did you manage it by using the hydrocodone that they gave you?

A. I believe I went to ibuprofen -- actually, no, I'm sorry, I wasn't allowed to use ibuprofen. I normally would use ibuprofen. It was probably just Tylenol.

I don't like to take, especially narcotic type drugs because I don't like the way they make me feel, so I may have used that just a couple of times, but then I went to just taking over-the-counter type medication to manage. And ice.

Q. How would you describe the pain? Was it a constant pain, was it a sharp pain, an ache, a dull throb, how would you -- you experienced it, so I have to rely on you to tell me what it was like.

A. Sure. There was constant dull aching. Like I said, it was uncomfortable because, again, the soft cast is not a complete cast that would hold your arm in place. It's, again, just kind of

60



a partial piece and then they wrap it with, like, an Ace bandage type material. And I knew that it wasn't stable. So, again, try to be very comfortable -- or very careful with it and not make it too uncomfortable. But again, because of it not being stable there would be times if you twist it a certain way you would get more pain because the bone was not in place.

Q. And after you had the surgery, did you wear a cast after the surgery?

A. They never put me in a hard cast. I was in, like, a brace type contraption.

Q. So something different than the soft cast?

A. The first couple days they kept it wrapped up kind of like the soft cast, too. When I went back in to see him is when they gave me with something more removable and things like that, so I could start physical therapy.

Q. How long did you wear that removable cast?

A. It was during the whole time of my physical therapy, so probably for two months. At this time I actually started a job in August at a

61

bank as a teller. So I did wear the brace often there because of needing the extra support.

Q. Is that Heartland Bank & Trust?

A. Yes.

Q. When did you start there?

A. I don't know the exact date. It was early August, August 10, somewhere around there. I would have to look at my resume to know exactly which date it was.

Q. Was this a job you had lined up before the accident happened?

A. No. It was one that I had an interview scheduled for to go in and talk with them for the job. But at the time I was not given the job.

Q. So you had already had the interview before the accident?

A. Right. They were making interviews, so I had done, like, a phone interview and we were going to go into for the actual, you know, you start with their corporate HR kind of people and then they slowly bring you in to talk with you one-on-one.

Q. So did you have a personal interview with the bank before the accident?



62

A. No.

Q. Was that after the accident?

A. Yes.

Q. So you went to see them in a cast?

A. Yes, I did. I did. A little concerned because as a teller you are required to use both arms, but the manager was very accommodating. Even with scheduling to make sure that I had time off to go to physical therapy and everything.

Q. When do you think that interview was, when do you think you went to see them for your last interview?

A. It was early August because I was offered the job pretty quickly after that last interview.

Q. And when you were at the bank then doing normal teller duties, cashing checks, giving people money, those were your duties?

A. Yes.

Q. Did you have any difficulty doing that?

A. You know, again, just mobility. There was the tightness, there was things that the physical therapy was working on trying to gain strength back, those kind of things.

People asking, you know, what happened

63

because again, at that time the scars were so very fresh.

So, again, something that I tried to conceal as best I could with longer sleeves and things like that because I didn't want to talk about it too much. But at one point I would have the brace on, too.

Q. When you had the brace on, would that cover the scar?

A. Yes. Yeah, because it was -- it would go up to -- not up to the elbow, but, you know, right at the elbow. It was longer.

Q. Do you still have a scar today?

A. Yes.

Q. Can I take a look?

A. Sure.

Q. So it looks like on the top part of your left arm it starts just a little bit below the elbow and goes to about what, 2 inches above the wrist would you say? So how long would you say that is, 5 inches maybe, 4 inches?

A. 4 to 5 inches.

Q. Does it bother you?

A. With the way that they had to move the

64

muscle, you're welcome to feel if you like, the muscle is missing kind of in this area a little bit. So the muscle is here, so you see the bulging. I do have problems where, like, if I'm pulling this, I can feel tightness in here. If I'm lifting anything of any substantial weight, I do feel pressure and pain in that area.

And then also there's times when, like, driving when -- you've got this area because I guess the way the bones kind of -- the radius and the ulna kind of fit together, it does feel like at times there's something there keeping it from moving the way it needs to, almost like it needs to pop, like, between the elbow and the wrist.

Q. So that's more of a sensation as opposed to pain?

A. No, I mean, it feels like it needs to pop. Like put back in place. It feels like it's out of place.

Q. And the muscle you were talking about is on the -- seems to be popping a little bit or out a little bit, bulging a little bit towards the hand?

A. Correct.

65

Q. And it's missing, it's a little concave --

A. Exactly.

Q. -- in the middle of where the scar is?

A. Right. And you can press down, you can feel down where there's not that tissue or that muscle like you do in other areas.

Q. So sometimes you have pain when you're picking up something that's heavy. You have pain sometimes when you're driving. Is there anything else that causes it to bother you?

A. There's a little bit of numbness still but, again, it could be from where they had to cut through nerve endings and things like that. But there's no sensation in that area. It's kind of numb.

Q. So the area you're describing then is the bottom part of the scar closer towards your hand?

A. Correct.

Q. And does it cause you -- does the scar cause you any embarrassment it?

A. It does, actually, because I have a lot of people ask what happened. And I've worked with the department I'm in now and people, you know --

66

I've had people actually touch it, which is very uncomfortable because, again, I know they're trying to be, you know, oh, what happened, but it's kind of -- it's bringing attention to it so yes, it bothers me.

Q. When you say it's uncomfortable when people touch it, it's uncomfortable that they're getting in your physical space as opposed to it's physically uncomfortable?

A. Because I know that they notice it. And I've had people talk to me and you're kind of drawn away, especially if you're using your hands at all, it's something that they notice.

Q. Is there anything that you do in particular to try and alleviate people looking at the scar?

A. There's times where I'll hold my arm or cover it or -- summertime is bad because you can't wear long sleeves as much. But in the winter I love it because I can hide it and it's something that, you know, again, this looks really good compared to the way it did because, of course, with the freckling and things. It is a little more concealed than it was, so it's not as

67

embarrassing as it was at one point.

Q. Did you do anything, I mean, did you use Mederma or some type of scar reducing lotion?

A. There was some sort of cream or, like, even, I don't remember the name of it. It was like a sticky, almost like a second skin kind of thing that you could put on it and it would -- you put it on at night and the moisture was supposed to help with healing or something like that.

It's something they gave me a piece at the physical therapy area and then I ended up buying one. I don't remember, like, New Skin or something like that. But it was a clear, flimsy, rubbery bandage that you would put over to help with scars.

Q. Is there any -- do you have any plans to have any revisionist surgery or have anything done to the scar?

A. No.

Q. You were hospitalized after the surgery on your arm?

A. Yes.

Q. How long were you hospitalized?

A. I believe we were released the next day.

68

Pages 65 to 68

Q. And that was at Edward Hospital?

A. Correct.

Q. I want to make sure I got this right, Rhonda.

So between the date of the accident and the date of surgery, you think you might have taken a couple of the narcotic pills they gave you, but for the most part you were just taking Tylenol --

A. Over the counter.

Q. -- to deal with the pain?

A. Correct.

Q. And when you left the hospital, when you left Edward Hospital following the surgery, were you in any pain at that time?

A. I don't recall being in pain. I know that, of course, you've got just the healing requirements and, again, they did a nerve block. So for the first couple of days I don't think I felt anything. Not even sensation, you know, when you were touching your hand or anything. So it did take a good 24 hours or so for at least the block to wear off.

Q. And after that first day or so after the

69

block wore off, were you experiencing any pain?

A. If I did, again, it was something I would have just taken over-the-counter medication for. I don't recall taking a lot of medication for the pain.

Q. The answers to interrogatories that we've marked as, I believe, Exhibit 8 indicate that you saw a Dr. Irina Domjan on July 17 of 2014. Do you know what you saw Dr. Domjan for?

A. She was probably -- I'm assuming that she may have been one of the internists at the hospital that come in to see patients. I'm not sure. I don't know her name.

Q. So you don't know what she might have done for you?

A. I don't.

Q. How about your answers to interrogatories indicate that you saw a Dr. Joseph Sutherland on July 18?

A. Yes.

Q. Do you know what that was for?

A. He is, again, he would have been an internist. So, again, somebody is who visiting through the hospital or DuPage Medical Group. I'm

70

assuming that maybe they worked together because they have the same address, so she may have been the first day and him be the one who was on call the second day, but I don't --

Q. So they might have been the doctors that stopped by to see you after the surgery?

A. Exactly, exactly.

Q. You didn't specifically --

A. I didn't call for --

Q. -- go to see them?

A. -- them. No, no, no.

And with the dates of service, yes, that would have been the two days that I would have been in the hospital. So that's my guess, is they are the DuPage on-call representatives for, you know, their patients.

Q. And so you don't know if they actually did anything other than come see you and make sure that everything was okay?

A. Exactly.

Q. Now the answers to interrogatories indicate you went back to M&M Orthopaedics. M&M Orthopaedics, that's the service that the doctor who performed the surgery works for?

71

A. Right. M&M was purchased by DuPage Medical Group and they were in the middle of their merger at the time. So it was M&M, but everything is billed through or done through DuPage Medical Group. Because I have an HMO I have to make sure that I'm seeing a DuPage physician, so, again, they're intertwined.

Q. And Dr. Brian Murphy, is that who did the surgery?

A. Yes.

Q. So it looks like -- and you gotta kind of bounce back and forth I think between the answer to Interrogatory 17 and the answer to Interrogatory 18, but it looks like you went to M&M Orthopaedics on July 25 of 2014, August 1 of 2014, August 4 of 2014, August 27th of that year, September 3rd of 2014, September 8th of 2014, September 17th of 2014, September 24th of 2014 and October 6th of 2014, is that right?

A. I'm sorry, where are you seeing those dates at?

Q. So it looks like -- maybe Mike can help, too.

It looks like if you look at the answer

72

to 17, so you can see here's 7/17, which we know was the surgery and then --

A. This would have been a follow-up.

Q. -- and then 7/25, and then 8/27 and 10/6?

A. Okay.

Q. But if you also look then in the answer to -- I'm sorry, the answer to 19. It shows August 1st, August 4th, September 3rd, September 8th, September 17th and September 24th. So if you put the two of them together, it looks like it was between July and October that you were receiving treatment at M&M Orthopaedics, right?

A. Right. And I believe these dates may be all of the physical therapy.

Q. That's what I was going to ask you.

A. Because, again, with M&M, because they were going in that merger, I was going to a DuPage location, but, again, it could have been billed under M&M as they were, you know, coming together.

Q. So you think that those -- a number of those visits were for physical therapy?

A. Yes.

Q. Some of them, I take it, would have been for you to go back and see Dr. Murphy so he could

73

have seen how the incision was healing and everything was healing properly?

A. Correct.

Q. Tell me what the physical therapy consisted of?

A. She worked with me with little -- I don't know, tools, looked like little hammers that would work with range of motion and weights. We would do different weights that would work on building up the strength and muscle again of the arm.

She also did some heat therapy massage.

Q. Anything else you remember, Rhonda, that she did?

A. No. Like I said, she gave me the piece to put on the arm to hopefully help with the scar healing and things like that. But it was mainly working to build range of motion, strength again, those kinds of things.

Q. Was it always the same therapist?

A. I believe most of the time it was. I believe there may have been one occasion or so that she might not have been there and someone else may have helped her or I went to another location and seen someone different.

74

Q. Do you know who the main therapist was?

A. I don't remember her name. It would be in my medical records.

Q. How many physical therapy sessions did you have?

A. I don't recall without looking at the bills. I believe there was an amount of time that they gave me. With the insurance they were saying you could have usually this many allotted. So I think I did most of the visits that I needed. And then they released me.

Q. When were you released from physical therapy?

A. I don't remember the date.

Q. Do you remember what month it was?

A. It would have probably been the September October range. It was a couple months after the surgery.

Q. So during that time frame then, between the time that you had -- strike that.

When did you start the physical therapy, how soon after your surgery?

A. I believe we started pretty quickly because once the arm was in place, I think he was

75

pretty adamant about let's get this moving and things like that. I don't remember the first date.

I know there's some dates here that you have listed, it looks like maybe August 1st, so that may have been maybe the first visit. Without looking at my medical records, I don't remember.

Q. So what you remember is pretty soon after the surgery and then it probably lasted through October of 2014?

A. Right, it was a couple months.

Q. And you went to most of the visits that had been scheduled?

A. Yes.

Q. So during that time frame that you started physical therapy and the time that you ended physical therapy, how would you describe for me how your left arm was feeling?

A. I was discouraged because I didn't have the strength. Again, with the manipulation of the muscle from the surgery and things like that, it took a while for the strength to build up. And even to this day there's still a strength issue, like lifting a skillet off of a burner, I don't

76

Pages 73 to 76

have the strength or stability, I feel like, to hold it, so I do have to do that with my other hand. So there's still certain things that I have to be real careful with because I don't feel like the strength ever returned to what it was before.

But it's definitely better than it was obviously, you know, when I probably ended therapy. But, again, she was just telling me it's, unfortunately, with an injury, you know, it's never going to be exactly the same.

Again, working at home with some of the little exercises that she had given us to just continue to build up strength.

Q. Do you continue those exercise?

A. I do when I'm having issues. I mean, I don't do it as often as I did before.

Q. How often would you say you do it?

A. Even at work, there's times I'll use a stress ball or something like that to just kind of strengthen the muscle.

If I feel like sometimes where it feels, like I mentioned, it feels like it's out of place, she had given me a couple exercises that you can do to kind of help line everything back up and get

77

the bone and everything in the right positioning, so I'll do those, too.

Q. How often would you say you do that?

A. I don't do that very often. Just again, when I'm feeling -- if I feel it's out of place, then I'll do a couple just to kind of put it back in place I feel like and it seems to be better.

Q. How many times would you say in the last six months you've had to do that?

A. It would be hard to quantify. I mean, just as needed. I don't know how to answer that question, unfortunately, how often. I mean, it's not something I do daily, if that's what you're asking, no.

Q. Is it something you do weekly?

A. I could probably do it weekly, yes.

Q. What about the strength exercises, how often do you do those?

A. Again, just when -- usually, when it's bothering me or I feel like, you know, I'm feeling any type of discomfort or pain, I'll do some of that just to help build it up. Again, as I do this I can actually feel the contraction of muscles. Like with this arm, I don't feel it.



78

But with this arm, I can actually feel it and it reacting where the muscles don't seem to be -- they're not lined up like they were before, you know. Because, again, he told us where he had to cut and the way he had to move it around to get to the break, that there would be some of that issue.

Q. Would you say you do the strength exercises weekly as well?

A. Every couple weeks probably.

Q. And during that time frame then between the time that you started physical therapy and the time that you ended physical therapy, how would you characterize for me the pain in your arm, if there was any?

A. The main -- when I normally feel pain, again, it's because I've tried to lift a grocery bag or something like that that's weight bearing.

Or, again, I mentioned driving where it feels like it's out of place, so it feels like it needs to be kind of popped or put back into alignment. Those are the two things that probably bother me the most.

And I just have to be careful with, again, how much I'm lifting. If I'm holding

79

even -- doesn't necessarily have to be just carrying like a grocery bag, it could be something in your arms that you're holding and if it's putting any type of weight on that, I do feel pressure that's uncomfortable in that area.

Q. How about during the time frame between the time you started therapy and the time you ended therapy, were you experiencing pain in your arm during that time?

A. I think just healing pain. And, again, just general, you know, discomfort that you would expect with the healing process.

Q. Would you take anything for that?

A. Again, if I was taking anything, it would be over-the-counter ibuprofen, Tylenol.

Q. How often would you have to take something for the pain?

A. I don't recall. It wasn't something, again, I was taking on a daily basis. I used a lot of ice for swelling and even a heating pad for heat a lot of times, too, to avoid taking any type of medication.

Q. Have you had any physical therapy since October of 2014?

80

A. No.

Q. Do you have any plans to have physical therapy in the future?

A. Not at this time.

Q. Did the pain in your arm gradually get better as your treatment progressed?

A. I think it did.

Q. How would you describe that to me, when did it start to feel better?

A. Within a few weeks, again, as the strength building, I think it helped. And as the healing took place, they had advised me based on the way the break was fixed, there was a small area between the bones where -- it would have to heal. The bone would have to regenerate in those areas to combine. So, again, I know that took some time.

But, again, I think I was very cautious about using the arm a lot just because I didn't want to aggravate the healing process. And I still do, I think, to this day. I don't use this arm as much as I probably would otherwise, just because there's times when I am afraid that the weight is going to bother it.

81

Q. Are you right-hand dominant or left-hand dominant?

A. Right.

Q. So it didn't affect your ability to write?

A. Exactly.

Q. Did the pain in your left arm ever go away?

A. It's not something that aches if I'm just sitting there. But, again, with activity there's certain things that will aggravate it.

Q. So there's certain activities that you'll engage in that will aggravate the arm, but generally it doesn't bother you?

A. Right. If I'm sitting here, I'm not -- it's not aching.

Q. So as you're sitting here talking to me today, you're not having any issues?

A. No. If I'm sitting here, as I said, as I move the wrist in certain ways where the muscle would be contracting, it's something that I can feel and I can observe. Is it painful? No. Is it uncomfortable? Yeah, because it's awkward. It doesn't feel normal.

82

Again, watching what I'm lifting, things like that. I try to avoid those kind of things knowing that it's going to aggravate the situation.

Q. Let's just describe, so we can more for the record, Rhonda, what you were doing.

So if you move your hand, your left hand, backwards towards the elbow?

A. Right.

Q. That's when you feel a tightness or some type of sensation in the left forearm?

A. Yes, yes.

Q. And is it on the top of the arm?

A. Yes. You know, they had tried to teach other exercises, too, to try to stretch that out, too, because, again, those are areas that would become tight if you're not using -- those are range of motion kind of exercises that she would give me.

Q. How often do you do those?

A. Just, again, if it's feeling tight and you may see me kind of bending or twisting, trying to just loosen it up a little bit.

Q. Is there anything in particular that

83

makes it feel that way, is there anything that you do on a daily basis that would require you to move your left hand backwards towards the wrist and cause that sensation?

A. Just -- I type. I sit at a desk job, so, again, typing. So, again, you do have your wrists, you know, slightly elevated or bent. And so some of that after a while, yeah, you do feel the muscles in your arm moving as you're typing.

Q. And does that muscle movement, does that cause pain or you can just feel it, it feels a little different?

A. It's just awkward. It's something that's not -- it doesn't feel normal like the right arm.

Q. When was the last time you received any treatment from Dr. Murphy or M&M Orthopaedics?

A. It's whatever date he would have released me. So it would have been somewhere probably in October maybe. I don't know without looking at the invoices and bills.

Q. So he did release you from his care?

A. Yes.

Q. Do you have any plans to go back to see Dr. Murphy or M&M Orthopaedics?

84

A. No.

Q. What did he tell you when he released you back in October of 2014?

A. At this point I don't recall exactly what he was saying, but he did -- I mean, he was just telling me that this is something that, with increased use and exercise, you know, it would get better. At this point, you know, he didn't see a reason to see me unless I was having more issues or trouble with it.

Q. Have you seen Dr. Irina Domjan at any time since September 17 of 2014?

A. Not that I recall, no.

Q. How about -- strike that.

Do you have any plans to go back to see Dr. Domjan?

A. No.

Q. Have you seen Dr. Joseph Sutherland at any time since September 18 of 2014?

A. Not that I recall. He's not my regular physician.

Q. Do you have any plans to go back to see Dr. Sutherland?

A. No.

85

Q. Have you received any treatment from Dr. Peter Schubel at Edward Hospital since July of 2014?

A. No.

Q. Any plans to go back to see Dr. Schubel to go to Edward Hospital?

A. No.

Q. Have you received any medical treatment for your injuries since October of 2016?

A. October of -- I'm sorry, what date was that?

Q. October -- oh, strike that.

Have you received any medical treatment for your injuries since October of 2014?

A. Not for this that I recall.

Q. Do you have any plans to receive any medical treatment for the injuries you suffered in this accident in the future?

A. At this time, no.

Q. Have you suffered any personal injuries since July 13 of 2014?

A. Not that I recall.

Q. Are you taking any prescription medication today?

86

A. Blood pressure medication.

Q. But nothing for any of the injuries --

A. No.

Q. -- resulting from the accident?

A. No.

Q. How often would you say, Rhonda, that you feel pain in your left arm?

A. Again, just with activity. Certain activities can make it uncomfortable.

Q. When you engage in those activities and you feel discomfort, how would you rate that on a scale of 1 to 10?

A. It's probably just a 2 or 3. Again, it's just more of a level of discomfort that's, you know, I'm aware of and I avoid or use one of those coping mechanisms to stretch it out or things like that.

Q. Tell me, what are the activities that cause discomfort in your left arm?

A. Any weight bearing or lifting with that arm. Again, driving. The angle that my wrist and arms are at at times feel like the bones are not necessarily aligned, so I'll feel discomfort either in the elbow or in that area where it feels

87

like it needs to pop.

Again, if there's any weight that's on the middle or if I hit it. There's been times where, you know, you're walking and you'll bump into the doorknob or something like that. It is very tender in that area because I think there's the lack of muscle or something that's not quite right there.

Q. Anything else that makes the arm uncomfortable?

A. Like I said, it's more weight bearing or again, just, again, certain motions you can feel the tugging or the tightness. And then, again, if weight bearing will cause -- I'll feel pressure or little discomfort in that area, so I know to stop lifting or that's too much.

Q. Anything else that you can think of?

A. Not that I can think of.

Q. And then in order to alleviate that sensation, you'll do some of the things you discussed, the coping mechanisms, in order to either stretch it out or make it feel better?

A. Correct, those that were taught by the physical therapy department.

88

Q. Are there any activities that you can't do today that you could do before the accident?

A. Not that I can't do. Just maybe that I don't do as well.

Q. What are the activities that you can't do as well today?

A. One would be I enjoy cooking. So I talked about lifting skillets or pans with that left hand. I don't have the strength or stability to do that as much. If it's a very light pan, then I can, but it's anything of any weight at all, I'm having to use my right hand to move it with the left hand.

Q. What would you say in terms of weight, Rhonda, how much do you think you could lift just with your left arm?

A. I don't know exactly, but I would say probably a couple pounds. If it's more than 4 or 5 pounds then I start feeling discomfort.

Q. Other than cooking, which you've had to sounds like change the way you engage in that activity. You still do it, you just don't do the same way?

A. Correct.

89

Q. Anything else, any other activities that you don't participate in to the same extent?

A. No, because I was never like a golfer, played tennis or anything like that that would -- that I would use that arm for.

Q. And there's nothing that you can't do today that you could do before the accident, right?

A. Not that I can't do.

Q. And is there any activities that you participate in less today than you did before the accident?

A. Not that I recall.

Q. Any other ways that you can think of that the accident has changed how you do things or how you live your life?

A. Other than just being uncomfortable when people are observing or, again, just watching weight bearing or, you know -- not that I can think of that would be done differently.

I am more aware of it, so I do things to either hide it, cover it, avoid using it, so that I can avoid discomfort or embarrassment.

MR. NAHRSTADT: I think that's all I've got,

90

Mike. I'm just going to look real quick and see if there's anything that I missed, but I think I'm pretty good.

MR. KACZMAREK: Okay, let me just state on the record that we have signed and are producing an authorization for DuPage Medical Group records from the plaintiff.

And also, we did produce at the start of the deposition a statement, a witness statement, from Michael Mitts and two bills from Hanger Prosthetics, which we had not previously produced.

MR. NAHRSTADT: Got them all.

MR. KACZMAREK: Okay.

MR. NAHRSTADT: I do have one more.

BY MR. NAHRSTADT:

Q. Do you have any problems with your right foot or ankle today?

A. No.

MR. NAHRSTADT: I'm pretty sure that's it, Mike. I think I'm done.

MR. KACZMAREK: Okay. We'll waive signature.

(FURTHER DEPONENT SAITH NOT).

91

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARIA MICELI, do hereby certify that heretofore, to-wit, on the 5th day of October, 2016 personally appeared before me, at 230 West Monroe, Chicago, Illinois, RHONDA MITTS, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein MITTS is the Plaintiff, and COSTCO is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by Counsel for the respective parties.

92

I further certify that the taking of this deposition was pursuant to Notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

**IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my notarial seal this 16th day of October, 2016.**

NOTARY PUBLIC, COOK COUNTY, ILLINOIS

93

Rhonda Mitts 10/05/2016

1

## A

ability
82:4
able
17:5 56:12 57:13
accident
8:1 9:22 10:17 11:1
12:1,6,23 13:17
31:16 32:3 33:22
34:3 37:1,3 39:4,23
46:13 47:14,18 51:17
51:18,20 52:15,19,23
54:19 55:20 58:23
59:8,20 62:11,16,24
63:2 69:5 86:18 87:4
89:2 90:7,12,15
accommodate
5:23
accommodating
63:7
ace
55:3,7 61:2
ache
60:17
aches
82:9
aching
60:21 82:16
activities
82:12 87:9,10,18 89:1
89:5 90:1,10
activity
82:10 87:8 89:22
actual
62:19
adamant
76:1
address
6:6 71:2
admitted
49:22
advised
33:13 81:12
advising
48:4
affect
82:4
affixed
93:10
aforesaid
92:15,21
afraid
81:23
afternoon
8:22,23
age
17:6
ages
7:5
aggravate
81:20 82:11,13 83:3
ago
13:10
ahead
15:10
aisle
41:17
aisles
17:16
aligned
87:23
alignment

79:21
alleviate
67:15 88:19
allotted
75:9
allowed
60:7
amount
53:4 75:7
andrew
7:8
angle
87:21
animal
16:23
ankle
21:3 35:14,19,22,24
36:7 43:17,18 44:17
44:23 45:8 53:8,21
55:17,22 56:1,5,9
91:18
anniversary
59:22,24
answer
5:7,9 72:12,13,24 73:6
73:7 78:11
answers
54:11 70:6,17 71:21
anybody
10:3
appearances
2:1
appeared
19:19 92:6
appears
49:2
applicable
4:10
approach
22:6
approaching
17:24
approximately
26:1
area
12:7 14:8,12 15:1,17
16:7 17:17,18,23
18:11 20:10,19,24
21:4 22:7,24 24:12
24:12,21,22 25:23
26:12,13 28:6,7
29:17 30:1 31:8 32:5
32:6,10,15 33:14
34:4 35:24 37:23
38:8,14 43:20 44:18
53:11 65:2,7,9 66:15
66:17 68:11 80:5
81:14 87:24 88:6,15
areas
66:7 81:16 83:16
arm
22:10,12 23:12 25:3
26:21 27:8 28:19,20
34:12,17,19,22,23
35:13 40:23,23 44:17
44:19,23 50:24 54:18
56:12,13,20,24 57:18
58:10,24 59:13 60:24
64:18 67:17 68:21
74:10,15 75:24 76:18
78:24 79:1,13 80:9
81:5,19,22 82:7,13
83:13 84:9,14 87:7

87:19,21 88:9 89:16
90:5
arms
63:7 80:3 87:22
arrived
9:24 26:10 28:9
ashleigh
7:7,7
aside
40:9
asked
24:3,9,20 39:18
asking
5:6,14 19:4 24:2 25:3
26:22 27:1 63:24
78:14
assistance
24:16
assistant
26:5
assistive
55:12
associated
41:6,10
assume
39:11
assumed
35:23
assuming
16:13 41:24 70:10 71:1
attention
33:11 67:4
attorneys
93:3
august
13:13,14 61:24 62:7,7
63:13 72:15,16,16
73:8,8 76:5
authority
26:6
authorization
91:6
avoid
80:21 83:2 87:15 90:22
90:23
avoided
47:21
aware
47:20 87:15 90:21
awkward
82:23 84:13

## B

b
3:11
back
12:19 13:11,21,24 14:6
14:7 15:2 18:23
22:13,23,23 23:2,3
24:24 27:13 32:3,4,9
32:19 33:13,16,20,23
37:23 39:2 40:8,9
41:17 42:8,18 45:13
45:16,18 46:17 48:20
58:7,18 61:17 63:23
65:18 71:22 72:12
73:24 77:24 78:6
79:20 84:23 85:3,15
85:22 86:5
backwards
23:8 83:8 84:3
bad

67:18
bag
79:17 80:2
balance
22:9
ball
77:19
bandage
55:3,7 61:2 68:14
bank
62:1,3,24 63:15
based
81:12
basically
12:11 38:15 45:6 50:23
58:5
basis
80:19 84:2
bcn
2:18
bearing
79:17 87:20 88:11,14
90:19
bed
50:17
behalf
2:9,19
believe
10:23 16:23 19:23,24
22:16 26:4 28:6,19
30:14 37:11 42:16
44:5,11 45:9 47:19
48:3 50:15 51:23
52:13 57:12,23 60:6
68:24 70:7 73:13
74:20,21 75:7,23
believed
57:3
bending
83:22
benjamin
2:3
benshaplaw
2:8
bent
84:7
best
5:8 64:4
better
59:3 77:6 78:7 81:6,9
85:8 88:22
beyond
18:20
big
12:11,15 20:21
billed
72:4 73:18
bills
75:7 84:20 91:10
birth
6:2
bit
16:8 35:19 64:18 65:3
65:21,22,22 66:12
83:23
block
69:18,23 70:1
blood
87:1
blue
6:22,22
body
22:9,21

bolingbrook
13:6,11
bone
58:7 59:15 61:8 78:1
81:15
bones
65:10 81:14 87:22
boone
7:13
boot
54:24
bother
64:23 66:11 79:22
81:24 82:14
bothering
78:20
bothers
67:5
bottom
66:18
bounce
72:12
boxed
24:21
boxes
24:24
brace
61:12 62:1 64:7,8
bradley
2:14
break
5:22 23:12 27:7 43:14
45:6 79:6 81:13
breakable
26:24
breaks
43:20
brian
72:8
briefly
24:22
bring
25:5 62:21
bringing
41:13 67:4
broken
26:21 28:20
brought
33:11 46:15,23
bruised
22:17 35:24 36:1
bruising
36:3,5 51:11,16 52:10
53:1
bucket
30:23
build
74:17 76:22 77:13
78:22
building
74:9 81:11
bulging
65:4,22
bump
88:4
burner
76:24
buying
68:12

## C

c

92:3
calf
20:11,12,24 21:1,5,6,7
34:5
calin
7:6
call
24:3,11 48:1 71:3,9
called
1:15 4:12 48:7
calling
45:9 48:4
calls
21:15
cant
20:21 67:18 89:1,3,5
90:6,9
capris
10:9 20:9 34:4
car
33:19,21,24 45:19
46:16,23
card
9:18
care
41:22 54:15 59:18
84:21
careful
61:4 77:4 79:23
carrying
14:19 80:2
cart
11:15,17,19,20,22
14:16 15:16,17 25:22
40:6
cashing
63:16
cast
56:15,21 57:9 60:23,23
61:10,11,14,16,21
63:4
casually
11:6
catch
22:9,11,20
caught
23:10
cause
56:16 66:20,21 84:4,11
87:19 88:14 92:8,14
caused
19:10 29:14
causes
66:11
causing
59:16
caution
32:12,16
cautious
81:18
cell
31:4,5,11
center
34:22,23
certain
61:7 77:3 82:11,12,20
87:8 88:12
certify
92:4,12,22 93:1,5
chairs
50:16
chance
37:18 46:7 50:11 51:8

Rhonda Mitts 10/05/2016

2

52:7 54:8
change
  89:21
changed
  90:15
characterize
  79:13
check
  39:17 51:14
checked
  28:15 42:13
checks
  63:16
chicago
  2:6,16 92:7
children
  7:1 47:20 56:11
circuit
  92:9
civil
  1:17
claim
  8:4
classes
  7:20
clean
  30:24 33:16,17
cleaning
  30:20
clear
  5:20 36:18 68:13
client
  6:20
close
  38:4 42:15
closed
  42:9,21
closer
  66:18
closest
  9:2
closet
  10:23
clothes
  34:3
coating
  36:18
cold
  26:24
collapse
  24:23
college
  7:11,17,20
com
  2:8,18
combine
  81:16
come
  12:13 15:19 18:3 23:18
    24:20 26:2,6 27:13
    30:24 33:20 40:8,9
    50:16 70:12 71:18
comfortable
  11:2 61:4
coming
  73:19
comments
  29:6
company
  6:21
compared
  67:22
complained

21:24
complete
  48:21 60:23
completely
  53:14 56:13
computeraided
  92:18
concave
  66:2
conceal
  64:4
concealed
  67:24
concerned
  34:12 63:5
concrete
  36:18
consisted
  74:5
constant
  60:17,21
consult
  57:1
contact
  28:2
content
  20:1
continue
  77:13,14
contracting
  82:21
contraction
  78:23
contractor
  16:21
contraption
  61:12
conversation
  41:12,14,19 47:21
convicted
  7:21
cook
  92:9 93:16
cooking
  89:7,20
cooler
  12:7,9,15 13:19 14:4,8
    14:9,12,13 15:3,11
    15:17,19 16:4,7
    17:10,14,15,18,20,23
    18:3,21 19:11 21:22
    22:2,6,24 23:5,18
    24:14 25:18,23 26:3
    26:9,13,15 28:5
    29:24 30:24 31:21
    32:6,10,14,21 33:14
    36:11,16 38:1,19,23
    39:5 48:17 49:3
coping
  87:16 88:21
corner
  13:21
corporate
  48:6 62:20
corporation
  1:11
correct
  8:3,6 9:16 11:13 12:14
    16:16 18:5,8 19:9
    20:5 23:6,14 32:18
    33:2 34:1 38:17 49:8
    49:11 56:22 57:19
    65:24 66:19 69:2,12

74:3 88:23 89:24
  92:20
costco
  1:10 4:21 8:18,21,24
    9:2,8,15,17,18,21
    10:1,7 11:14 13:1,8
    16:6,9,11,14,18
    21:11,20 22:1 25:17
    26:2,23 28:17 30:20
    32:3,19 33:7 36:20
    39:20,22 40:12,17
    41:7,10 42:8,10,15
    42:20 45:13 46:17
    47:14 48:1,17 59:3
    92:10
counsel
  92:23 93:5
counter
  69:10
county
  7:13 92:3,9 93:16
couple
  9:12 41:12 52:19,22
    54:7 60:12 61:15
    69:7,19 75:17 76:11
    77:23 78:6 79:9
    89:18
course
  57:8 67:22 69:17
court
  1:1 5:1 18:16 92:9
courts
  1:18
cover
  64:9 67:18 90:22
covered
  20:19
cream
  68:4
crime
  7:22
croc
  10:10,13
crocs
  11:8
cross
  6:22
crutches
  55:11
crying
  24:5 26:20 27:11 35:7
    41:16
csr
  1:19,23
customers
  16:5 17:16,17 27:5
cut
  66:13 79:5
cv
  1:7

## D

d
  3:1
dad
  47:20
daily
  78:13 80:19 84:2
date
  6:2 8:9,17 9:21 10:17
    36:24 51:13,14 52:12
    57:14 62:6,9 69:5,6

75:14 76:3 84:17
  86:10
dates
  71:12 72:21 73:13 76:4
day
  5:18 8:1,11,13 11:1,4,4
    44:12 51:17,21 52:14
    52:16 55:20 56:20
    57:17 58:22 68:24
    69:24 71:3,4 76:23
    81:21 92:5 93:10
days
  52:19,22 53:10 55:9
    57:12 59:19,19 61:15
    69:19 71:13
deal
  69:11
decide
  8:20,24
decided
  8:17
decision
  57:7
defendant
  1:12 2:19 92:11
defendants
  54:6
definitely
  8:16 42:18 77:6
department
  48:6 57:6 66:24 88:24
depict
  49:9
depicted
  37:20 53:2
deponent
  91:23
deposition
  1:15 3:13 4:7,9,16
    37:12 46:1 48:8
    49:12 50:5 51:2 52:1
    54:1 91:9 92:23 93:2
    93:3
depositions
  1:18
describe
  22:4 34:24 35:5,15
    36:10 58:23 59:12
    60:16 76:17 81:8
    83:5
described
  37:22
describing
  66:17
desk
  84:5
details
  47:23
device
  55:12
diagnosis
  45:1,4,7
didnt
  31:15 46:18 48:2 54:23
    54:24 56:15 64:5
    71:8,9 76:19 81:19
    82:4 85:8
different
  5:13 13:3 42:17 61:13
    74:9,24 84:12
differently
  90:20
difficult

56:2
difficulty
  63:19
dim
  36:13
discharged
  55:21 60:2
discomfort
  35:19 78:21 80:11
    87:11,14,19,23 88:15
    89:19 90:23
discouraged
  76:19
discuss
  8:7
discussed
  88:21
dishonesty
  7:22
dispute
  16:19
distance
  12:20
district
  1:1,2,17
division
  1:3
doctor
  43:2,7 50:15 57:3,12
    58:15 71:24
doctors
  71:5
document
  46:10 48:14 49:18
doesnt
  18:17 80:1 82:14,24
    84:14
dog
  16:24
doing
  14:21,23 55:5 63:15,19
    83:6
dominant
  82:1,2
domjan
  70:8,9 85:11,16
dont
  5:11,19 8:14 9:23
    10:18 11:8,19 12:17
    12:20 16:5 17:17
    19:2,15,23 20:3,15
    20:18 21:14 23:16,23
    25:2,9,15 26:8,11
    27:17,21 28:10 29:5
    29:8,12,15,15,20
    30:5,16 33:6,19 34:6
    34:7,15 36:15 37:10
    38:4 39:9 40:2 42:4,7
    42:11,16 43:2 44:24
    45:10 49:24 50:15
    52:15 53:4 57:13
    60:10,11 62:6 68:5
    68:12 69:16,19 70:4
    70:13,14,16 71:4,17
    74:6 75:2,6,14 76:2,7
    76:24 77:4,16 78:4
    78:11,24 79:2 80:18
    81:21 84:19 85:4
    89:4,9,17,22 90:2
door
  18:13
doorknob
  88:5

dr
  43:1,4 57:20 70:8,9,18
    72:8 73:24 84:16,24
    85:11,16,18,23 86:2
    86:5
drawn
  67:12
driving
  65:9 66:10 79:18 87:21
drugs
  60:11
dry
  34:9
due
  20:1
dull
  60:18,21
duly
  4:12 92:13
dupage
  70:24 71:15 72:1,4,6
    73:17 91:6
duties
  63:16,17

## E

e
  3:1,11
earlier
  10:19,20
early
  8:22 17:7 62:7 63:13
eastern
  1:3
education
  7:10,15
edward
  40:14 42:1,23 44:13
    45:2 57:23,24 69:1
    69:14 86:2,6
egg
  12:9 13:19 14:4 16:3
    17:20 19:11 21:22
    22:2,7 25:18 26:3,9
    26:15 28:5 36:11
    37:23 38:1 48:16
    49:3
eggs
  12:8,12 14:1,5,6,24
    15:2,11,23 16:1
    22:22 38:16
either
  5:12 52:14 87:24 88:22
    90:22
elaborate
  40:19
elaine
  4:4
elbow
  34:24 35:2 44:20 64:11
    64:12,19 65:14 83:8
    87:24
elevated
  84:7
embarrassing
  68:1
embarrassment
  66:21 90:23
emergency
  27:11 32:1,2 33:20
    36:4 44:6,7 45:12
    46:18 50:14,17 56:19

59:11
employed
40:16 47:13
employee
16:18
employees
25:17 26:2,23 27:20
28:1 39:20,22 40:13
ended
22:22 23:10 68:11
76:17 77:7 79:12
80:8
endings
66:14
engage
82:13 87:10 89:21
enjoy
89:7
entered
14:3,11 25:23
entering
22:21
entire
13:24
entrance
17:19 18:2
epoxy
36:19
er
40:15 42:5,13,23 43:10
43:22 55:21,23 57:2
58:22 60:3
especially
11:5 60:10 67:12
essentially
13:23 21:2 23:8
evening
48:23
everyday
11:3
exact
51:13 53:4 57:14 62:6
exactly
34:10 42:11 44:7 62:8
66:3 71:7,7,20 77:10
82:6 85:4 89:17
examination
1:16 3:2 4:14
examined
4:13
exercise
77:14 85:7
exercises
77:12,23 78:17 79:8
83:15,18
exhibit
3:14,15,16,17,18,19,20
3:21 37:13,16 46:2,6
46:22 47:4 48:9,13
49:13,17 50:6,10
51:3,7 52:2,5,20,20
53:2,2 54:2,6 70:7
existence
21:12,21
expect
80:12
expected
59:23
experienced
58:17 60:18
experiencing
35:12 44:14,15,22 70:1
80:8

extent
90:2
extra
62:2

**F**

facing
22:22,23 23:4
fact
30:15 39:6
fade
53:6
fair
52:18
fall
15:22 19:1,3,8,10
23:12 25:18 27:23
29:14 30:19 34:14
35:12,22 38:22 40:6
40:17 41:7,10
fallen
19:16 20:23 32:8 36:20
falling
22:22 23:9,22
family
47:19
far
13:21 14:13 17:19 18:9
19:7 25:20
fear
59:14
feel
58:17 60:12 65:1,5,7
65:11 66:6 77:1,4,21
78:5,7,20,23,24 79:1
79:15 80:4 81:9
82:22,24 83:10 84:1
84:8,11,14 87:7,11
87:22,23 88:12,14,22
feeling
19:17 35:16 53:10
76:18 78:5,20 83:21
89:19
feels
65:17,18 77:21,22
79:19,19 84:11 87:24
feet
11:11 14:14 18:14,22
25:24,24 38:19
fell
14:22,22 15:12,15 16:1
16:4 20:17,20 21:9
21:13,22 22:2,5 23:7
23:8,17,24 25:21
26:3 28:8,12 31:3,9
32:14,22 38:7 39:19
40:18 47:23 49:7,10
felony
7:21
felt
22:8,9,11 23:13 24:5,6
26:21 28:20 34:5,17
35:6,6,17 53:11
69:20
female
17:4 26:4,10,17 27:15
27:22 28:4,17 40:22
fill
27:13,14 28:24 29:11
32:3 33:12 41:4
45:22 46:16
filled

29:7 46:14,21 47:10
final
57:7
finish
5:8 18:16
finished
40:12
first
4:12 38:15 44:12 61:15
69:19,24 71:3 76:2,6
92:13
fit
65:11
fixed
81:13
flimsy
68:13
floor
19:13 20:17,22 21:21
22:1,12,18 23:15,18
24:1,7 27:2,4 29:18
29:19,22 30:9,12,18
30:21 31:1 32:12,16
33:1,4,8,15 34:2,17
35:11 36:2,8,16 39:3
49:2
floors
36:24
florence
7:13
flying
27:4
focused
41:19
follow
57:5
following
69:14
follows
4:13
followup
73:3
foot
22:7,8,14,17 35:14,21
35:24 36:7 43:17,18
44:17,23 45:8 51:11
52:10 53:8,20 54:19
54:22 55:17,22 56:5
56:9,18 91:18
forearm
83:11
foregoing
92:19,23
forgive
39:19
form
4:22 46:16,21 47:3
forth
72:12
forward
23:9
four
7:4 59:19,19
fracture
57:5
fractured
54:18
frame
75:19 76:15 79:10 80:6
freckling
67:23
frequent
12:22

frequented
9:12
fresh
64:2
front
27:4
further
4:9 91:23 92:12,22
93:1,5
furthest
17:22
future
58:20 81:3 86:18

**G**

gain
63:22
garage
12:14
garbage
38:10
general
9:6,7 21:4 26:12 32:15
38:14 80:11
generalized
29:6
generally
38:8 82:14
getting
51:16 67:8
give
43:21,23 45:1,7 54:24
55:3,11 83:19
given
4:16 44:8 59:1 62:14
77:12,23 92:15,20
giving
16:6,12,14,18,22 17:2
17:12,20 24:2 29:17
29:21,24 30:8 63:16
glue
19:21
go
7:12 8:17 11:12,15
14:24 26:18 27:9
28:23 29:9 40:24
41:3,17,22 47:23
48:21 53:2 57:1,5
58:18 62:13,19 63:9
64:10 71:10 73:24
82:7 84:23 85:15,22
86:5,6
goes
64:19
going
4:19,21 9:5 11:5 12:18
14:5 19:22,22 27:10
28:14 32:1 33:16
38:4 48:12 53:12
54:10 57:4 62:19
73:15,17,17 77:10
81:24 83:3 91:1
golfer
90:3
good
67:21 69:22 91:3
gotta
18:15 72:11
gradually
81:5
graduation
7:16

groceries
40:8
grocery
79:16 80:2
group
70:24 72:2,5 91:6
guess
17:23 33:15 57:7 65:10
71:14
guessing
39:13,15
gym
11:7

**H**

h
3:11
half
53:5,17,18
hammers
74:7
hand
22:10 65:23 66:18
69:21 77:3 83:7,7
84:3 89:9,12,13
93:10
handing
24:9
handle
40:4
hands
14:19 67:12
handwriting
47:5,8,10
hanger
91:10
happen
12:6 13:17 48:2
happened
4:20 8:8 12:1 14:3
22:20 25:14 46:19
47:22 62:11 63:24
66:23 67:3
happens
58:20
happy
5:23
hard
5:1 61:11 78:10
hate
18:17
havent
58:17
head
5:3
headed
14:6 26:16
heal
53:11 56:11 59:16
81:15
healing
68:9 69:17 74:1,2,16
80:10,12 81:12,20
hear
41:9 48:5
heard
40:23
heartland
62:3
heat
74:11 80:21
heating

80:20
heavy
66:9
help
24:3,4,7,10,11 56:5,12
59:2 68:9,14 72:22
74:15 77:24 78:22
helped
56:6 74:23 81:11
helping
24:17
hereinbefore
93:4
heres
73:1
heretofore
92:5
hereunto
93:9
hes
85:20
hide
67:20 90:22
high
7:12,13,16
highest
7:10
hit
22:7 88:3
hmo
72:5
hold
39:16 40:7 60:24 67:17
77:2
holding
51:1 79:24 80:3
home
6:6 8:1 9:2 44:8 51:16
77:11
hopefully
74:15
hospital
28:16 42:1,24 44:13
45:2 49:22 69:1,13
69:14 70:12,24 71:14
86:2,6
hospitalized
68:20,23
hour
1:20 42:6
hours
42:17 69:22
house
6:9
hover
38:5
hr
62:20
hurt
40:23,23 41:22
husband
10:4 11:18 13:9 15:14
19:3,8 23:18 24:1
25:2,20 26:22 27:5
27:10 28:12 29:1,16
30:14,14 31:11,20
32:4,20 33:4,8,24
39:2 40:4 41:9,24
45:15,21 46:14,21
47:17 48:15 50:4,22
51:22 59:22
husbands
47:7

Rhonda Mitts 10/05/2016

4

hydrocodone
44:3,10 60:5

**I**

ibuprofen
60:6,8,8 80:15
ice
25:3,5 26:22,23 27:3
27:20 41:13 60:15
80:20
id
3:12
idea
37:9
identification
37:14 46:3,6 48:10,13
49:14,17 50:7,10
51:4,7 52:3,6 54:3,6
ill
5:7,19 67:17 77:18
78:2,6,21 87:23
88:14
illinois
1:2 2:6,16 6:7 92:1,7,9
93:16
im
4:19,21 5:6,14,16
14:14 19:20,21 22:23
26:20,20 28:6,14
29:18 38:4,21 39:16
40:19 41:14,16,21,24
43:1 44:7 48:12
50:16 51:13,19 52:16
54:10 57:24,24 58:1
60:7 65:4,6 66:24
70:10,12,24 72:6,20
73:7 77:15 78:5,20
79:24,24 82:9,15,15
82:19 83:1 86:10
87:15 89:12 91:1,2
91:20,21
immediately
14:22 44:4
impact
22:17
inches
64:19,21,21,22
incident
4:20 8:7 27:18 48:2
55:16 56:20
incision
74:1
increased
85:7
indicate
70:7,18 71:22
individual
17:12
information
46:14
injuries
86:9,14,17,20 87:2
injury
19:5 29:2 54:22 56:16
77:9
inside
28:7 45:21
insistent
29:1 41:2
instant
26:24
insurance

48:6 75:8
interested
93:7
internist
70:23
internists
70:11
interrogatories
54:11 70:6,17 71:21
interrogatory
54:17 72:13,14
intertwined
72:7
interview
62:12,15,18,23 63:10
63:12,14
interviews
62:17
invoices
84:20
involving
7:22
irina
70:8 85:11
issue
53:20 76:23 79:6
issues
77:15 82:18 85:9
ive
41:15 66:23 67:1,11
79:16 90:24

**J**

jeans
13:10,12
job
6:23 61:24 62:10,14,14
63:14 84:5
joliet
6:7 7:20
joseph
70:18 85:18
july
8:8 10:1,8 36:21 47:14
47:18 48:23 50:2,18
57:15,17 59:12 70:8
70:19 72:15 73:11
86:2,21
junior
7:20

**K**

k
92:3
kaczmarek
2:4 15:6 21:15 91:4,14
91:22
keep
55:9 56:12,17
keeping
65:12
kentucky
7:14,18
kept
61:15
kind
13:21 19:17 24:22,23
35:18 36:14 38:12
41:2 54:14,21 60:24
61:16 62:20 63:23
65:2,10,11 66:15
67:4,11 68:6 72:11

77:19,24 78:6 79:20
83:2,18,22
kinds
74:18
knee
20:10 21:2
knew
21:20 33:7 47:24 61:2
know
5:6,12,17,19,23 8:14
10:11,15 11:20 12:20
12:20 16:10 19:2,7
19:14 20:3,9,13,16
21:11,14,18,20,24
22:3,19 25:2 26:7
27:1,6,15,19 28:8,15
29:15,15,16,20 30:2
30:4,5,5,11,14,16
33:3,7,11,17,19 34:6
35:17,23 36:14 37:17
39:8,10 41:11 42:8
42:10,11,17 43:13
44:2 45:10 46:7
47:19 48:19 49:24
52:6,15 53:9 54:8
55:24 56:2,10 57:14
58:3 59:14 62:6,8,19
63:20,24 64:11 66:24
67:2,3,10,21 69:16
69:20 70:9,13,14,21
71:16,17 73:1,19
74:7 75:1 76:4 77:7,9
78:11,20 79:4 80:11
81:16 83:14 84:7,19
85:7,8 87:15 88:4,15
89:17 90:19
knowing
83:3
knows
39:7

**L**

lack
88:7
lady
24:2,9 29:16 41:11
landed
20:11
landing
22:10
lap
50:24
large
20:19
lasalle
2:5
lasted
76:9
leaving
55:23 59:3
left
13:21 15:16 20:10
22:10,13 23:3,4,12
27:8 28:12 32:2,9
33:20 34:5,20 35:3
35:13 37:24 38:24
39:4,23 40:14,18
42:10 43:15 44:17,19
44:23 45:6,12 49:3,5
50:23 54:18 56:19,20
58:22,24 59:10,13
64:18 69:13,14 76:18

82:7 83:7,11 84:3
87:7,19 89:9,13,16
lefthand
82:1
leg
19:16,18 20:6,7 30:6
30:17 34:7,8,13
length
20:24
letting
40:3
level
7:10 87:14
license
1:24
life
90:16
lift
79:16 89:15
lifting
65:6 76:24 79:24 83:1
87:20 88:16 89:8
light
89:10
lighting
36:10,12,14
limp
55:24
limping
53:10
line
38:15 77:24
lined
62:10 79:3
lining
58:6
lipe
2:13
lipelyons
2:18
liquid
19:12 22:7
listed
45:10 76:5
listening
41:18
little
16:8 35:19 56:6 63:5
64:18 65:2,21,22,22
66:1,12 67:23 74:6,7
77:12 83:23 84:12
88:15
live
90:16
lived
6:11 9:11
located
12:8 13:20 17:15 34:21
location
13:11 73:18 74:24
long
6:11,17,23 9:17 10:15
10:16 20:16 23:15
28:8,11 33:3 34:8
39:21,21 42:3,4 53:1
53:7,13 55:7 56:8
57:9 58:5 59:15
61:20 64:20 67:19
68:23
longer
64:4,12
look
37:17,18 43:3 46:6,7

50:11 51:8 52:7,12
54:7,8 62:8 64:15
72:24 73:6 91:1
looked
32:24 74:7
looking
12:14 13:9 14:24 15:5
15:10 41:16 67:15
75:6 76:7 84:19
looks
38:9 55:14 59:19 64:17
67:21 72:11,14,22,24
73:10 76:5
loosen
83:23
lost
8:4
lot
40:4 66:22 70:4 80:20
80:21 81:19
lotion
68:3
loud
4:22 5:4
love
67:20
lower
34:5
lyons
2:13

**M**

m
1:21 71:22,22,23,23
72:1,1,3,3,15,15
73:12,12,16,16,19,19
84:16,16,24,24
main
41:17 75:1 79:15
making
8:4 29:6 62:17
man
17:3
manage
60:4,14
manageable
59:14 60:4
manager
26:5,5,10,17 27:16,22
28:4,17 29:23 33:12
40:22 48:3,22 63:7
manipulation
76:20
maria
1:19,23 92:4
marked
3:12 37:13,16 46:2,5
46:22 47:4 48:9,12
49:13,16 50:6,9 51:3
51:6 52:2,5 54:2,5
70:7
married
6:13,15,17
massage
74:11
material
10:13 61:2
matthew
7:8
mean
19:23 38:20 40:20
47:21 55:24 59:1

65:17 68:2 77:15
78:10,12 85:5
mechanisms
87:16 88:21
mederma
68:3
medical
40:10,24 41:20,22 45:5
45:11 54:15 70:24
72:2,4 75:3 76:7 86:8
86:13,17 91:6
medication
43:21 56:4 60:14 70:3
70:4 80:22 86:24
87:1
medicine
44:2
member
9:15,17
mentioned
58:16 77:22 79:18 93:4
merger
72:3 73:17
miceli
1:19,23 92:4
michael
2:4 6:16 10:4 91:10
middle
66:4 72:2 88:3
mike
15:8 72:22 91:1,21
milk
12:7,9,12 13:19,24
14:4,5 16:3 17:20
18:3,21 19:10,22,24
21:22 22:2 24:14,18
24:21 25:8,18 26:2,9
26:15 28:5 30:24
31:21 32:5,6,7,11,24
33:3,8 36:11,16
37:22,23 38:1,10,13
39:3,5,11,12,14
48:16 49:3
mind
9:4
minutes
12:5 28:15 40:4 54:7
missed
91:2
missing
65:2 66:1
mitts
1:5,15 3:3,13 4:4,5,7
4:11,16 6:16 16:9
21:5 37:12 39:19
46:1 48:8 49:12 50:5
51:2 52:1,6 54:1
91:10 92:7,10
mkaczmarek
2:8
mobility
63:20
moisture
68:8
moment
25:16 35:10 40:3
money
63:17
monroe
1:20 2:15 92:7
month
13:10 75:15
months

9:13 61:23 75:17 76:11 78:9

**mop**
30:23

**morning**
51:20

**motion**
74:8,17 83:18

**motions**
88:12

**move**
64:24 79:5 82:20 83:7 84:2 89:12

**movement**
84:10

**moving**
65:13 76:1 84:9

**murphy**
2:13 43:1,7 57:20 72:8 73:24 84:16,24

**muscle**
65:1,2,3,20 66:7 74:10 76:21 77:20 82:20 84:10 88:7

**muscles**
78:24 79:2 84:9

---

**N**

**n**
3:1

**nahrstadt**
2:13,14 3:4 4:2,6,15 15:8,9 21:17 37:15 46:4 48:11 49:15 50:8 51:5 52:4 54:4 90:24 91:13,15,16,20

**name**
4:2,3 27:15,19 43:1,2,3 58:5 68:5 70:13 75:2

**names**
7:5

**naperville**
9:1,21 10:1,7 11:14 13:8 38:2 40:15 48:17

**narcotic**
60:10 69:7

**naturally**
59:15

**necessarily**
50:17 80:1 87:23

**need**
4:23 12:13 29:9,10,10 41:20,22 44:10 57:4

**needed**
26:18 27:14 44:9 75:10 78:11

**needing**
62:2

**needs**
29:7 65:13,13,17 79:20 88:1

**nerve**
66:14 69:18

**never**
61:11 77:10 90:3

**new**
32:5 33:14 68:12

**nice**
40:7

**night**
42:20 48:4 50:1 51:19

52:15 68:8

**normal**
63:16 82:24 84:14

**normally**
60:8 79:15

**north**
2:5

**northern**
1:2 7:18

**notarial**
93:10

**notary**
93:16

**notice**
1:16 4:8 67:10,13 93:2

**numb**
66:16

**number**
3:12 6:4 73:20

**numbers**
54:11

**numbness**
66:12

**nurses**
10:14

---

**O**

**o**
92:3,3

**objection**
21:15

**observe**
82:22

**observed**
29:17 30:1,2

**observing**
34:11 90:18

**obviously**
4:22 47:20 57:3,16 59:17 77:7

**occasion**
74:21

**occupation**
6:19

**october**
1:20 72:19 73:11 75:17 76:10 80:24 84:19 85:3 86:9,10,12,14 92:6 93:11

**offer**
24:16

**offered**
63:13

**office**
26:18 27:9 28:24 29:10 41:3 48:6

**oh**
33:15 67:3 86:12

**okay**
4:23,24 5:9,10,14,15,21 5:24 18:16 24:4 33:15 37:18,19 46:8 46:9 54:9,13 71:19 73:5 91:4,14,22

**older**
56:11

**oncall**
71:15

**once**
9:12 20:23 23:17 75:24

**oneonone**
62:22

**open**
27:1,7

**opening**
18:4,7,7,10,20

**opposed**
38:24 65:15 67:8

**opposite**
32:21

**order**
9:14 13:24 57:2 88:19 88:21

**orthopaedic**
57:2,6,12

**orthopaedics**
71:22,23 72:15 73:12 84:16,24

**outcome**
93:8

**outside**
8:1 15:16 16:7 17:22 18:11,13 21:7 23:5 25:22 26:11 28:7

**overcast**
8:15

**overthecounter**
60:14 70:3 80:15

---

**P**

**pack**
27:8

**packages**
27:7

**packs**
26:24,24 27:4,20 41:14

**pad**
80:20

**pain**
24:6 27:12 28:21 34:17 34:21 35:5,7,7,12,15 36:6 40:3 41:18 44:1 44:14,15,22 53:7,14 53:19 55:16,22 56:5 58:23 59:2,13 60:3 60:16,17,17 61:7 65:7,16 66:8,9 69:11 69:15,16 70:1,5 78:21 79:13,15 80:8 80:10,17 81:5 82:7 84:11 87:7

**painful**
82:22

**pair**
10:9,10 11:8 13:9

**pallet**
38:15

**pan**
89:10

**pans**
89:8

**pant**
34:6

**pants**
20:8

**paper**
30:24

**paperwork**
27:13 28:24 29:7 33:12 45:22 48:21

**parked**
25:22

**part**
21:6 64:17 66:18 69:8

**partial**
61:1

**participate**
90:2,11

**particular**
9:5 67:15 83:24

**parties**
4:8 92:24 93:6

**passing**
25:13

**patients**
70:12 71:16

**pending**
92:8

**people**
19:4 41:13,15 47:21,24 58:16 62:20 63:17,24 66:23,24 67:1,7,11 67:15 90:18

**perform**
43:9 57:20

**performed**
58:4 71:24

**person**
16:17 17:2 19:7

**personal**
62:23 86:20

**personally**
92:6

**pertaining**
1:18

**peter**
43:6 86:2

**phone**
31:4,5,11 51:14 52:13 52:14 62:18

**phonetic**
7:6

**photo**
51:12

**photograph**
37:21 49:1

**physical**
61:19,23 63:9,22 67:8 68:11 73:14,21 74:4 75:4,12,21 76:16,17 79:11,12 80:23 81:2 88:24

**physically**
67:9

**physician**
72:6 85:21

**physicians**
47:17

**picking**
66:9

**picture**
29:10 31:8,15,17,20 32:20 33:4,9 38:6 39:3,8 48:15,16 49:6 50:3,21,23 51:15 52:11

**pictures**
26:19 29:1 41:3

**piece**
61:1 68:10 74:14

**pills**
69:7

**place**
38:23 41:14 60:24 61:8 65:18,19 75:24 77:22 78:5,7 79:19 81:12

**placing**

58:7

**plaintiff**
1:6 2:9 91:7 92:10

**plan**
56:23

**plans**
58:14,20 68:16 81:2 84:23 85:15,22 86:5 86:16

**plate**
58:7,9

**played**
90:4

**please**
4:2

**point**
11:20,21 12:19 23:19 24:5,24 25:11 26:6 26:14,20,23 27:6,11 27:14 30:3,13 35:7 38:6 41:15 48:7 50:15 56:23 58:15 64:6 68:1 85:4,8

**pointing**
30:15

**pontikis**
2:13

**pop**
65:14,18 88:1

**popped**
79:20

**popping**
65:21

**positioning**
78:1

**pounds**
89:18,19

**prescription**
43:23 86:23

**presence**
92:17

**present**
93:3

**press**
66:5

**pressure**
65:7 80:5 87:1 88:14

**pretty**
57:24 58:1 59:17 63:14 75:23 76:1,8 91:3,20

**previously**
91:11

**prior**
20:17 25:18,19 36:21

**probably**
9:12 10:19 12:4,17 17:7 25:24 28:14,15 35:10 38:18 42:7,12 53:5,16 59:4 60:9 61:23 70:10 75:16 76:9 77:7 78:16 79:9 79:21 81:22 84:18 87:13 89:18

**problems**
36:23 59:16 65:4 91:17

**procedure**
1:17

**process**
80:12 81:20

**produce**
91:8

**produced**
91:12

**producing**
91:5

**progressed**
81:6

**properly**
74:2

**prosthetics**
91:11

**providence**
6:7

**public**
93:16

**pulled**
11:19

**pulling**
65:5

**purchased**
10:18 72:1

**purse**
15:18 31:7

**pursuant**
1:16 4:8,10 93:2

**pushing**
11:20,22

**put**
61:11 65:18 68:7,8,14 73:10 74:15 78:6 79:20

**putting**
80:4

---

**Q**

**quantify**
78:10

**question**
5:7,7,9 78:12

**questions**
4:20,21

**quick**
22:19 91:1

**quickly**
59:17 63:14 75:23

**quite**
11:2 88:7

---

**R**

**r**
3:13 37:12 46:1 48:8 49:12 50:5 51:2 52:1 54:1

**radius**
43:14 45:6 65:10

**raining**
8:15,16

**range**
59:4 74:8,17 75:17 83:18

**rate**
35:9 36:6 55:16,21 87:11

**rated**
35:8

**reacting**
79:2

**read**
46:24 47:1

**real**
77:4 91:1

**really**
67:21

**reason**
16:19 85:9

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

Rhonda Mitts 10/05/2016

6

**recall**
8:8,14 9:23 10:18 16:5
17:17 22:20 23:16,23
25:2,9,16 26:11
28:10 29:5,12 34:7
34:15 40:2 42:7,16
43:2 44:24 53:4
57:13 69:16 70:4
75:6 80:18 85:4,13
85:20 86:15,22 90:13
**receive**
86:16
**received**
84:15 86:1,8,13
**receiving**
73:12
**recognize**
46:10 47:7 48:14 49:18
**record**
4:3,6,8 83:6 91:5
**records**
42:14 75:3 76:7 91:6
**reduced**
92:18
**reducing**
68:3
**reflect**
4:6,9
**regenerate**
81:15
**regular**
85:20
**related**
93:6
**release**
84:21
**released**
68:24 75:11,12 84:17
85:2
**rely**
60:19
**remember**
5:17 11:19 16:22 26:14
29:8 30:16 42:4 68:5
68:12 74:12 75:2,14
75:15 76:2,7,8
**removable**
61:18,20
**remove**
58:18,21
**removed**
58:14
**removing**
58:6
**rep**
6:20
**rephrase**
5:13 21:19
**report**
26:19 27:18 29:11 32:3
33:22 41:4 46:13
47:11
**reported**
1:23 92:16
**reporter**
5:1 18:17
**representative**
16:6,10,11,14 21:11
26:17
**representatives**
71:15
**require**
84:2

**required**
63:6
**requirements**
69:18
**respective**
92:24
**respond**
4:23
**rest**
22:12 23:1,2
**result**
54:19
**resulting**
87:4
**resume**
62:8
**returned**
77:5
**revisionist**
68:17
**rhonda**
1:5,15 3:3 4:4,7,11
69:4 74:12 83:6 87:6
89:15 92:7
**right**
8:5 9:15 10:21 12:10
14:21 15:11 18:4,11
18:13 21:4 22:16
25:22 32:14,22,23
35:14,21,24 36:6
37:23 38:16,23 39:14
43:16 44:17,23 45:8
49:7 51:11 52:10
53:8,20 54:7,18,19
54:22 55:17,18 58:20
59:19,24 62:17 64:11
66:5 69:3 72:1,19
73:12,13 76:11 78:1
82:3,15 83:9 84:14
88:8 89:12 90:8
91:17
**righthand**
24:18 38:9 82:1
**roadmap**
54:14
**room**
12:11 27:11 32:1,2
33:20 36:4 44:6,7
45:13 46:18 50:14,17
56:19 59:11
**route**
9:1
**rubbery**
10:13 68:14
**rules**
1:16 4:10

---

**S**

**s**
3:11
**saith**
91:23
**sample**
41:11
**samples**
16:6,12,15,18 17:3,13
17:21 24:3,10 25:13
29:17,21,24 30:8
**sandals**
10:10,12 11:10
**sat**
24:22

**saw**
5:17 19:8 30:9,11,13
32:21 70:8,9,18
**saying**
25:9,16 26:17 29:8
30:5,15,17 41:21
75:8 85:5
**says**
54:17
**scale**
35:8 38:21 87:12
**scar**
64:9,13 66:4,18,20
67:16 68:3,18 74:15
**scars**
64:1 68:15
**scene**
27:23
**schedule**
57:6
**scheduled**
62:13 76:13
**scheduling**
63:8
**school**
7:12,13,16
**schubel**
43:4,6 86:2,5
**screws**
58:8,9
**scubel**
43:5
**seal**
93:10
**sealant**
36:19
**second**
68:6 71:4
**security**
6:4
**see**
12:19 13:12 19:1,3
21:8 25:17 30:3,19
30:23 34:24 36:5
42:23 43:3 57:11,13
61:17 63:4,11 65:3
70:12 71:6,10,18
73:1,24 83:22 84:23
85:8,9,15,22 86:5
91:1
**seeing**
38:20 72:6,20
**seek**
54:23
**seen**
27:22 29:2 57:14,16
74:1,24 85:11,18
**send**
33:16
**sensation**
65:15 66:15 69:20
83:11 84:4 88:20
**sent**
33:17
**september**
9:19 13:13,13,14 72:17
72:17,18,18 73:8,9,9
73:9 75:16 85:12,19
**series**
4:19
**service**
6:20 71:12,23
**sessions**

**75:4**
**set**
40:9 93:9
**setting**
12:14
**shakes**
5:2
**shapiro**
2:3
**sharp**
60:17
**shes**
17:7
**shield**
6:22
**shirt**
10:10
**shoes**
10:16,22 11:7,9
**shop**
9:14 13:1,3,5
**shopping**
9:6,7 12:1,3
**shortsleeved**
10:9
**shoulders**
5:3
**show**
43:12,19 46:5 48:12
49:16 50:9 51:6 52:5
54:5
**showing**
51:16
**shows**
73:7
**shrugs**
5:3
**side**
18:1 20:11,12 22:13
23:3,4 24:19 32:6,10
32:21 38:9,23,24
39:4 43:15 49:4,5
**sideways**
23:9
**sign**
27:17 33:22 46:24
**signature**
47:4 91:22 92:22
**signed**
46:15,23 47:1 91:5
**signs**
32:12,16,17
**silk**
24:18,21 25:8 37:22
38:10,12
**sit**
24:18,21 25:8 84:5
**sitting**
50:16 82:10,15,17,19
**situation**
83:4
**six**
58:7,9 78:9
**skillet**
76:24
**skillets**
89:8
**skin**
68:6,12
**sleeves**
64:4 67:19
**slid**
22:14

**slide**
22:8
**sliding**
23:10
**slightly**
84:7
**slip**
11:11
**slipped**
14:7,10 19:12 20:14
21:9 23:17 36:20
37:4,7
**slowly**
53:6 62:21
**small**
81:13
**smear**
30:18
**smell**
37:4
**snap**
22:12 23:13 24:6 26:21
40:23
**snapping**
35:6
**social**
6:4
**socks**
11:9
**soft**
56:15,21 57:9 60:23
61:13,16
**sole**
10:11
**somebody**
70:23
**soon**
17:24 23:11 75:22 76:8
**sorry**
40:19 43:1 57:24 60:7
72:20 73:7 86:10
**sort**
16:23 68:4
**sounds**
89:21
**space**
67:8
**speak**
46:18
**speaking**
5:4
**specifically**
54:10 71:8
**speculate**
37:10
**speculation**
21:16
**spell**
4:3
**spelled**
7:7
**spend**
11:24
**spending**
59:24
**spent**
12:3
**spill**
32:5,10,20 33:14 39:7
**splintering**
58:6
**spoke**
40:22

**spoken**
47:13,16
**spot**
30:17
**sprain**
35:16 45:10 53:9,10
**spring**
10:19
**ss**
92:2
**stability**
77:1 89:9
**stable**
56:14 61:3,6
**stacked**
12:12
**stamp**
51:14
**standing**
15:17
**standpoint**
45:11
**start**
18:16 44:4 61:19 62:5
62:20 75:21 81:9
89:19 91:8
**started**
53:11,12 61:24 75:23
76:16 79:11 80:7
**starting**
24:23 25:3 53:6
**starts**
64:18
**state**
4:2 91:4 92:1
**statement**
91:9,9
**states**
1:1,17
**stay**
56:7
**stayed**
33:19,23 45:18
**stenographically**
92:16
**stepped**
26:11,15
**stickier**
19:24
**sticky**
19:15,16,18,20,21 20:7
68:6
**stood**
24:24
**stop**
13:11 88:15
**stopped**
71:6
**store**
4:21 11:22,24 12:19,22
13:3,5,20,22,24
18:23 26:16 28:13
33:24 36:21,24 38:2
40:18
**straight**
15:10
**street**
2:5,15
**strength**
63:23 74:10,17 76:20
76:22,23 77:1,5,13
78:17 79:7 81:11
89:9

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Rhonda Mitts 10/05/2016

7

| | | | | | | |
|---|---|---|---|---|---|---|
| strengthen<br>77:20 | tackiness<br>20:1 | 73:15 78:13 79:17<br>80:5 83:10 84:13 | 84:15 85:12,19 86:19<br>times | 35:18<br>twice | 73:21 75:10 76:12<br>vs |
| stress<br>77:19 | tacky<br>19:15,17,18 | 87:14 88:2,7,16<br>90:24 91:20 | 9:10 60:13 61:6 65:8<br>65:12 67:17 77:18 | 12:24<br>twist | 1:8 |
| stretch<br>83:15 87:16 88:22 | take<br>5:2,22 26:18,19 27:10 | therapist<br>74:19 75:1 | 78:8 80:21 81:23<br>87:22 88:3 | 23:6 61:7<br>twisted | **W** |
| strike<br>17:1 21:18 31:19 55:14 | 29:1,10 31:8,15,17<br>31:20 34:8 37:16 | therapy<br>61:19,23 63:9,22 68:11 | tissue<br>66:6 | 23:7 35:21 54:18 56:1<br>twisting | wages<br>8:5 |
| 59:9 75:20 85:14<br>86:12 | 39:21 46:6 47:8 53:1<br>54:6 59:18 60:10 | 73:14,21 74:4,11<br>75:4,13,21 76:16,17 | today<br>64:13 82:18 86:24 89:2 | 22:9,21 83:22<br>two | wait<br>5:5,6 |
| strong<br>35:6 | 64:15 69:22 73:23<br>80:13,16 | 77:8 79:11,12 80:7,8<br>80:23 81:3 88:24 | 89:6 90:7,11 91:18<br>told | 6:24 26:23 27:3,19<br>28:1 42:6 61:23 | waiting<br>24:19,20 48:1 59:15 |
| subsided<br>53:19 | taken<br>1:19 4:7,10 39:8 41:4 | thereof<br>93:8 | 16:17 27:2,6 28:19<br>29:19,20 31:24 32:4 | 71:13 73:10 79:21<br>91:10 | waive<br>91:22 |
| substance<br>10:14 19:12,14,19,21 | 48:19,20 49:6,23,24<br>50:18 51:12,15,18,22 | theres<br>5:18 18:4 37:22 39:6 | 40:22 55:2,15 57:1,3<br>79:4 | tylenol<br>60:9 69:9 80:15 | waived<br>92:23 |
| 19:24 20:3,13,16,20<br>20:21 21:8,12,21 | 52:11,22 69:7 70:3<br>talk | 58:20 65:8,12 66:6<br>66:12,15 67:17 76:4 | tools<br>74:7 | type<br>36:19 44:2 57:4 58:3 | walk<br>12:12 56:3 |
| 22:1,7 29:19,21 37:4<br>37:6 49:2 | 17:9 41:6,9 48:1 54:15<br>62:13,21 64:5 67:11 | 76:23 77:3,18 81:23<br>82:10,12 88:2,3,6 | top<br>64:17 83:13 | 60:11,14 61:2,12<br>68:3 78:21 80:4,21 | walked<br>15:11 24:12 32:11,13 |
| substantial<br>65:6 | talked<br>33:12 89:8 | 90:6 91:2<br>theyre | touch<br>67:1,7 | 83:11 84:5<br>typewriting | 32:14<br>walking |
| suffered<br>54:18 86:17,20 | talking<br>19:21,21 39:20 40:12 | 11:2,10 67:2,7 72:7<br>79:3 | touching<br>69:21 | 92:18<br>typical | 14:8 22:6 27:5 35:18<br>35:20 41:13,16 88:4 |
| sugar<br>20:1 | 40:20 65:20 82:17<br>taste | thing<br>68:7 | towels<br>30:24 | 10:14<br>typing | wall<br>14:6 15:2 |
| suit<br>93:7 | 37:6<br>taught | things<br>61:18 63:21,23 64:5 | towit<br>92:5 | 84:6,9 | want<br>5:16,22 38:4 41:22 |
| suite<br>2:5,15 | 88:23<br>teach | 66:14 67:23 74:16,18<br>76:2,21 77:3 79:21 | transcript<br>92:20 | **U** | 56:15 58:18 64:5<br>69:3 81:20 |
| summer<br>10:19 | 83:14<br>tell | 82:11 83:1,2 87:16<br>88:20 90:15,21 | transcription<br>92:19 | uhhuh<br>14:2 15:4 34:1 44:16 | wanted<br>27:9 40:24 |
| summertime<br>67:18 | 12:17 14:3 17:5 20:23<br>24:1 34:10,19 37:20 | think<br>5:5 9:24 12:15 13:7 | travel<br>9:3 | 46:9<br>uhhuhs | wanting<br>28:23 |
| sunday<br>8:12 42:20 | 45:5 46:12 47:22<br>48:13 49:17,20 50:10 | 34:16 35:21 39:16,18<br>40:3,21 51:18 55:15 | traverse<br>13:23 | 5:2<br>ulna | warehouse<br>36:12 |
| support<br>55:4 62:2 | 50:13 51:7,10 52:9<br>60:19 74:4 85:2 | 56:6 63:10,11 69:6<br>69:19 72:12 73:20 | treat<br>16:24,24 | 65:11<br>uncomfortable | warm<br>11:6 |
| supposed<br>68:8 | 87:18<br>teller | 75:10,24 80:10 81:7<br>81:11,18,21 88:6,17 | treated<br>29:3 32:1 | 60:22 61:5 67:2,6,7,9<br>80:5 82:23 87:9 | wasnt<br>19:3 34:11 36:12 60:7 |
| sure<br>4:4 5:4,8 12:18 14:15 | 62:1 63:6,16<br>telling | 88:18 89:15 90:14,20<br>90:24 91:2,21 | treating<br>47:17 | 88:10 90:17<br>uncontrollably | 61:3 80:18<br>watching |
| 18:15,19 28:7 29:18<br>37:11 38:8,21 40:21 | 26:21 77:8 85:6<br>tender | threw<br>27:3 | treatment<br>40:10,24 41:20 54:15 | 27:12<br>underneath | 83:1 90:18<br>water |
| 41:14 44:7 51:13,19<br>52:17 54:16 57:24 | 88:6<br>tenderness | throb<br>60:18 | 54:21,23 57:8 73:12<br>81:6 84:16 86:1,8,13 | 22:8,14<br>understand | 19:23<br>way |
| 58:1 60:21 63:8<br>64:16 69:3 70:13 | 35:17<br>tennis | throw<br>27:2 | 86:17<br>trick | 5:12,14,19 19:6<br>understanding | 4:23 5:13 6:7 14:7<br>59:23 60:11 61:7 |
| 71:18 72:5 91:20<br>surgeon | 90:4<br>terminology | tight<br>83:17,21 | 5:16<br>tried | 7:24<br>undetermined | 64:24 65:10,13 67:22<br>79:5 81:13 84:1 |
| 57:2<br>surgery | 45:5<br>terms | tightness<br>63:21 65:5 83:10 88:13 | 12:18 22:11 23:11 48:3<br>56:6 64:3 79:16 | 92:8<br>unfortunately | 89:21,23 93:6,7<br>ways |
| 43:8 49:21,22 50:1<br>56:24 57:4,15,18,20 | 89:14<br>testified | time<br>5:22 9:13,20,24 10:5 | 83:14<br>trip | 60:1 77:9 78:12<br>unhuns | 82:20 90:14<br>wear |
| 58:3,18 59:12 60:3<br>61:9,10 68:17,20 | 4:13<br>testify | 10:15 11:21,24 12:3<br>13:7,17 14:7,17 | 8:20 9:6,7<br>trouble | 5:2<br>united | 10:14,15,24 11:4,7,9<br>55:7 57:9 61:10,20 |
| 69:6,14 71:6,24 72:9<br>73:2 75:18,22 76:9 | 92:13<br>testimony | 15:14,21 16:4 17:18<br>18:17 19:4 20:17 | 35:18 58:16 85:10<br>true | 1:1,17<br>university | 62:1 67:19 69:23<br>wearing |
| 76:21<br>sutherland | 92:15,20 93:9<br>tests | 21:12 22:11 25:13<br>26:14 28:10,11,12 | 8:2 92:19<br>trust | 7:19<br>use | 10:8<br>weather |
| 70:18 85:18,23<br>swell | 43:9<br>thank | 29:2 30:19 31:3,10<br>31:16 32:8,9 34:12 | 62:3<br>truth | 34:13 44:10 54:14 60:7<br>60:8 63:6 68:2 77:18 | 8:13 11:6<br>week |
| 25:4<br>swelling | 6:1 43:5<br>thankfully | 36:4,7,21 37:3 40:2,6<br>40:17,18 42:4,7,8,15 | 92:13,14,14<br>try | 81:21 85:7 87:15<br>89:12 90:5 | 8:11 53:5,5,16,16,18,18<br>56:10 |
| 35:16 36:5 53:12,14,19<br>55:10 56:17 80:20 | 56:11<br>thanks | 42:17 49:7,10 51:14<br>53:4 55:16 56:23 | 5:13,19 56:17 59:17,18<br>61:3 67:15 83:2,15 | usually<br>42:5 75:9 78:19 | weekends<br>11:5 |
| sworn<br>4:1,13 92:13 | 15:8<br>thats | 58:22 59:5,8,10 60:2<br>60:3 61:22,24 62:14 | trying<br>22:9,20 24:4 55:9 | **V** | weekly<br>78:15,16 79:8 |
| **T** | 7:7 12:11 20:5 22:17<br>23:12 38:16 39:13 | 63:8 64:1 69:15 72:3<br>74:20 75:7,19,20 | 59:16 63:22 67:3<br>83:22 | visit<br>8:24 42:5 76:6 | weeks<br>79:9 81:10 |
| t<br>3:11 | 41:21 47:5 48:16<br>52:10 53:2 57:17<br>65:15 66:9 71:14,23 | 76:15,16 79:10,11,12<br>80:6,7,7,9 81:4,17 | tugging<br>88:13<br>turned | visiting<br>46:18 70:23<br>visits | weight<br>65:6 79:17 80:4 81:24<br>87:20 88:2,11,14 |

Rhonda Mitts 10/05/2016

8

89:11,14 90:19
weights
74:8,9
welcome
65:1
went
7:18 10:7 17:10,14
20:10 23:11 27:4
32:4,19 33:13,24
39:2 40:10,14 41:24
45:13,15,18,21 46:17
46:21 48:21 53:14,19
59:11 60:6,13 61:17
63:4,11 71:22 72:14
74:23 76:12
west
1:19 2:15 92:7
wet
19:19 20:12,24 21:6
29:17 30:6,17,17
32:12,16 34:3,5,7
wetness
30:1
weve
9:11 46:5,22 47:3
49:16 51:6 52:5 70:6
whats
6:2,6,19 7:10 36:16
37:20
whereof
93:9
white
32:7 39:6,10 49:2
wholesale
1:10
wind
55:5
winter
67:19
wipe
34:13
witness
3:2 4:1,4,12 15:7 91:9
92:12,16,17,21
woman
17:3,20 25:12 29:20,23
30:7
words
4:22
wore
70:1
work
7:24 74:8,9 77:18
worked
66:23 71:1 74:6
working
63:22 74:17 77:11
works
71:24
worse
51:16
wound
23:17
wrap
54:24 55:2 61:1
wrapped
61:16
wrist
35:1,2 44:20 64:20
65:14 82:20 84:3
87:21
wrists
84:7

write
82:5

**X**

x
3:1,11
xrays
42:6 43:11,12,16,18

**Y**

yeah
11:23 14:2 23:6 38:20
55:19,24 58:2 59:7
59:21 64:10 82:23
84:8
year
7:11,17,19 10:20 72:16
years
6:12,18,24 9:11
youll
82:12 88:4,20
younger
27:21
youre
6:13 8:4 17:24 39:13
42:5 65:1 66:8,10,17
67:11,12 78:13 80:3
82:17,18 83:17 84:9
88:4
youve
37:17 46:7 50:11 51:7
52:7 54:8 56:1,1 65:9
69:17 78:9 89:20

**Z**

**0**

00
1:21 8:22 10:2 42:12
42:16
084003859
1:24

**1**

1
3:14 6:3 35:8 37:13,16
72:15 87:12
10
1:21 6:12 9:11 14:14
25:24 28:15 35:8
38:19 40:4 55:17
59:6 62:7 73:4 87:12
10year
9:13
12
7:8
13
10:1,8 36:21 47:14,18
48:23 50:18 86:21
13th
8:8
15
38:19
16
1:7
16th
93:10
17
54:11,17 57:17 59:12
70:8 72:13 73:1,1
85:12

17th
50:1 57:15 59:21 72:18
73:9
18
54:12 70:19 72:14
85:19
180
2:5
18th
50:2
19
73:7
1st
73:8 76:5

**2**

2
3:15 46:2,6,22 47:4
64:19 87:13
20
7:8 12:5
2006
9:19
2014
8:8 10:1,8,20 36:21
47:14,18 48:23 50:2
50:19 57:17 70:8
72:15,16,16,17,17,18
72:18,19 76:10 80:24
85:3,12,19 86:3,14
86:21
2016
1:20 13:15 86:9 92:6
93:11
2019
6:7
20x20
12:21
21
7:6
2260
2:15
23
6:18
230
1:19 2:15 92:7
24
69:22
24th
72:18 73:9
25
72:15 73:4
2600
2:5
27
73:4
27th
72:16

**3**

3
3:16 8:22,22 10:2
13:18 28:16 42:11,12
42:13 48:9,13 87:13
30
8:22 13:18 42:12
312
2:7,17
37
3:14
3rd
72:17 73:8

**4**

4
3:4,17 42:12 49:13,17
64:21,22 72:16 89:18
401253912
6:5
45
42:11
46
3:15
48
3:16
49
3:17
4th
73:8

**5**

5
3:18 6:3 14:14 36:9
50:6,10 55:17 64:21
64:22 89:19
50
3:18
50s
17:8
51
3:19
52
3:20
54
3:21
5788
1:7
58
28:16 42:13
59
9:1
5th
1:20 92:5

**6**

6
3:19 36:9 42:16 51:3,7
52:20 53:2 55:17
59:4,6 73:4
60431
6:8
60601
2:6,16
6415944
2:7
6th
72:19

**7**

7
3:20 52:2,5,20 53:2
59:4,6 73:1,4
7020584
2:17
75
6:3

**8**

8
3:21 7:9 54:2,6 70:7
73:4
8th
72:17 73:9

**4**

4
3:4,17 42:12 49:13,17
64:21,22 72:16 89:18

**9**

9
35:10

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052



DEFENDANT'S
EXHIBIT

2014-07-14 11:46    costco w342 office        630 328 2920 >> costco Wholesale  P 4/4

ML NUMBER _____

COSTCO WHOLESALE CORP.                    WAREHOUSE LOC. # 342

MEMBER FIRST REPORT OF INCIDENT TO BE FILLED OUT BY MEMBER ONLY
(Do Not Complete on Behalf of Member)

1.  Name: _____Rhonda Mitts_____

    If Minor, Parent/Guardian: _____

2.  Date of Birth: _1-5-75_  Email Address: ___mitt_cm@msn.com___

3.  Your address (Please include city and zip code): _2019 Providence Way, Joliet, IL
    60431_

4.  Home Phone Number: (815) 609-0120  Work Phone Number: (   ) _____

5.  Employer: _____  City: _____

    Occupation / Job Title: _____

6.  Are you a Costco Member? Yes ___✓___  No _____  Membership # _111770 373794_

    If you are a guest of Costco, please identify Costco member who accompanied you:

    Name: _____  Membership #: _____  Telephone No.: (   ) _____

7.  Incident date: _7/13/14_  Time incident occurred: _3:30 pm_

8.  Description of Incident: _Went into cooler for milk + eggs slipped and
    fell on a clear substance_

9.  Did anyone witness the incident: YES ___✓___  No _____  IF YES, PLEASE GIVE: _815-609-0120 60431_

    Name: _Michael Mitts_  Address/Phone No.: _2019 Providence Way, Joliet, IL_

    Name: _____  Address/Phone No.: _____

    Name: _____  Address/Phone No.: _____

10. Was a Costco employee involved in the incident? YES _____  NO __✓__  If Yes, Who? _____

    Employee Name: _____

11. Was anyone injured: YES ___✓___  NO _____  If Yes, Who? _Rhonda Mitts_

    Please describe (injury, illness, property damage): _Forearm Fracture_

12. Do you intend to seek medical treatment? (YES)  NO  If yes, name of doctor or hospital:
    _Edwards Hospital - ER  Dr. Peter Schubel, MD_

    _Rhonda Mitts_
    MEMBER SIGNATURE                    DATE            TIME

DISTRIBUTION:    White Copy:   RETAIN AT WAREHOUSE
                 Yellow Copy   REGIONAL MANAGER
                 Pink Copy     MEMBER (UPON REQUEST

FORM# SF03  06/09

DEFENDANT'S
EXHIBIT
2
R. MITTS  10-5-16
90272





DEFENDANT'S
EXHIBIT
4
R. MITTS 10-6-14



DEFENDANT'S
EXHIBIT
5

R. MITTS   10-5-16





DEFENDANT'S
EXHIBIT
7
R. Myers   10-5-16

03013          rd

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RHONDA MITTS,                          )
                                       )
                Plaintiff,             )
                                       )
        Vs.                            )          No. 2016 cv 5788
                                       )
COSTCO WHOLESALE CORPORATION,)
                                       )
                Defendant.             )

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

Now comes the Plaintiff, RHONDA MITTS, and for her Answers to Interrogatories propounded by Defendant, COSTCO WHOLESALE CORPORATION, states:

Objection. Defendant's "definitions" and "instructions" are so complicated as to be incomprehensible. They also require an unduly burdensome level of detail, they intrude into attorney work product and attorney client communications, they would require the plaintiff to adopt non-standard and non-accepted definitions of English words and terms, and they are improperly directed to plaintiff's attorney rather than to the plaintiff. Plaintiff's answers to interrogatories are subject to these objections, and plaintiff's answers are made as if the "definitions" and "instructions" preceding defendant's interrogatories do not exist.

1. State your full name, age, date of birth, occupation, last four digits of your social security number, marital status and name of spouse, if any.

**Answer:**     Rhonda Elaine Mitts
                Age:41
                Date of Birth: January 5, 1975
                Occupation: Customer service representative
                Social: XXX-XX-3912
                Married to Michael Mitts.

2. Identify each of your residence addresses in the last ten years and the dates during which you resided at each address.

**Answer:**     2019 Providence Way
                Joliet, Illinois 60431.



DEFENDANT'S EXHIBIT
8
R. Mitts  10-5-16

3. Identify each of your employers (including your present employer) in the last ten years, addresses of those employers, occupation at each place of employment, and the dates of each employment.

**Answer:**    Health Care Service Corporation
1020 31st Street
Downers Grove, Illinois 60515
Customer service representative from November 11, 2014 to today.

Heartland Bank and Trust Company
700 W. Jefferson Street
Shorewood, Illinois 60404
Teller
August 2014 to November 2014.

Equifax
1550 Peachtree Street NE
Atlanta, Georgia 30309
Sales consultant
February 2005 to February 2014.

4. State the full name and current residence address of each person who witnessed or claims to have witnessed the occurrence that is the subject of this suit.

**Answer:**    Rhonda Mitts, Plaintiff, address previously provided.
Michael Mitts, same address as Plaintiff.
Defendant's woman employee who was standing at the corner giving out samples, name unknown.
Unknown woman at Costco.

5. State the full name and current residence address of each person, not named in Interrogatory No. 4 above, who was present, or claims to have been present, at the scene of the occurrence(s) described in the complaint immediately before the occurrence(s), at the time of the occurrence, or immediately after the occurrence.

**Answer:**    Unknown.

6. State the name and current or last known address of all individuals who have been contacted, interviewed or interrogated on your behalf, either before or after the commencement of this suit, concerning the facts alleged in the pleadings and the subject matter of this action.

**Answer:**    Objection, seeks to invade attorney work product.

7. Do you have any statements from any witness, including yourself? If so, give the name and address of each such witness, the date of said statement and state whether such statement was

written or oral. Provide a copy of said statement pursuant to FRCP 34.

**Answer:**     No.

8. Do you allege or contend that your injury, illness or damages were due to or caused in any way by any defect, defective condition, foreign substance or object on the premises described in you complaint? If so, state with particularity:

a.     The nature of the alleged defect, object, substance or condition which caused the alleged occurrence giving the exact dimensions and physical description of such including the size, shape, color, height, length and depth of such defect or object.

b.     The length of time each defect, condition, or circumstance, if any, existed; and

c.     The specific time that you first became aware of the defect, condition or circumstance.

**Answer:**     A.     A wet, sticky substance on the floor, about a foot to a foot and a half long.

B.     Unknown.

C.     When I slipped. There were no wet floor signs.

9. Was an inspection made by you or your agents to determine the nature of source and such defect, defective condition, foreign substance or object? If so, describe the date of such inspection, identify by name and address the person making such inspection, and describe what was found to be the source for such defect, defective condition, foreign substance or object.

**Answer:**     No.

10. Do you or your attorneys have knowledge of the results of any inspection, examination, or testing of the premises in question? If yes, please state the dates and places of the inspections, examinations, or testing, the identity and address of the persons or organizations, whether any report was prepared with respect to the results of the inspections, examinations, or testing, and who presently has custody of such reports.

**Answer:**     Objection, improperly directed to Plaintiff's attorneys.

11. Identify, as nearly as possible, the exact location at which the alleged occurrence took place on the premises of the defendant(s), pinpointing such location in feet, inches and direction from fixed objects or boundaries at the scene of the occurrence.

**Answer:**     I do not have exact measurements. It was inside the store, by the dairy case, inside the inlet area.

12. Were any photographs taken of the scene of the occurrence or of the persons or

alleged condition on the premises at any time? If so, state the date or dates on which such photographs were taken, the subject thereof, the name and address of the person who took said photographs and who now has custody of them. Provide a copy of said photographs pursuant to Rule 214.

**Answer:**    Yes. See photographs taken of the scene of the occurrence and of Plaintiff's injuries, which were produced in Plaintiff's Rule 26 disclosures, taken by Michael Mitts, 2019 Providence Way, Joliet, Illinois 60431.

13. Identify all persons not heretofore identified in answers to the foregoing interrogatories who have knowledge of discoverable matters (liability or damages) related to this lawsuit.

**Answer:**    See physicians listed in Plaintiff's answer to Interrogatory No. 18.

14. List any individual employed by a Defendant, or any staff member at the subject premises, to whom you reported the presence of the alleged defect, defective condition or object, stating:

a.    The date and form (oral or written) of such report and the place where the report was given;

b.    The name or job title, or a job description and a physical description of such individual to whom the report was given;

c.    The name and last known address of any other individual present at the time such report was given; and

d.    Attach a copy of each said report hereto.

**Answer:**    Defendant's employee, name unknown.

A.    July 13, 2014. Written.

B.    I do not know their name or job title.

C.    Myself, Michael Mitts, and Defendant's employee.

D.    Not available.

15. Have you (or has anyone acting on your behalf) had any conversation with any person at any time, with regard to the manner in which the occurrence complaint of occurred, or have you overheard any statements made by any person at any time with regard to the injuries complaint of by Plaintiff or to the manner in which the occurrence complain of occurred? If the answer to this Interrogatory is in the affirmative, state the following:    ·

a.    The date or dates of such conversations and/or statements;

b.    The place of each conversations and/or statements;

c.    All persons present for the conversation and/or statements;

d.    The matters and things state by the person in the conversations and/or statements;

e. Whether the conversation was oral, written and/or recorded; and

f. Who has possession of the statement if written and/or recorded.

**Answer:**
A. July 13, 2014
B. Defendant's store.
C. Myself, Michael Mitts and Defendant's employee.
D. I told them about the accident, and they said they would prepare an accident report.
E. The accident report was written.
F. The Defendant kept the accident report. ·

16. State the name, address, and telephone number for the individual or individuals with knowledge of any facts to support that the unreasonably dangerous condition which Plaintiff alleges caused Plaintiff's accident existed for a period of time thereby giving defendant notice of the condition. Also, briefly state what information these individuals have regarding the condition.

**Answer:** Objection, seeks to invade attorney work product.

17. Describe, in general, the personal injuries sustained by you as a result of the occurrence alleged in the Complaint.

**Answer:** Painful injuries of a fractured left arm and twisted right foot.

18. With respect to said injuries described in your answer to Interrogatory No. 17, state:

a. The name and address of each attending physician or other medical person who has provided you with treatment/service, the date or inclusive dates on which each rendered you service, the type of treatment/service provided and the amount of each of their respective bills; ·

b. The name and address of each person or laboratory from which you have received an X-ray, MRI, radiograph, blood test or any other type of test taken and the amounts of the bills for said tests; and

c. From which of the above medical personnel do you have written reports.

**Answer:**
A. Peter Schubel M.D.- Emergency Medicine
801 S. Washington Street
Naperville, Illinois 60540
07-13-2014   amount unknown at present.

Brian Murphy M.D.
M &M Orthopedics
1900 Ogden Avenue, Suite 210
Aurora, Illinois 60504
07-17-2014   amount unknown at present. Surgery.
07-25-2014   $139.00

08-27-2014   $90.00
10-06-2014   $90.00

Irena Domjan M.D.- Internal medicine
25 N. Winfield Road, Suite 400
Winfield, Illinois 60190
07-17-2014   $350.00

Joseph Sutherland M.D. - Internal Medicine
25 N. Winfield Road, Suite 400
Winfield, Illinois 60190
07-18-2014   $153.00

B.     Edward Hospital
801 S. Washington Street
Naperville, Illinois 60540
See medical bills produced for date, amount, and type.

M&M Orthopedics
1900 Ogden Avenue, Suite 210
Aurora, Illinois 60504
See medical bills produced for date, amount, and type.

C.     None.

19. As a result of said personal injuries which were described in your answer to Interrogatory No. 17, were you an in-patient or out-patient in any hospital or clinic? If so, state:

a.     The names and addresses of each such hospital or clinic;
b.     The amounts of their respective bills; and
c.     The date or inclusive dates of said services.

**Answer:**     Yes.

A, B, C).

Edward Hospital
801 S. Washington Street
Naperville, Illinois 60540
07-13-2014          $4,465.00
07-17-2014 to 07-18-2014   $23,418.00

M&M Orthopedics
1900 Ogden Avenue, Suite 210
Aurora, Illinois 60504

| | |
|---|---|
| 08-01-2014 | $365.00 |
| 08-04-2014 | $264.00 |
| 09-03-2014 | $254.00 |
| 09-08-2014 | $254.00 |
| 09-17-2014 | $254.00 |
| 09-24-2014 | $219.00 |

20. As a result of said personal injuries described in your answer to Interrogatory No. 17, were you unable to work? If so, state:

      a.     The name and address of your employer, if any, at said time;

      b.     The date or inclusive dates on which you were unable to work;

      c.     The amount of wage or income loss claimed by you;

      d.     The name and address of your supervisor(s) the time period immediately before your incident, during the time period you were unable to work and upon your return to work;

      e.     The name and address of your present employer, if any.

**Answer:**     No, I was unemployed.

21. Had you suffered any personal injury, medical condition, medical problem or chronic illness in the ten (10) years prior to the date of the occurrence alleged in the Complaint, whether physical or mental? If so, state when, where, and, in general, how you were so injured, and describe, in general, the injuries suffered.

**Answer:**     Objection, unduly burdensome for the length of time and as to every slight injury or illness which did not require medical attention. Answering without waiving said objection, and limited to injuries or illnesses which required medical attention: See Plaintiff's answer to Interrogatory No. 22.

22. During the ten years immediately prior to the date of the occurrence alleged in the Complaint, had you been confined in a hospital, treated by a physician, received physical therapy or been X-rayed/radiographed for any reason? If so, give the name and address of each such hospital, physician, medical professional, technician, or clinic, the approximate date of the confinement or service and state, in general, the reason for such confinement or service.

**Answer:**     In March, 2014, I had carpal tunnel surgery by John Lombardi, M.D., 100 Spalding Drive, Suite 300, Naperville, Illinois 60540, with the surgery performed at the DuPage Medical Group Surgical Center, 430 Warrenville Road, Suite 210, Lisle, Illinois 60532.

      In January of 2012, I was treated for a hiatal hernia at the DuPage Medical Group, 100 Spalding Drive, Naperville, Illinois 60540.

      Around 2007 or 2008, I was treated for a mitral valve prolapse at the

DuPage Medical Group, 100 Spalding Drive, Naperville, Illinois 60540.

Around 2007 or 2008, I had my gallbladder removed at Edward Hospital, 801 S. Washington Street, Naperville, Illinois 60540.

From approximately 2006 to date, I have had high blood pressure, treated by Steven Lieberman, M.D., 100 Spalding Drive, Naperville, Illinois 60540.

From around 2007 or 2008 to date, I have had gastroesophageal reflux disease (GERD), treated by Donald Rusthoven, M.D., 2940 Rollingridge Road, Suite 300, Naperville, Illinois 60564.

I have had kidney stones a couple of times, treated at the DuPage Medical Group, 100 Spalding Drive, Naperville, Illinois 60564.

I was told I had a fatty liver at the DuPage Medical Group, 100 Spalding Drive, Naperville, Illinois 60564.

I do not recall the specific doctors unless listed above, and the above is all I can recall at this time.

23. Have you suffered any personal injury, medical condition, medical problem or illness since the date of said occurrence, whether physical or mental? If so, for each (a) state when, where, and, in general, how you were injured and describe, in general, the injuries suffered, and for (b) state when you were ill and describe, in general, the illness. Also provide the name and address of every medical provider who treated you for the injury/illness.

**Answer:**  A.  No injuries.

B.  I still have high blood pressure and GERD, seen by the physicians listed in answer to Interrogatory No. 22.

24. Have you ever been declared legally disabled? If so, state:

a.  The institution or agency which declared you disabled;

b.  The personnel in the aforementioned institution or agency that handles your claim;

c.  The time period during which you were declared disabled;

d.  The physical or mental impairment for which you were declared disabled, generally;

e.  Produce the medical records you submitted that contain evidence of the physical or mental impairment, pursuant to Rule 214; and

f.  Produce your application for disability with any and all attachments, pursuant to Rule 214.

**Answer:** No.

25. Are you claiming any psychiatric, psychological and/or emotional injuries as a result of this occurrence? If so, state:

        a.    The name of any psychiatric, psychological and/or emotional injury claimed and the name and address of each psychiatrist, physician, psychologist, therapist or other health care professional rendering you treatment for each injury;

        b.    Whether you had suffered any psychiatric, psychological and/or emotional injury prior to the date of the occurrence; and

        c.    If b is in the affirmative, please state when and the nature of any psychiatric, psychological and/or emotional injury, and the name and address of each psychiatrist, physician, psychologist, therapist or other health care professional rendering you treatment for each injury.

**Answer:** No.

26. State any and all other expenses and/or losses you claim as a result of the occurrence. As to each expense and/or loss, state the date or dates it was incurred, the name of the person, firm and/or company to whom such amounts are owed, whether the expense and/or loss in question has been paid and, if so, by whom it was so paid, and describe the reason and/or purpose for each expense and/or loss.

**Answer:** Objection, this Interrogatory exceeds the 25 Interrogatory limit of Rule 33 of the Federal Rules of Civil Procedure. Answering without waiving said objection, see medical bills provided in Plaintiff's Rule 26 disclosures, and the medical bill payment records of First Recovery Group and Blue Cross Blue Shield of Illinois, which were provided in response to Defendant's Request to Produce and which are incorporated by reference.

27. If you have ever made a claim or filed a lawsuit for injury or damages other than the Complaint in this case, fully disclose all information regarding these lawsuits or claims including but not limited to the date(s) each incident which led to injury or damage occurred, the nature of the injury or damage, a brief description of how the injury or damage was incurred, the names and addresses of the parties against whom each claim or lawsuit was made, the date the claim was made or lawsuit filed, and in the case of a lawsuit, the court in which it was filed, the year filed, and the title and docket number of each such suit.

**Answer:** Objection, this Interrogatory exceeds the 25 Interrogatory limit of Rule 33 of the Federal Rules of Civil Procedure.

28. If you have ever been convicted of or pled guilty to a crime, fully disclose all information related to the conviction or plea including, but not limited to, the date of the conviction or plea, the full description of the court, the case name and number, the precise

charge, your plea, the name under which you were convicted, the dates of confinement or probation and whether the conviction has been or is being appealed and if so, the court to which appealed, the docket number and the result, if any. Also disclose as much of the above information as practical on any crime of which you have been charged that has not been resolved in the criminal justice system, including the charge and the expected date of trial.

**Answer:** Objection, this Interrogatory exceeds the 25 Interrogatory limit of Rule 33 of the Federal Rules of Civil Procedure. Additional objection is that it seeks irrelevant and harassing information as to any convictions, when only felony convictions or misdemeanor convictions involving dishonesty are admissible.

29. Identify any statements, information and/or documents known to you and requested by any of the foregoing Interrogatories which you claim to be work product or subject to any common law or statutory privilege, and with respect to each Interrogatory, specify the legal basis for the claim.

**Answer:** Objection, this Interrogatory exceeds the 25 Interrogatory limit of Rule 33 of the Federal Rules of Civil Procedure.

## AFFIDAVIT

The undersigned, being duly sworn on oath, depose and state: That I am the plaintiff Rhonda Mitts, and I am familiar with the contents of the document to which this affidavit is attached, and all facts and averments set forth therein are true and correct, to the best of my personal knowledge, or upon information and belief. Further, affiant saith not.

_Rhonda Mitts_

Rhonda Mitts

Subscribed and Sworn before me:

```
OFFICIAL SEAL
PATRICIA S GROVES
Notary Public - State of Illinois
My Commission Expires Jun 19, 2018
```

Benjamin and Shapiro Ltd.
180 N. LaSalle St., Suite 2600
Chicago, IL 60601
(312)-641-5944