IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RHONDA MITTS,            )
    Plaintiff,       )
              ) No. 16 cv 5788
  vs.                )
              )
COSTCO WHOLESALE        )
CORPORATION,
    Defendant.

The deposition of MICHAEL MITTS called for the examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before MARIA MICELI, CSR, at 230 West Monroe on the 5th of October 2016, at the hour of 11:45 a.m.

REPORTED BY:  MARIA MICELI, CSR
LICENSE NO.:  084-003859

1

APPEARANCES:

    BENJAMIN & SHAPIRO, LTD., by
    MR. MICHAEL A. KACZMAREK
    180 North LaSalle Street - Suite 2600
    Chicago, Illinois, 60601
    (312) 641-5944
    mkaczmarek@benshaplaw.com
      On behalf of Plaintiff;

    LIPE LYONS MURPHY NAHRSTADT & PONTIKIS,
    by MR. BRADLEY NAHRSTADT
    230 West Monroe Street - Suite 2260
    Chicago, Illinois, 60601
    (312) 702-0584
    bcn@lipelyons.com
      On behalf of Defendant.

2

DEFENDANT'S EXHIBIT F

I N D E X
WITNESS
MICHAEL MITTS
  By Mr. Nahrstadt

E X H I B I T S
NUMBER                          MARKED FOR ID
M. MITTS Deposition
  Exhibit No. 1                    45

PREVIOUSLY marked R. Mitts
  Exhibit No. 1                    35
  Exhibit No. 2                    43
  Exhibit No. 3                    42
  Exhibit No. 4                    48
  Exhibit No. 5                    49
  Exhibit No. 6                    49
  Exhibit No. 7                    50

ONLY EXHIBIT M. MITTS NO. 1 ATTACHED
TO DEPOSITION

3

(Witness sworn.)

MR. NAHRSTADT:  Sir, can you state your name and spell your last name for the record?

THE WITNESS:  Sure.  It's Michael Mitts, M-I-T-T-S.

MR. NAHRSTADT:  Let the record reflect that this is the deposition of Michael Mitts taken pursuant to notice to all parties.

Let the record further reflect that this deposition is being taken pursuant to all applicable rules.

MICHAEL MITTS, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. NAHRSTADT:

Q. Mr. Mitts, have you given a deposition before?

A. No, I have not.

Q. Let me just go over a couple ground rules for you, okay.

I'm going to be asking you a series of questions about an incident that your wife was involved in in Costco.  I need you to answer my

4

question out loud and in the form of words, okay. Because the court reporter can't take down uh-huhs and un-huns, shrugs of the shoulders and nods of the head, okay?

A. Okay.

Q. If I ask you a question at any time and you don't understand what I'm asking, just let me know and I'll rephrase it and I'll ask it a different way until we get to where we both understand each other, all right?

A. Okay.

Q. Very important rule. I need you to wait until I finish asking my question, even if you think you know what I'm going to ask before you answer, and then I will do my best to wait until you finish answering before I ask my next question, okay?

A. Okay.

Q. Because it's very difficult for the court reporter to take down the two of us -- in fact, it's impossible, for her to take down two of us talking at the same time, right?

A. Understand.

Q. If you want to take a break, I don't

think we're going to be very long, but if you want to take a break, I'll be happy to accommodate you, okay?

A. Okay.

Q. What's your date of birth, sir?

A. June 23, 1971.

Q. And what's your home address?

A. 2019 Providence Way, Joliet, Illinois, 60431.

Q. And you are married to Rhonda Mitts?

A. That is correct.

Q. How many years have you been married?

A. 23.

Q. What's your occupation, sir?

A. I am an account service consultant.

Q. With what company?

A. Axa, A-X-A, Employee Benefits.

Q. What's your highest level of education?

A. High school.

Q. Where did you go to high school?

A. Boone County High School.

Q. In Kentucky?

A. Florence. Kentucky.

Q. You ever been convicted of a felony or

crime involving dishonesty?

A. No.

Q. I'm going to ask you some questions about an incident that happened on July 13 of 2014, okay?

A. Okay.

Q. Do you recall that date?

A. Yes.

Q. And what day of the week was that?

A. That was a Sunday.

Q. What was the weather like that day?

A. It was July, so it was, I believe, I recall it was nice, probably in the 80s, approximately.

Q. Any rain that day?

A. No.

Q. And at some time on July 13 of 2014, you decided you were going to go to Costco?

A. That's correct.

Q. And when did you decide to go there?

A. It was approximately between 2:00 and 3:00.

Q. What were you going to go to Costco for?

A. Pick up a few miscellaneous items.

Specifically, something for dinner that night.

Q. What Costco did you decide to visit?

A. It -- I believe it's considered the Naperville Costco. It's on Route 59.

Q. Do you know what the cross street is?

A. Route 59 and 75th Street.

Q. Had you been to that Costco before July 13 of 2014?

A. Yes.

Q. How many times?

A. Approximately, we would visit there one to two times a month.

Q. How long have you been a member of Costco?

A. Since 2006.

Q. When was the last time you had been in the Naperville Costco prior to the date of your wife's accident?

A. Prior to the date of my wife's accident, I don't recall.

Q. How many times would you say you had been in that store before the date of your wife's accident?

A. Approximately, one to two times a month,

so 12 to 24 times a year.

Q. What time did you get to the Naperville Costco on July 13 of 2014?

A. I would say approximately between 2:30 and 3:00.

Q. And your wife was with you at the time?

A. That is correct.

Q. Did you enter the store together?

A. Yes.

Q. What was your wife wearing at the time?

A. She had capri pants on, her sandals, her Croc sandals, and a top.

Q. When you entered the store, did you get a cart?

A. Yes.

Q. Who got the cart?

A. I believe she got the cart when we entered the store.

Q. And who was pushing the cart as you entered the store?

A. That would have been her.

Q. At some time during your shopping trip to Costco, did you start pushing the cart?

A. Yes.

9

Q. When would that have been?

A. That would have been very shortly after we entered. Typically, she will get it and then I will push it.

Q. Here you, do some work?

A. There you go.

Q. I've been there.

So how much time did you spend shopping before the accident happened?

A. I would say approximately 20 minutes.

Q. And where did your wife's accident happen?

A. It occurred in what they refer to as the milk and egg cooler. It's a cooler that houses milk and eggs.

Q. Big room, refrigerated room, that you walk into, right?

A. Exactly. It's a refrigerated room that I guess you could say sort of resembles a garage.

Q. Is there any door on the cooler?

A. There's no door.

Q. And how big would you say it is?

A. I would have to say -- I would approximately estimate it at 15 feet by 15 feet.

10

Q. And your wife's accident occurred inside the cooler?

A. That's correct.

Q. What time did the accident happen?

A. So I would approximate the accident somewhere between 3:00 and 3:30.

Q. Where is the milk and egg cooler located in that store?

A. If you -- you would probably consider it -- it's in the back of the store on the, I guess you would consider it the left side. The back left side if you were walking in the front door.

Q. So if you're standing at the front of the store, it's in the rear left portion of the store?

A. Correct.

Q. So tell me what happened at the time that your wife was injured?

A. Okay. She had entered the milk cooler to get milk and eggs. I was approximately six to seven feet behind her and what I witnessed was her leg, her legs slipped, looked like she was kind of slipping on ice. Her legs came up, she flipped around, she landed right on her side and on her

11

front.

I immediately rushed over to her and she was in a great deal of pain. And that's when I noticed that -- when I ran up to her that's when I noticed the floor was wet because I had stepped in it as well when I ran up to her, and then her leg, her thigh, her lower calf, I should say, was wet.

Q. Which leg did you see slip?

A. It appeared to be the right leg. I don't exactly recall. I saw one leg start to slide, the other leg start to slide, and then they both came up, she kind of spun and then landed -- and then landed -- and then landed on that arm.

Q. When you say landed on the arm, landed on her left arm?

A. Right, she came down and landed on the left arm.

Q. And then was laying on her left side when you got to her?

A. Correct.

Q. And you said that when you got to her the floor was wet?

A. Yes. When I ran over to her and I got to that -- sort of that final step right by to lean

12

down right towards her, I stepped on the -- I stepped on it and my foot moved a little bit and then that's when I went down to her, I said, are you okay? Are you okay? That's when I noticed her leg was wet and that's when she was telling me, she was crying, saying my arm, my arm.

Q. So where was the substance in relation to your wife when you ran up to her?

A. It was -- at that point it was pretty much kind of underneath her, but on the side. Because when she flipped, when she flipped and fell, so her legs kind of were immediately here. When she flipped, she flipped and moved to the side here. Some at that point it was right about there.

Q. So it was -- the substance was next to her on the floor?

A. Yeah, next to her feet, right next to her feet on the floor, probably slightly to the right because when she slipped and fell and spun, her body spun towards the left. So it was right about on the right.

Q. So it would have been to the right of her?

13

A. Of her. After she fell.

Q. And your foot slipped a little bit?

A. That's correct.

Q. You didn't go down?

A. No, I was already -- I was already going down to make sure she was okay. So as I took my last step and started bending down, I felt my foot give.

Q. Did she ever make it to the eggs?

A. No.

Q. At the time that she fell you were outside the cooler?

A. Correct, I was about maybe two feet outside of the cooler trailing behind her.

Q. And you were with the cart?

A. I had the cart, correct.

Q. So she didn't take the cart into the cooler with her?

A. No.

Q. And you actually saw her fall?

A. Yes. There was nobody else in the cooler. She was in my direct line of sight.

Q. So there were no other shoppers in the cooler?

14

A. Inside the cooler, no.

Q. And no employees inside the cooler?

A. No.

Q. And was your wife carrying anything when she fell?

A. No.

Q. Do you know if anyone other than you saw your wife fall?

A. There was a woman, I'm not sure if she was an employee of Costco or not, there was a woman set up at the corner, the front corner of the cooler, the entrance to the cooler so she wasn't inside the cooler. And she had a table set up and she was doing samples of some sort of -- something about pets.

And so her table was angled to where her point of view was facing, obviously, away from the cooler, so she was standing there. So I'm not sure if she saw her fall because I -- prior to my wife falling as I was walking towards the cooler I just kind of looked over and I saw her standing there. And then that's when I turned to walk towards the cooler and was looking at Rhonda, so I'm not sure if she saw it or not.

15

Q. So you don't know if this woman who was demoing products saw the fall?

A. That's correct.

Q. And you don't know if that individual was an employee of Costco?

A. That's correct also.

Q. If I told you that she was not an employee of Costco, would you have any reason to dispute that?

A. No.

Q. Did you, before your wife's fall, did you talk to the person who was demoing product?

A. No.

Q. Was it a man or woman?

A. It was a woman.

Q. And any idea how old she was?

A. She was an older woman. If I had to put an age on it I would say approximately 45 to 60.

Q. Other than you and the woman who was demoing the products, was there anyone else near the milk and egg cooler when Rhonda fell?

A. There could have been people behind me. Obviously, my line of sight was directly into the cooler, so there very well could have been people

16



behind me. I honestly don't know. Once she fell, I went immediately into the cooler, so...

Q. Do you know what caused your wife to fall?

A. It was definitely whatever was on the floor. There was a liquid substance on the floor.

Q. Do you know what that substance was?

A. I do not. It was a clear liquid substance, but it did have some stickiness or some volume, whatever you want to call it, to it. It didn't appear to be just plain water. There was something to it, but it was clear.

Q. Do you know if your wife saw the substance before she fell?

A. No.

Q. Did you see the substance before your wife fell?

A. No.

Q. Do you know where the substance that your wife slipped on came from?

A. No.

Q. Do you know how long the substance had been on the floor prior to the time your wife fell?

17

A. No.

Q. How big was the -- this area where the substance was, how -- I mean, if you can give me a dimension; was it the size of a teacup, you know, size of a roasting pan, how big was the area that the substance covered?

A. Sure. I probably couldn't give you an area what the substance covered only because by the time I ran over to Rhonda and kneeled down, obviously you could tell the bottom calf of her leg was wet, so it was wet completely. And there was substance on the floor. At that point it was all, you know, from her feet sliding, so it was all kind of mashed up. So I couldn't tell you an approximate of what it was laying on the floor prior to it. So it was just around her feet area when I came up to her.

Q. So it had been disturbed when she fell --

A. Right, when she slipped and fell, absolutely.

Q. And you said -- we just got to make sure that the record is clear, Mr. Mitts. You said that her leg was wet. Left leg, right leg, which leg?

18

A. Yes, it was the left leg. It may have been both, but I'm almost certain it was the left leg and it was also on her shoe, her sandal.

Q. So the left leg between the knee and the ankle?

A. Correct, yeah, the lower portion of it.

Q. Do you know if any representative of Costco knew of the existence of the substance on the floor any time before your wife fell?

A. No.

Q. Do you know if anyone complained to anyone at Costco about the substance on the floor in the milk and egg cooler before your wife fell?

A. No.

Q. So when you saw your wife falling, did she try to catch herself with her hands as she fell?

A. Yes.

Q. And then wound up landing on her left arm?

A. Yes.

Q. And when she came to rest, she was laying on her left side?

A. Correct.

19

Q. And which direction was she facing, was she facing towards the door of the milk and egg cooler or towards the back wall?

A. In terms of her, like, her -- what part of her body?

Q. Her orientation. When she fell, I'm assuming when she fell she came to a stop, right?

A. Yes.

Q. When she fell and came to a stop you said she was on her left side?

A. Yes.

Q. Which direction was she facing at that point, her head; which direction was her head facing?

A. I believe her head was facing the entrance to the cooler.

Q. So did she fall forward or backwards?

A. She slipped, she kind of spun around and then she fell back down.

Q. So when you saw her fall, you ran into the cooler and what did you do?

A. I ran into the cooler. As I ran up to her, I immediately went down on the floor, that's how I knew there was liquid there. And I was

20



like, are you okay? Are you okay? She was immediately crying saying her arm, her arm, her arm. So when she slowly rolled over, that's when I immediately notice her arm was completely started to be twisted and looked deformed.

Q. Did you ask her what happened?

A. No. It was obvious what happened.

Q. Did you help her up?

A. At that immediate point, no.

Q. How long would you say she was on the floor after she slipped?

A. I would say approximately a minute to three minutes. The first thing I did was turn and ask for help.

Q. Who did you -- okay, so let make sure we got the sequence right.

You go in the cooler, Rhonda is on the floor, you ask her if she's okay, she's telling you that her arm hurts, you see that her left arm is deformed, and then what's the next thing you do?

A. I immediately -- while kneeling down with her, I immediately turned my body towards the entrance of the cooler and I said could somebody

21

please get some help and get some ice.

Q. And who did you direct that to?

A. Really anyone that was going to be there. The woman that was in the corner that I referred to before, she was standing there. At that point I can't honestly recall if there was anybody else kind of passing by. I just started yelling, can somebody please get help and can somebody please get some ice.

Q. And did the woman who was passing out the samples, did she respond?

A. Yes, she says I will get somebody.

Q. So what did she do then?

A. She -- she walked away. And then at some -- at some point she came back and she said -- she says, I've called and I've asked somebody to come back here.

Q. How long was she gone?

A. I would say approximately a minute.

Q. And what did she do when she came back?

A. She just said I called somebody. And then at that point I was -- we were starting to help Rhonda up and that's -- at the point she offered, she said, why don't you try sitting up on

22

here, which was the pallets to the right-hand side of the cooler that housed that Silk milk.

So she said, why don't you sit up here and try to just sit up. But when Rhonda sat there, obviously the pallets that had the product on it, they started to -- they were lopsided, so we said no, no, no, she can't sit there.

Q. Did she sit on the pallet at all?

A. She started to, yes. And then, like I said, the product started to shift.

Q. And then what?

A. And then at that point a gentleman came in just really quick. He walked in, from Costco, and he said, okay, he says, someone is on their way back.

And at that point, again, watching Rhonda's arm swell, I said, Rhonda, we gotta get you to the hospital. It's -- you know it's broken, because she yelled out it was broken. So I said, it's clear it's broken. I said, we gotta get you to a hospital. So that's when I helped her up.

Q. The person -- the gentleman who came into the cooler from Costco, do you know his name?

23

A. I don't.

Q. Had you ever seen him before?

A. No.

Q. Did he do anything other than come in and say someone is on their way?

A. He said someone is on their way and then I said can you please bring me some ice.

Q. And what was his response?

A. He walked back out. He didn't respond. He just walked back out.

Q. Did you have any other interaction with that gentleman from Costco?

A. No, I don't recall seeing him after that.

Q. And about how long after the accident happened would you say he was there, Michael?

A. After the -- after the initial accident, I don't know. Everything happened so fast.

Q. Did anyone else from Costco show up then after this gentleman said someone is on the way?

A. After that point we -- I helped Rhonda up and we started to walk out of the cooler because we were on our way to the hospital.

At that point we were engaged by what I would assume would be a manager at Costco. And

24

there was also -- there was either one or two employees with her at the time. I can't recall if it was one or two.

Q. Female employees?

A. There was a -- I believe there was a female, there was two females and, again, the third employee that possibly was a male standing there, too.

Q. And one of these employees you believe was a manager or some type of -- someone with some authority?

A. Yes.

Q. And that was a woman?

A. That was a woman.

Q. Do you know her name?

A. I do not.

Q. Had you ever seen her before the incident?

A. No.

Q. Have you seen her any time since the incident?

A. No.

Q. Do you know the names of the other two people who were with her?

25

A. No.

Q. Did they all arrive at the same time?

A. Yes.

Q. And when they came up, were you and Rhonda still in the cooler?

A. No, at that point we had exited the cooler, turned left, because there's the main aisleway that leads up to the front of the store. So we were starting to head up towards the front of the store.

Q. Let me just back up for a minute.

The woman who was handing out the samples, did you say anything to her other than can you get some help and can you get some ice?

A. No.

Q. Did she say anything to you other than I've called someone and they're on their way?

A. No.

Q. The woman -- strike that.

The manager who showed up as you guys were making your way down the aisle, what did you say to her?

A. So she came up to us, I believe she engaged us and she -- I don't recall exactly what

26

was said. She said, oh, you know, what happened, are you okay? And then I briefly explained to her what occurred and then, again, I stressed can I please get some ice.

At that point one of the other employees that was next to her had two ice packs. Small square ice packs, the ones that you have to pop and, you know, pop in order to activate. So she said oh, absolutely, absolutely. So then the other employee said to what I assumed was the manager at Costco, said, I can't, I don't know how -- I can't get it. She says, all you do is break it. And then she grabbed the two ice packs from the employee, she slammed them on the floor in the main aisleway, they went sliding all over, now mind you there's other shoppers, and then she went back, picked them it up and we put them on Rhonda's arm.

She then told me -- I then told her that we were headed to the hospital. She said, no, you can't. You have to stay because you need to fill out some forms and we have to take a couple of pictures. And I said, I'm not staying. My wife needs medical attention, we are going to the

27

hospital.

Q. Okay. So you said that you had told the manager what happened. What did you tell her had happened?

A. I said that she had fallen in the egg/milk cooler and that she had slipped on a substance that was in there, the floor was wet. She slipped on the substance and she's apparently broken her arm.

Q. So did you wind up going to the -- strike that.

Did you, at that time, fill out an accident report?

A. At that time, no, I did not.

Q. You left to go to the hospital?

A. That is correct.

Q. What did they do with your groceries?

A. They put them -- I think they put them away or put them to the side.

Q. Did you come back and get them later?

A. When I came back after the emergency room and filled out the emergency report, the manager said we held your groceries if you're interested in buying them. So I purchased them.

28

Pages 25 to 28

Q. Have you been back to the Naperville Costco since your wife's accident?

A. So we went back at some time later, approximately months later after the accident. I don't recall exactly when. We went back. My brother was in town, so we went back. He wanted to pick up something. We probably were in the store, that specific Costco store, for maybe 10 minutes and my wife started to have a panic attack so we left.

Q. Do you know when that was?

A. I would say probably months later. I would have to approximate it around the holidays. That's typically when my brother comes into town.

Q. So this would have been around the Christmas Holiday in 2014?

A. Correct.

Q. Have you been back to that Costco since?

A. I was back about a month ago. We stopped in to -- I needed a pair of jeans and I stopped in to get a pair of jeans.

Q. Other than those two visits, Michael, have you been back in the Naperville Costco store since the accident?

29

A. No, I have not.

Q. Have you spoken to any employees of Costco about your wife's incident since the day of the accident?

A. No, I have not.

Q. Do you know what the substance was that your wife slipped on?

A. I do not.

Q. And do you know how it got there?

A. I do not.

Q. How long would you say that you talked to the manager who had the employees with the ice packs with her?

A. So, approximately, from the time it took us to get from the back of the store, because we had already exited the cooler, so we were right in front of the cooler, so from the approximate time to get from the back of the store to the front of the store she walked us out to the front door. So I would say two minutes. Rhonda wasn't walking, obviously, very quickly in terms of she was in a lot of pain. So I would say an approximate time of two to three minutes.

Q. Did she say anything to you other than

30

you need to fill out a statement and we need to take some pictures?

A. No, that was it. Outside of after I said I'm not doing that right now, I need to get medical attention for my wife, she asked could you come back at some other time to fill something out.

Q. So she asked you to come back and fill out a report?

A. Yeah, at whatever time I could, yes.

Q. And you did do that?

A. That's correct.

Q. And at any time after your wife fell in the milk and egg cooler, did you see anyone from Costco cleaning up anything on the floor of the cooler?

A. No, I did not.

Q. Did you have a cell phone with you at the time?

A. At the time of the accident?

Q. Yeah.

A. Yes.

Q. Did you take any pictures of the substance or the area where your wife fell at that

31

time?

A. Not at that time.

Q. But I understand that you did take a picture later when you came back?

A. Yes. So when I returned from the emergency room and went back to Costco to fill out the accident report, before I went to the front office I went back to the dairy cooler to take a couple of pictures. And at that time there was liquid on the floor still.

Q. How many pictures did you take?

A. Probably four, approximately.

Q. You still have them?

A. Yes, they're on my cell phone.

MR. NAHRSTADT: Mike, I would like to get a copy of those, if we can. I think we've only got the one. I don't know if there's more. It sounds like there's more than one.

THE WITNESS: There is the one picture I believe Mike has and then there's probably two or three more of just similar to pictures like that of just sort of the dimension or the picture of the room, yes.

32

BY MR. NAHRSTADT:

Q. All right, okay.

When Rhonda got up from the floor after the accident, were her clothes wet?

A. Her leg -- she had capris on, so the capris pants come down to just, you know, like slightly below the knee. So most of the wetness was on her leg, on the bare side of her leg. And there was some wetness on her shoe, obviously.

Q. And again, it's the left leg we're talking about, right?

A. If I recall it was the left leg.

Q. And her left shoe?

A. And her left shoe.

Q. Did you get anything to wipe off her leg or her shoe?

A. No, just with my hand.

Q. So you wiped off her leg and her shoe with your hand?

A. Yeah, when she was getting up and we were getting ready to go to the hospital, I just kind of wiped it off.

Q. How would you describe the substance, was it sticky, was it --

33

A. It had a residue -- it had a substance to it. So it was sticky, it wasn't -- it wasn't completely thick like a syrup thick, but it had some volume to it and it was sticky.

Q. And clear?

A. It appeared clear.

Q. How would you describe the lighting in the milk and egg cooler?

A. The lighting in the milk and egg cooler, if I recall, it's similar to the lighting in the store. So typical warehouse store that has the overhead -- I can't remember what you call those type of lights, not neon lights.

Q. Fluorescent?

A. Fluorescent, yes. So the lighting in the cooler is pretty much identical to what's in the store itself.

Q. Did you have any trouble seeing in the cooler?

A. No.

Q. Did you at any time, did you smell the substance that your wife slipped in?

A. No.

Q. Did you taste the substance that your

34

wife slipped in?

A. No.

Q. Didn't want to do that, right?

A. No.

Q. What's the floor of that milk and egg cooler made out of?

A. It's made of the same material as the floor in the entire store, which appears to be just a concrete with like a glaze, like a protectant, whatever, glaze protectant.

Q. Protective coating?

A. Yeah, the coating, the glaze coating.

Q. Had you or your wife had any problems with the floors in that store prior to the date of her accident?

A. No.

(Whereupon, R. MITTS Deposition Exhibit No. 1 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q. Mr. Mitts, I'm going to show you what we've previously had marked as Exhibit 1 for identification from your wife's deposition.

Just take a look at that and let me know

35

when you've had a chance to look at it, okay?

A. Okay.

Q. Can you tell me what that is?

A. So this is the milk and egg cooler. Appears to be the milk and egg cooler of Costco.

Q. Does it depict the area where your wife's accident occurred?

A. Yes.

Q. And can you tell us, using that photograph, where she fell?

A. Sure.

Q. I'm going to come over here and take a look as you're describing it.

A. It would be approximately right about there.

Q. We see there's a stack of boxes right past this garbage can on the right-hand side, right?

A. Yes.

Q. Is that the Silk that she was trying to sit down on after the accident?

A. I believe all that's Silk and whatever.

Q. So it would have been over to the left of those pallets that are on the right side of the

36

cooler?

A. Correct.

Q. And as you're approaching the eggs, right?

A. Correct.

Q. So at the very end of the photo we see this stack of merchandise, on the bottom there is where the eggs are?

A. That's correct.

Q. So it would have been over on the right-hand side as she was approaching the eggs?

A. Yeah. So if I divided the floor in half, it would be, yeah, it would be the right quadrant closer to the Silk.

Q. About how far do you think she was in the cooler?

A. I probably say five feet maybe.

Q. Okay.

A. Give or take.

Q. But she was definitely in the cooler when it happened?

A. She was definitely in the cooler, yes.

Q. I think that's all the questions I have on that exhibit. Let me just take a look.

37

So after you talked to the manager and told her my wife fell in the milk cooler, she's injured and gotta get to the hospital, you took her to the hospital?

A. That's correct.

Q. Which hospital did you go to?

A. It's Edward in Naperville. I can't remember if it's considered Edwards North or South, I can't remember exactly the official name of it. It's Edwards. It's in Naperville.

Q. Do you know when you got there?

A. I'd approximately say -- the hospital is only literally five to seven minutes from Costco. So, again, probably 10 minutes after we left the store, to be safe.

Q. How long were you there?

A. I would say we were in the emergency room for probably hour to two hours, approximately.

Q. Do you know the name of the doctor that your wife saw?

A. I believe the emergency room attending was Dr. Schubel, if I pronounced it correctly.

Q. Did he perform any tests?

A. Yes. Well, he examined her and then she

38

went for both arm X-rays and they also did an X-ray of her foot because her foot was starting to swell as well.

Q. Which arm did they X-ray?

A. The left.

Q. Left arm?

A. Yes.

Q. Which foot?

A. The foot was, I believe, the right foot.

Q. Do you know what the results were?

A. The results were the arm was broken. It had a clean break in whichever bone, I'm not going to remember the bones, but it was a clean break.

Q. Left forearm bone?

A. Yes, left forearm bone. And then the results of the foot X-ray were negative. So she apparently just had a sprain.

Q. So at some point while you were there, did they talk with you and your wife about her needing surgery on the arm?

A. Yes, the doctor came in after he had the results and he explained to Rhonda the results, he said you're probably going to need some surgery to put some screws or whatever in it.

39

Q. And then after you left the ER, is that when you went back to Costco?

A. Yes.

Q. So what time do you think you got there?

A. I would probably say anywhere approximately around 6:00, give or take.

Q. And I take it Rhonda was with you?

A. She stayed in the car when I went back to the store.

Q. You went in the store, she stayed in the car?

A. Correct.

Q. What did you do when you got in the store?

A. So the first thing I did when I went into the store is I went back to the milk cooler just to take a couple of pictures. And then from there I went to the front of the store and that's when I saw the manager again and she immediately asked me, she says, oh, how is she? And I told her what the result was, that she had broken her arm.

Q. Did you say anything else to her at that time?

A. No. I mean, well, no, she was like, oh,

40

I'm so sorry, I can't believe that. She says, can you stay and fill this out, this piece of paper right here.

Q. So she gave you the incident reports to fill out?

A. That's correct.

Q. And you filled out two of them?

A. Yes. I think they were -- I believe either she made a copy or they were kind of the carbon type paper. I believe she made a copy. I don't remember filling out two. I think I signed -- I may have signed two, but I believe she made a photocopy of one.

And prior to filling them out, I did let her know that before I filled this out I just want to let you know I was just back in the cooler, I went to take a picture, there's still liquid all over the floor. I said, please have somebody clean it before somebody else falls.

Q. And what did she say?

A. She said, oh, yeah, I'll take care of that right away.

41

(Whereupon, R. MITTS Deposition Exhibit No. 3 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q. Let me show you what we've marked as Exhibit 3 for identification. Is that the picture that you took of the floor when you went back around 6:00 that day?

A. That's one of the photos.

Q. And do the other photos show anything other than what's depicted in Exhibit 3?

A. Just -- the other photos are similar to Exhibit 1 that you have here, so the --

Q. More of a wide shot of the cooler itself?

A. Yes.

Q. And Exhibit 3 is a close-up of the floor?

A. Of the floor, yes.

Q. Is that on the left side of the cooler?

A. Yes, that was right in front of the milk.

Q. So not the area where your wife fell?

A. Correct.

Q. And it looks like there's some -- there's some white on the -- in the middle, pretty much in the exact middle of that picture, right?

42

A. Correct.

Q. Of what we've marked as Exhibit 3?

A. Correct.

Q. And do you know what that white substance was?

A. That substance was clear it was milk.

Q. And do you know how long that substance had been on the floor before you took that picture?

A. No, I do not.

Q. Do you know if anyone from Costco knew that that substance was on the floor before you took the picture?

A. No, I do not.

(Whereupon, R. MITTS Deposition Exhibit No. 2 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q. And the -- let me show you, Mike, what we've marked as Exhibit 2 for identification. That was Exhibit 2 at your wife's deposition. Just take a look at that and let me know if you recognize that document.

A. Okay, yep.

43

Q. Can you tell me what that is?

A. So this is the incident report to -- this is the incident report that was filled out and this was -- she asked me to fill it out for Rhonda.

Q. So when you say she, let's make sure the record is clear, the manager at Costco asked you to fill that report out?

A. Yes. She asked me to fill this out, yes.

Q. AND was it the same manager that you had talked to as the two of you were leaving the store when the accident happened?

A. Yes.

Q. And this was the report that you filled out 6:00 or so when you came back after Rhonda had received medical care?

A. Approximately, yes.

Q. So the handwriting that's on that report that we've marked as Exhibit 2 from your wife's deposition, is that in your handwriting?

A. Yes, this is my handwriting except for the signature.

Q. And the signature is your wife's?

A. Correct.

44

Q. And so did you take this -- the report out to Rhonda in the car to have her read it and then sign it?

A. The manager took it out. The manager walked out with me directly to the car and then the manager just asked Rhonda how she was doing, et cetera. And then she asked Rhonda to take a look at this and sign it.

Q. So where were you when that report was filled out?

A. This one here?

Q. Yeah. Physically in the store where were you?

A. I don't know if they call it the front office, there's like a little office in front of all the cash registers, there's the front of the store, there's like a little office. I guess an office.

(Whereupon, M. MITTS Deposition Exhibit No. 1 was marked for identification.)

BY MR. NAHRSTADT:

Q. And then let me show you what we've marked as Exhibit 1 for purposes of your

45

deposition. So it's Exhibit 1, M. Mitts 10/5/15. Take a look at that document, will you. Let me know when you've had a chance to look at it.

A. Okay.

Q. Can you tell me what that document is?

A. So this is the document that I filled out after I returned to the Costco in front of the manager. I filled this out, answered all the questions and signed it.

Q. So it looks like that's different than the document that we marked as Exhibit 2 for your wife's deposition, right?

A. Correct.

Q. So it is two separate reports?

A. Correct.

Q. You filled out both, and the first one, the one that we've marked as Exhibit 2, defendant's Exhibit 2, R. Mitts 10/5/16, this one is entitled Member First Report of Incident To Be Filled Out by Member Only, right?

A. Uh-huh.

Q. And then the one that we've marked as Exhibit 1 --

MR. KACZMAREK: Is that a yes?

46

THE WITNESS: Yes.

MR. NAHRSTADT: He's very good at catching me on that, I'd just let you slide.

BY MR. NAHRSTADT:

Q. And then one that we've marked as Exhibit 1 for identification for your deposition, that's actually entitled Witness Report of Incident, right?

A. That's correct.

Q. So the one that we've marked as Exhibit 1 for purposes of your deposition, filled out in your hand and signed by you, right?

A. Correct.

Q. And what's the time on that report?

A. 5:52 p.m.

Q. So just about exactly when you thought you were back there, close to 6:00 on the day of the incident?

A. Yes.

Q. Have you filled out any other documentation, any other reports about what happened, other than these two that have been marked as Exhibit 2 for Rhonda's deposition, Exhibit 1 for your deposition?

47

A. No.

Q. Have you spoken to any witnesses about the incident other than the conversations you related to me that you had on the day that Rhonda fell?

A. No.

(Whereupon, R. MITTS Deposition Exhibit No. 4 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q. Let me show you what we've marked as Exhibit 3 -- I'm sorry.

Let me show you what we've marked as Exhibit 4 for identification from your wife's deposition. Tell me if you recognize that.

A. Yes.

Q. Can you tell me what that is?

A. That's a picture I took of Rhonda when she was in the hospital. This would have been after she had the surgery on her arm.

Q. So this would have been post-surgery?

A. Post-surgery.

Q. Day of the surgery?

A. Day of the surgery, yes. Evening of the

48

surgery.

(Whereupon, R. MITTS Deposition Exhibit No. 5 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q.  Let me ask you to take a look at what we've had marked as Exhibit 5 at the deposition of your wife.  Can you tell me what that document is?

A.  So that's a picture I took of Rhonda when she was at the emergency room.

Q.  Picture of her left arm?

A.  Correct.

Q.  And it appears that she's holding her left arm in her lap in the emergency room?

A.  Correct.

(Whereupon, R. MITTS Deposition Exhibit No. 6 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q.  Let me show you what we've marked as Exhibit 6 for identification.  Tell me if you recognize that document.

A.  Yep.

Q.  What is that?

49

A.  So that's a picture I took of Rhonda. That is her foot and that was taken at our house.

Q.  Her right foot?

A.  Yes.

Q.  And do you know when that picture was taken?

A.  That was probably taken, approximately, probably three -- anywhere between three to five days -- I'm sorry, one to five days after the accident.

Q.  That's a picture that depicts the bruising to her right foot?

A.  Correct.

(Whereupon, R. MITTS Deposition Exhibit No. 7 was PREVIOUSLY marked for identification.)

BY MR. NAHRSTADT:

Q.  And then let me show you what we've marked as Exhibit 7 for identification.  Do you recognize that document?

A.  Yes.

Q.  Can you tell me what that is?

A.  That's a picture I took of her foot that shows the bruising on the front side of the foot.

50

And, again, same thing; probably approximately one to five days after the accident.

Q.  And it would have been the bruising that occurred to her right foot?

A.  Yes.

Q.  So Michael, what injuries did Rhonda suffer as a result of the accident?

MR. KACZMAREK:  Objection, calls for medical opinion from a layperson, for the record.

BY MR. NAHRSTADT:

Q.  If you know?

A.  I believe she suffered a broken arm.

Q.  Broken left arm?

A.  That's correct.

Q.  And a twisted right foot?

A.  That's correct.

Q.  Do you know what her medical care consisted of or is she a better person to talk about that?

A.  I'm sorry, can you repeat the question?

Q.  Do you know what her medical care consisted of or is Rhonda a better person to ask about that?

A.  I would say Rhonda would be a better

51

person to get an accurate view of her medical care.

Q.  Do you know if Rhonda has suffered any personal injuries since July 13th of 2014?

A.  No.

Q.  Do you know if she has any plans to seek any medical treatment in the future?

A.  No.

Q.  Do you know how long she experienced pain in her right foot as a result of the accident?

A.  No.  At this -- if I -- I would approximate and say a couple weeks.  That's an approximation.

Q.  Do you know how long she experienced pain in her left arm as a result of the accident?

A.  I would say she still continues to have some pain.  So, you may want to rephrase the question.

Q.  Well, let me ask you about that.  How do you know that, how do you know she continues to have pain in her left arm?

A.  Because she'll let me know.

Q.  Let's talk about that; tell me what she tells you when it comes to pain in her left arm.

52

A. So I will either recognize that she's kind of struggling with something, if she's picking up a pot or a pan, if she happens to pick it up with her left hand, I can tell the way she's picking it up. Or -- and she'll do that and if there's pain and if I'm standing there, I may ask her, I say, does that hurt? And she's like, yeah, I can sometimes feel it.

Q. Anything else that you notice causes her to continue to have pain in her left arm?

A. No.

Q. Are there any activities that your wife cannot participate in today that she could participate in before the accident?

A. No.

Q. Is there anything that she does less today, less frequently today, than she did before the accident?

A. No.

Q. By the way, I noticed I put down on your --

MR. NAHRSTADT: We can be off the record for this.

(Whereupon, a discussion was had

53

off the record.)

MR. NAHRSTADT: The exhibit for him should say 10/5/16. I had 10/5/15, so I'll fix that and we should be good to go.

I think I'm good. Thank you, sir.

THE WITNESS: Thank you.

MR. NAHRSTADT: I appreciate it.

MR. KACZMAREK: You get to decide whether or not you want to reserve your signature and review it when the court reporter types it up, if she types up. Or you can waive that right and rely on her to get your testimony accurately, but you cannot change the substance of your testimony, you can only change, like, typos and things like that.

THE WITNESS: That's fine, I'll waive that.

MR. KACZMAREK: Okay, waive signature.

(FURTHER DEPONENT SAITH NOT.)

54

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARIA MICELI, do hereby certify that heretofore, to-wit, on the 5th day of October, 2016 personally appeared before me, at 230 West Monroe, Chicago, Illinois, MICHAEL MITTS, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein MITTS is the Plaintiff, and COSTCO is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by Counsel for the respective parties.

55

I further certify that the taking of this deposition was pursuant to Notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 16th day of October, 2016.

_____
NOTARY PUBLIC, COOK COUNTY, ILLINOIS

56

Michael Mitts 10/05/2016

1

## A

absolutely
18:20 27:9,9
accident
8:18,19,23 10:9,11
11:1,4,5 24:14,16
28:13 29:2,4,24 30:4
31:20 32:7 33:4
35:15 36:7,21 44:12
50:10 51:2,7 52:10
52:15 53:14,18
accommodate
6:2
account
6:15
accurate
52:1
accurately
54:12
activate
27:8
activities
53:12
address
6:7
affixed
56:10
aforesaid
55:15,21
age
16:18
ago
29:19
aisle
26:21
aisleway
26:8 27:15
angled
15:16
ankle
19:5
answer
4:24 5:15
answered
46:8
answering
5:16
anybody
22:6
apparently
28:8 39:17
appear
17:11
appearances
2:1
appeared
12:9 34:6 55:6
appears
35:8 36:5 49:13
applicable
4:11
appreciate
54:7
approaching
37:3,11
approximate
11:5 18:15 29:13 30:17
30:22 52:12
approximately
7:14,21 8:11,24 9:4
10:10,24 11:20 16:18
21:12 22:19 29:4

30:14 32:12 36:14
38:12,18 40:6 44:17
50:7 51:1
approximation
52:13
area
18:2,5,8,16 31:24 36:6
42:20
arm
12:13,14,15,17 13:6,6
19:20 21:2,2,3,4,19
21:19 23:17 27:18
28:9 39:1,4,6,11,20
40:21 48:20 49:11,14
51:12,13 52:15,21,24
53:10
arrive
26:2
asked
22:16 31:5,8 40:19
44:4,7,9 45:6,7
asking
4:22 5:7,13
assume
24:24
assumed
27:10
assuming
20:7
attached
3:23
attack
29:9
attending
38:21
attention
27:24 31:5
attorneys
56:3
authority
25:11
axa
6:17,17

## B

b
3:8
back
11:10,12 20:3,19 22:15
22:17,20 23:15 24:9
24:10 26:11 27:17
28:20,21 29:1,3,5,6
29:18,19,23 30:15,18
31:6,8 32:4,6,8 40:2
40:8,16 41:16 42:7
44:15 47:17
backwards
20:17
bare
33:8
ben
2:18
behalf
2:9,19
believe
7:12 8:3 9:17 20:15
25:5,9 26:23 32:20
36:22 38:21 39:9
41:1,8,10,12 51:12
bending
14:7
benefits

6:17
benjamin
2:3
benshaplaw
2:8
best
5:15
better
51:18,22,24
big
10:16,22 18:2,5
birth
6:5
bit
13:2 14:2
body
13:21 20:5 21:23
bone
39:12,14,15
bones
39:13
boone
6:21
bottom
18:10 37:7
boxes
36:16
bradley
2:14
break
5:24 6:2 27:13 39:12
39:13
briefly
27:2
bring
24:7
broken
23:19,19,20 28:9 39:11
40:21 51:12,13
brother
29:6,14
bruising
50:12,24 51:3
buying
28:24

## C

c
55:3
calf
12:7 18:10
call
17:10 34:12 45:14
called
1:15 4:13 22:16,21
26:17
calls
51:8
cant
5:2 22:6 23:7 25:2
27:11,12,21 34:12
38:7,9 41:1
capri
9:11
capris
33:5,6
car
40:8,11 45:2,5
carbon
41:10
care
41:21 44:16 51:17,21

52:2
carrying
15:4
cart
9:14,16,17,19,23 14:15
14:16,17
cash
45:16
catch
19:16
catching
47:2
cause
55:8,14
caused
17:3
causes
53:9
cell
31:18 32:14
certain
19:2
certify
55:4,12,22 56:1,5
cetera
45:7
chance
36:1 46:3
change
54:13,14
chicago
2:6,16 55:7
christmas
29:16
circuit
55:9
civil
1:17
clean
39:12,13 41:19
cleaning
31:15
clear
17:8,12 18:22 23:20
34:5,6 43:6 44:7
close
47:17
closer
37:14
closeup
42:16
clothes
33:4
coating
35:11,12,12
com
2:8,18
come
22:17 24:4 28:20 31:6
31:8 33:6 36:12
comes
29:14 52:24
company
6:16
complained
19:11
completely
18:11 21:4 34:3
computeraided
55:18
concrete
35:9
consider

11:9,11
considered
8:3 38:8
consisted
51:18,22
consultant
6:15
continue
53:10
continues
52:16,20
conversations
48:3
convicted
6:24
cook
55:9 56:16
cooler
10:14,14,20 11:2,7,19
14:12,14,18,22,24
15:1,2,12,12,13,18
15:20,23 16:21,24
17:2 19:13 20:3,16
20:21,22 21:17,24
23:2,24 24:21 26:5,7
28:6 30:16,17 31:14
31:16 32:8 34:8,9,16
34:19 35:6 36:4,5
37:1,16,20,22 38:2
40:16 41:16 42:14,18
copy
32:16 41:9,10
corner
15:11,11 22:4
corporation
1:11
correct
6:11 7:19 9:7 11:3,16
12:20 14:3,13,16
16:3,6 19:6,24 28:16
29:17 31:12 37:2,5,9
38:5 40:12 41:6
42:21 43:1,3 44:24
46:13,15 47:9,13
49:12,15 50:13 51:14
51:16 55:20
correctly
38:22
costco
1:10 4:24 7:18,23 8:2,4
8:7,14,17 9:3,23
15:10 16:5,8 19:8,12
23:13,24 24:12,18,24
27:11 29:2,8,18,23
30:3 31:15 32:6 36:5
38:13 40:2 43:11
44:7 46:7 55:10
couldnt
18:7,14
counsel
55:23 56:5
county
6:21 55:3,9 56:16
couple
4:20 27:22 32:9 40:17
52:12
court
1:1 5:2,19 54:10 55:9
courts
1:18
covered
18:6,8
crime

7:1
croc
9:12
cross
8:5
crying
13:6 21:2
csr
1:19,23
cv
1:7

## D

d
3:1
dairy
32:8
date
6:5 7:7 8:17,19,22
35:14
day
7:9,11,15 30:3 42:8
47:17 48:4,23,24
55:5 56:10
days
50:9,9 51:2
deal
12:3
decide
7:20 8:2 54:8
decided
7:18
defendant
1:12 2:19 55:11
defendants
46:18
definitely
17:5 37:20,22
deformed
21:5,20
demoing
16:2,12,20
depict
36:6
depicted
42:11
depicts
50:11
deponent
54:17
deposition
1:15 3:10,24 4:7,10,17
35:17,23 42:1 43:15
43:21 44:20 45:19
46:1,12 47:6,11,23
47:24 48:7,15 49:2,7
49:16 50:14 55:23
56:2,3
depositions
1:19
describe
33:23 34:7
describing
36:13
didnt
14:4,17 17:11 24:9
35:3
different
5:9 46:10
difficult
5:19
dimension

Michael Mitts 10/05/2016

2

18:4 32:22
**dinner**
8:1
**direct**
14:22 22:2
**direction**
20:1,12,13
**directly**
16:23 45:5
**discussion**
53:24
**dishonesty**
7:1
**dispute**
16:9
**district**
1:1,2,18
**disturbed**
18:18
**divided**
37:12
**division**
1:3
**doctor**
38:19 39:21
**document**
43:23 46:2,5,6,11 49:8
49:22 50:20
**documentation**
47:21
**doing**
15:14 31:4 45:6
**dont**
5:7,24 8:20 12:9 16:1,4
17:1 22:24 23:3 24:1
24:13,17 26:24 27:11
29:5 32:17 41:11
45:14
**door**
10:20,21 11:13 20:2
30:19
**dr**
38:22
**duly**
4:13 55:13

**E**

**e**
3:1,8
**eastern**
1:3
**education**
6:18
**edward**
38:7
**edwards**
38:8,10
**egg**
10:14 11:7 16:21 19:13
20:2 28:6 31:14 34:8
34:9 35:5 36:4,5
**eggs**
10:15 11:20 14:9 37:3
37:8,11
**either**
25:1 41:9 53:1
**emergency**
28:21,22 32:6 38:17,21
49:10,14
**employee**
6:17 15:10 16:5,8 25:7
27:10,14

**employees**
15:2 25:2,4,9 27:5 30:2
30:12
**engaged**
24:23 26:24
**enter**
9:8
**entered**
9:13,18,20 10:3 11:19
**entire**
35:8
**entitled**
46:19 47:7
**entrance**
15:12 20:16 21:24
**er**
40:1
**estimate**
10:24
**et**
45:7
**evening**
48:24
**exact**
42:24
**exactly**
10:18 12:10 26:24 29:5
38:9 47:16
**examination**
1:16 3:2 4:15
**examined**
4:14 38:24
**exhibit**
3:11,15,16,17,18,19,20
3:21,23 35:18,22
37:24 42:2,6,11,13
42:16 43:2,16,20,21
44:19 45:20,24 46:1
46:11,17,18,23 47:6
47:10,23,24 48:8,12
48:14 49:3,7,17,21
50:15,19 54:2
**existence**
19:8
**exited**
26:6 30:16
**experienced**
52:9,14
**explained**
27:2 39:22

**F**

**facing**
15:17 20:1,2,12,14,15
**fact**
5:20
**fall**
14:20 15:8,19 16:2,11
17:4 20:17,20
**fallen**
28:5
**falling**
15:20 19:15
**falls**
41:19
**far**
37:15
**fast**
24:17
**feel**
53:8
**feet**

10:24,24 11:21 13:18
13:19 14:13 18:13,16
37:17
**fell**
13:12,20 14:1,11 15:5
16:21 17:1,14,17,24
18:18,19 19:9,13,17
20:6,7,9,19 31:13,24
36:10 38:2 42:20
48:5
**felony**
6:24
**felt**
14:7
**female**
25:4,6
**females**
25:6
**fill**
27:21 28:12 31:1,6,8
32:6 41:2,5 44:4,8,9
**filled**
28:22 41:7,15 44:3,14
45:10 46:6,8,16,20
47:11,20
**filling**
41:11,14
**final**
12:24
**fine**
54:15
**finish**
5:13,16
**first**
4:13 21:13 40:15 46:16
46:19 55:13
**five**
37:17 38:13 50:8,9
51:2
**fix**
54:3
**flipped**
11:23 13:11,11,13,13
**floor**
12:5,22 13:17,19 17:6
17:6,23 18:12,15
19:9,12 20:23 21:11
21:18 27:14 28:7
31:15 32:10 33:3
35:5,8 37:12 41:18
42:7,16,17 43:8,12
**floors**
35:14
**florence**
6:23
**fluorescent**
34:14,15
**follows**
4:14
**foot**
13:2 14:2,7 39:2,2,8,9
39:9,16 50:2,3,12,23
50:24 51:4,15 52:10
**forearm**
39:14,15
**foregoing**
55:19,23
**form**
5:1
**forms**
27:22
**forward**
20:17

**four**
32:12
**frequently**
53:17
**front**
11:12,14 12:1 15:11
26:8,9 30:17,18,19
32:7 40:18 42:19
45:14,15,16 46:7
50:24
**further**
4:9 54:17 55:12,22
56:1,5
**future**
52:7

**G**

**garage**
10:19
**garbage**
36:17
**gentleman**
23:12,23 24:12,19
**getting**
33:20,21
**give**
14:8 18:3,7 37:19 40:6
**given**
4:17 55:15,20
**glaze**
35:9,10,12
**go**
4:20 6:20 7:18,20,23
10:6 14:4 21:17
28:15 33:21 38:6
54:4
**going**
4:22 5:14 6:1 7:3,18,23
14:5 22:3 27:24
28:10 35:21 36:12
39:12,23
**good**
47:2 54:4,5
**gotta**
23:17,20 38:3
**grabbed**
27:13
**great**
12:3
**groceries**
28:17,23
**ground**
4:20
**guess**
10:19 11:11 45:17
**guys**
26:20

**H**

**h**
3:8
**half**
37:12
**hand**
33:17,19 47:12 53:4
56:10
**handing**
26:12
**hands**
19:16
**handwriting**
44:18,20,21

**happen**
10:12 11:4
**happened**
7:4 10:9 11:17 21:6,7
24:15,17 27:1 28:3,4
37:21 44:12 47:22
**happens**
53:3
**happy**
6:2
**head**
5:4 20:13,13,15 26:9
**headed**
27:20
**held**
28:23
**help**
21:8,14 22:1,8,23
26:14
**helped**
23:21 24:20
**hereinbefore**
56:4
**heretofore**
55:5
**hereunto**
56:9
**hes**
47:2
**high**
6:19,20,21
**highest**
6:18
**holding**
49:13
**holiday**
29:16
**holidays**
29:13
**home**
6:7
**honestly**
17:1 22:6
**hospital**
23:18,21 24:22 27:20
28:1,15 33:21 38:3,4
38:6,12 48:19
**hour**
1:21 38:18
**hours**
38:18
**house**
50:2
**housed**
23:2
**houses**
10:14
**hurt**
53:7
**hurts**
21:19

**I**

**ice**
11:23 22:1,9 24:7
26:14 27:4,6,7,13
30:12
**id**
3:9 38:12 47:3
**idea**
16:16
**identical**

34:16
**identification**
35:19,23 42:3,6 43:17
43:20 45:21 47:6
48:9,14 49:4,18,21
50:16,19
**ill**
5:8,8 6:2 41:21 54:3,15
**illinois**
1:2 2:6,16 6:8 55:1,7,9
56:16
**im**
4:22 5:7,14 7:3 15:9,18
15:24 19:2 20:6
27:23 31:4 35:21
36:12 39:12 41:1
48:12 50:9 51:20
53:6 54:5
**immediate**
21:9
**immediately**
12:2 13:12 17:2 20:23
21:2,4,22,23 40:19
**important**
5:12
**impossible**
5:21
**incident**
4:23 7:4 25:18,21 30:3
41:4 44:2,3 46:19
47:8,18 48:3
**individual**
16:4
**initial**
24:16
**injured**
11:18 38:3
**injuries**
51:6 52:4
**inside**
11:1 15:1,2,13
**interaction**
24:11
**interested**
28:23 56:7
**involved**
4:24
**involving**
7:1
**items**
7:24
**ive**
10:7 22:16,16 26:17

**J**

**jeans**
29:20,21
**joliet**
6:8
**july**
7:4,12,17 8:7 9:3 52:4
**june**
6:6

**K**

**k**
55:3
**kaczmarek**
2:4 46:24 51:8 54:8,16
**kentucky**
6:22,23
**kind**



Michael Mitts 10/05/2016

3

11:22 12:12 13:10,12
15:21 18:14 20:18
22:7 33:21 41:9 53:2
knee
19:4 33:7
kneeled
18:9
kneeling
21:22
knew
19:8 20:24 43:11
know
5:8,14 8:5 15:7 16:1,4
17:1,3,7,13,19,22
18:4,13 19:7,11
23:18,24 24:17 25:15
25:23 27:1,8,11
29:11 30:6,9 32:17
33:6 35:24 38:11,19
39:10 41:15,16 43:4
43:7,11,22 45:14
46:3 50:5 51:11,17
51:21 52:3,6,9,14,20
52:20,22

**L**

landed
11:24 12:12,13,13,14
12:14,16
landing
19:19
lap
49:14
lasalle
2:5
laying
12:18 18:15 19:22
layperson
51:9
leads
26:8
lean
12:24
leaving
44:11
left
11:11,12,15 12:15,17
12:18 13:21 18:23
19:1,2,4,19,23 20:10
21:19 26:7 28:15
29:10 33:10,12,13,14
36:23 38:14 39:5,6
39:14,15 40:1 42:18
49:11,14 51:13 52:15
52:21,24 53:4,10
leg
11:22 12:6,8,9,10,11
13:5 18:11,23,23,23
18:24 19:1,3,4 33:5,8
33:8,10,12,15,18
legs
11:22,23 13:12
level
6:18
license
1:24
lighting
34:7,9,10,15
lights
34:13,13
line
14:22 16:23

lipe
2:13
lipelyons
2:18
liquid
17:6,8 20:24 32:10
41:17
literally
38:13
little
13:2 14:2 45:15,17
located
11:7
long
6:1 8:13 17:22 21:10
22:18 24:14 30:11
38:16 43:7 52:9,14
look
35:24 36:1,13 37:24
43:22 45:8 46:2,3
49:6
looked
11:22 15:21 21:5
looking
15:23
looks
42:22 46:10
lopsided
23:6
lot
30:22
loud
5:1
lower
12:7 19:6
lyons
2:13

**M**

m
1:21 3:10,23 45:19
46:1 47:15
main
26:7 27:15
making
26:21
male
25:7
man
16:14
manager
24:24 25:10 26:20
27:11 28:3,22 30:12
38:1 40:19 44:7,10
45:4,4,6 46:8
maria
1:19,23 55:4
marked
3:9,14 35:19,22 42:3,5
43:2,17,20 44:19
45:20,24 46:11,17,22
47:5,10,23 48:9,11
48:13 49:4,7,18,20
50:16,19
married
6:10,12
mashed
18:14
material
35:7
mean
18:3 40:24

medical
27:24 31:5 44:16 51:8
51:17,21 52:1,7
member
8:13 46:19,20
mentioned
56:4
merchandise
37:7
miceli
1:19,23 55:4
michael
1:15 2:4 3:3 4:4,7,12
24:15 29:22 51:6
55:7
middle
42:23,24
mike
32:15,20 43:19
milk
10:14,15 11:7,19,20
16:21 19:13 20:2
23:2 28:6 31:14 34:8
34:9 35:5 36:4,5 38:2
40:16 42:19 43:6
mind
27:16
minute
21:12 22:19 26:11
minutes
10:10 21:13 29:9 30:20
30:23 38:13,14
miscellaneous
7:24
mitts
1:5,15 3:3,10,14,23 4:4
4:5,7,12,17 6:10
18:22 35:17,21 42:1
43:15 45:19 46:1,18
48:7 49:2,16 50:14
55:8,10
mkaczmarek
2:8
monroe
1:20 2:15 55:7
month
8:12,24 29:19
months
29:4,12
moved
13:2,13
murphy
2:13

**N**

n
3:1
nahrstadt
2:13,14 3:4 4:2,6,16
32:15 33:1 35:20
42:4 43:18 45:22
47:2,4 48:10 49:5,19
50:17 51:10 53:22
54:2,7
name
4:2,3 23:24 25:15 38:9
38:19
names
25:23
naperville
8:4,17 9:2 29:1,23 38:7
38:10

near
16:20
need
4:24 5:12 27:21 31:1,1
31:4 39:23
needed
29:20
needing
39:20
needs
27:24
negative
39:16
neon
34:13
nice
7:13
night
8:1
nods
5:3
north
2:5 38:8
northern
1:2
notarial
56:10
notary
56:16
notice
1:16 4:8 21:4 53:9 56:2
noticed
12:4,5 13:4 53:20
number
3:9

**O**

o
55:3,3
objection
51:8
obvious
21:7
obviously
15:17 16:23 18:10 23:5
30:21 33:9
occupation
6:14
occurred
10:13 11:1 27:3 36:7
51:4
october
1:20 55:6 56:11
offered
22:24
office
32:8 45:15,15,17,18
official
38:9
oh
27:1,9 40:20,24 41:21
okay
4:21 5:1,4,5,11,17,18
6:3,4 7:5,6 11:19
13:4,4 14:6 21:1,1,15
21:18 23:14 27:2
28:2 33:2 36:1,2
37:18 43:24 46:4
54:16
old
16:16
older

16:17
once
17:1
ones
27:7
opinion
51:9
order
27:8
orientation
20:6
outcome
56:8
outside
14:12,14 31:3
overhead
34:12

**P**

p
47:15
packs
27:6,7,13 30:13
pain
12:3 30:22 52:9,14,17
52:21,24 53:6,10
pair
29:20,21
pallet
23:8
pallets
23:1,5 36:24
pan
18:5 53:3
panic
29:9
pants
9:11 33:6
paper
41:2,10
part
20:4
participate
53:13,14
parties
4:8 55:24 56:6
passing
22:7,10
pending
55:8
people
16:22,24 25:24
perform
38:23
person
16:12 23:23 51:18,22
52:1
personal
52:4
personally
55:6
pertaining
1:18
pets
15:15
phone
31:18 32:14
photo
37:6
photocopy
41:13
photograph

36:10
photos
42:9,10,12
physically
45:12
pick
7:24 29:7 53:3
picked
27:17
picking
53:3,5
picture
32:4,19,22 41:17 42:6
42:24 43:9,13 48:18
49:9,11 50:1,5,11,23
pictures
27:23 31:2,23 32:9,11
32:21 40:17
piece
41:2
plain
17:11
plaintiff
1:6 2:9 55:10
plans
52:6
please
22:1,8,8 24:7 27:4
41:18
point
13:9,14 15:17 18:12
20:13 21:9 22:5,15
22:22,23 23:12,16
24:20,23 26:6 27:5
39:18
pontikis
2:13
pop
27:7,8
portion
11:15 19:6
possibly
25:7
postsurgery
48:21,22
pot
53:3
presence
55:17
present
56:3
pretty
13:9 34:16 42:23
previously
3:14 35:18,22 42:2
43:16 48:8 49:3,17
50:15
prior
8:17,19 15:19 17:23
18:16 35:14 41:14
probably
7:13 11:9 13:19 18:7
29:7,12 32:12,20
37:17 38:14,18 39:23
40:5 50:7,8 51:1
problems
35:13
procedure
1:17
product
16:12 23:5,10
products
16:2,20

pronounced
38:22
protectant
35:10,10
protective
35:11
providence
6:8
public
56:16
purchased
28:24
purposes
45:24 47:11
pursuant
1:16 4:8,10 56:2
push
10:4
pushing
9:19,23
put
16:17 27:17 28:18,18
  28:19 39:24 53:20

**Q**

quadrant
37:13
question
5:1,6,13,17 51:20
  52:18
questions
4:23 7:3 37:23 46:9
quick
23:13
quickly
30:21

**R**

r
3:14 35:17 42:1 43:15
  46:18 48:7 49:2,16
  50:14
rain
7:15
ran
12:4,6,23 13:8 18:9
  20:20,22,22
read
45:2
ready
33:21
really
22:3 23:13
rear
11:15
reason
16:8
recall
7:7,13 8:20 12:10 22:6
  24:13 25:2 26:24
  29:5 33:12 34:10
received
44:16
recognize
43:23 48:15 49:22
  50:20 53:1
record
4:3,6,9 18:22 44:7 51:9
  53:22 54:1
reduced
55:18
refer

10:13
referred
22:4
reflect
4:6,9
refrigerated
10:16,18
registers
45:16
related
48:4 56:6
relation
13:7
rely
54:11
remember
34:12 38:8,9 39:13
  41:11
repeat
51:20
rephrase
5:8 52:17
report
28:13,22 31:9 32:7
  44:2,3,8,14,18 45:1,9
  46:19 47:7,14
reported
1:23 55:16
reporter
5:2,20 54:10
reports
41:4 46:14 47:21
representative
19:7
resembles
10:19
reserve
54:9
residue
34:1
respective
55:24
respond
22:11 24:9
response
24:8
rest
19:22
result
40:21 51:7 52:10,15
results
39:10,11,16,22,22
returned
32:5 46:7
review
54:9
rhonda
1:5 6:10 15:23 16:21
  18:9 21:17 22:23
  23:4,17 24:20 26:5
  30:20 33:3 39:22
  40:7 44:5,15 45:2,6,7
  48:4,18 49:9 50:1
  51:6,22,24 52:3
rhondas
23:17 27:18 47:23
right
5:10,22 10:17 11:24
  12:9,16,24 13:1,14
  13:18,19,21,22,23
  18:19,23 20:7 21:16
  30:16 31:4 33:2,11
  35:3 36:14,16,18,24

37:4,13 39:9 41:3,22
  42:19,24 46:12,20
  47:8,12 50:3,12 51:4
  51:15 52:10 54:11
righthand
23:1 36:17 37:11
roasting
18:5
rolled
21:3
room
10:16,16,18 28:21 32:6
  32:23 38:17,21 49:10
  49:14
route
8:4,6
rule
5:12
rules
1:17 4:11,20
rushed
12:2

**S**

s
3:8
safe
38:15
saith
54:17
samples
15:14 22:11 26:13
sandal
19:3
sandals
9:11,12
sat
23:4
saw
12:10 14:20 15:7,19,21
  15:24 16:2 17:13
  19:15 20:20 38:20
  40:19
saying
13:6 21:2
says
22:12,16 23:14 27:12
  40:20 41:1
school
6:19,20,21
schubel
38:22
screws
39:24
seal
56:10
see
12:8 17:16 21:19 31:14
  36:16 37:6
seeing
24:13 34:18
seek
52:6
seen
24:2 25:17,20
separate
46:14
sequence
21:16
series
4:22
service

6:15
set
15:11,13 56:9
seven
11:21 38:13
shapiro
2:3
shell
52:22 53:5
shes
21:18,18 28:8 38:2
  49:13 53:1,2,4,7
shift
23:10
shoe
19:3 33:9,13,14,16,18
shoppers
14:23 27:16
shopping
9:22 10:8
shortly
10:2
shot
42:14
shoulders
5:3
show
24:18 35:21 42:5,10
  43:19 45:23 48:11,13
  49:20 50:18
showed
26:20
shows
50:24
shrugs
5:3
side
11:11,12,24 12:18
  13:10,14 19:23 20:10
  23:1 28:19 33:8
  36:17,24 37:11 42:18
  50:24
sight
14:22 16:23
sign
45:3,8
signature
44:22,23 54:9,16 55:22
signed
41:12,12 46:9 47:12
silk
23:2 36:20,22 37:14
similar
32:21 34:10 42:12
sir
4:2 6:5,14 54:5
sit
23:3,4,7,8 36:21
sitting
22:24
six
11:20
size
18:4,5
slammed
27:14
slide
12:10,11 47:3
sliding
18:13 27:15
slightly
13:19 33:7
slip

12:8
slipped
11:22 13:20 14:2 17:20
  18:19 20:18 21:11
  28:6,8 30:7 34:22
  35:1
slipping
11:23
slowly
21:3
small
27:6
smell
34:21
somebody
21:24 22:8,8,12,17,21
  41:18,19
sorry
41:1 48:12 50:9 51:20
sort
10:19 12:24 15:14
  32:22
sounds
32:17
south
38:9
specific
29:8
specifically
8:1
spell
4:3
spend
10:8
spoken
30:2 48:2
sprain
39:17
spun
12:12 13:20,21 20:18
square
27:7
ss
55:2
stack
36:16 37:7
standing
11:14 15:18,21 22:5
  25:7 53:6
start
9:23 12:10,11
started
14:7 21:5 22:7 23:6,9
  23:10 24:21 29:9
starting
22:22 26:9 39:2
state
4:2 55:1
statement
31:1
states
1:1,17
stay
27:21 41:2
stayed
40:8,10
staying
27:23
stenographically
55:16
step
12:24 14:7
stepped

12:5 13:1,2
stickiness
17:9
sticky
33:24 34:2,4
stop
20:7,9
stopped
29:19,20
store
8:22 9:8,13,18,20 11:8
  11:10,15,15 26:8,10
  29:8,8,23 30:15,18
  30:19 34:11,11,17
  35:8,14 38:15 40:9
  40:10,14,16,18 44:11
  45:12,17
street
2:5,15 8:5,6
stressed
27:3
strike
26:19 28:10
struggling
53:2
substance
13:7,16 17:6,7,9,14,16
  17:19,22 18:3,6,8,12
  19:8,12 28:7,8 30:6
  31:24 33:23 34:1,22
  34:24 43:4,6,7,12
  54:13
suffer
51:7
suffered
51:12 52:3
suit
56:7
suite
2:5,15
sunday
7:10
sure
4:4 14:6 15:9,19,24
  18:7,21 21:15 36:11
  44:6
surgery
39:20,23 48:20,23,24
  49:1
swell
23:17 39:3
sworn
4:1,14 55:13
syrup
34:3

**T**

t
3:8
table
15:13,16
take
5:2,20,21,24 6:2 14:17
  27:22 31:2,23 32:3,8
  32:11 35:24 36:12
  37:19,24 40:6,7,17
  41:17,21 43:22 45:1
  45:7 46:2 49:6
taken
1:19 4:7,10 50:2,6,7
talk
16:12 39:19 51:18

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Mitts 10/05/2016

5

52:23
talked
30:11 38:1 44:11
talking
5:22 33:11
taste
34:24
teacup
18:4
tell
11:17 18:10,14 28:3
36:3,9 44:1 46:5
48:15,17 49:8,21
50:22 52:23 53:4
telling
13:5 21:18
tells
52:24
terms
20:4 30:21
testified
4:14
testify
55:13
testimony
54:12,13 55:15,20 56:9
tests
38:23
thank
54:5,6
thats
7:19 11:3 12:3,4 13:3,4
13:5 14:3 15:22 16:3
16:6 20:23 21:3
22:23 23:21 29:14
31:12 36:22 37:9,23
38:5 40:18 41:6 42:9
44:18 46:10 47:7,9
48:18 49:9 50:1,11
50:23 51:14,16 52:12
54:15
thereof
56:8
theres
10:21 26:7 27:16 32:17
32:18,20 36:16 41:17
42:22,22 45:15,16,17
53:6
theyre
26:17 32:14
thick
34:3,3
thigh
12:7
thing
21:13,20 40:15 51:1
things
54:14
think
5:14 6:1 28:18 32:16
37:15,23 40:4 41:8
41:11 54:5
third
25:7
thought
47:16
three
21:13 30:23 32:21 50:8
50:8
time
5:6,22 7:17 8:16 9:2,6
9:10,22 10:8 11:4,17
14:11 17:23 18:9

19:9 25:2,20 26:2
28:12,14 29:3 30:14
30:17,22 31:6,10,13
31:19,20 32:1,2,9
34:21 40:4,23 47:14
times
8:10,12,21,24 9:1
today
53:13,17,17
told
16:7 27:19,19 28:2
38:2 40:20
top
9:12
towit
55:5
town
29:6,14
trailing
14:14
transcript
55:20
transcription
55:19
treatment
52:7
trip
9:22
trouble
34:18
true
55:19
truth
55:13,14,14
try
19:16 22:24 23:4
trying
36:20
turn
21:13
turned
15:22 21:23 26:7
twisted
21:5 51:15
two
5:20,21 8:12,24 14:13
25:1,3,6,23 27:6,13
29:22 30:20,23 32:20
38:18 41:7,11,12
44:11 46:14 47:22
type
25:10 34:13 41:10
types
54:10,11
typewriting
55:18
typical
34:11
typically
10:3 29:14
typos
54:14

_____ U _____

uhhuh
46:21
uhhuhs
5:2
underneath
13:10
understand
5:7,10,23 32:3

undetermined
55:8
unhuns
5:3
united
1:1,17

_____ V _____

view
15:17 52:1
visit
8:2,11
visits
29:22
volume
17:10 34:4
vs
1:8

_____ W _____

wait
5:12,15
waive
54:11,15,16
waived
55:23
walk
10:17 15:22 24:21
walked
22:14 23:13 24:9,10
30:19 45:5
walking
11:12 15:20 30:20
wall
20:3
want
5:24 6:1 17:10 35:3
41:15 52:17 54:9
wanted
29:6
warehouse
34:11
wasnt
15:13 30:20 34:2,2
watching
23:16
water
17:11
way
5:9 6:8 23:15 24:5,6,19
24:22 26:17,21 53:4
53:20 56:6,7
wearing
9:10
weather
7:11
week
7:9
weeks
52:12
went
13:3 17:2 20:23 27:15
27:17 29:3,5,6 32:6,7
32:8 39:1 40:2,8,10
40:15,16,18 41:17
42:7
west
1:20 2:15 55:7
wet
12:5,7,22 13:5 18:11
18:11,23 28:7 33:4
wetness

33:7,9
weve
32:16 35:22 42:5 43:2
43:20 44:19 45:23
46:17,22 47:5,10
48:11,13 49:7,20
50:18
whats
6:5,7,14,18 21:20
34:16 35:5 42:11
47:14
whereof
56:9
whichever
39:12
white
42:23 43:4
wholesale
1:10
wide
42:14
wife
4:23 9:6,10 11:18 13:8
15:4,8,20 17:3,13,17
17:20,23 19:9,13,15
27:23 29:9 30:7 31:5
31:13,24 34:22 35:1
35:13 38:2,20 39:19
42:20 49:8 53:12
wifes
8:18,19,22 10:11 11:1
16:11 29:2 30:3
35:23 36:6 43:21
44:19,23 46:12 48:14
wind
28:10
wipe
33:15
wiped
33:18,22
witness
3:2 4:1,4,13 32:19 47:1
47:7 54:6,15 55:12
55:16,17,21
witnessed
11:21
witnesses
48:2
woman
15:9,11 16:1,14,15,17
16:19 22:4,10 25:13
25:14 26:12,19
words
5:1
work
10:5
wound
19:19

_____ X _____

x
3:1,8
xray
39:2,4,16
xrays
39:1

_____ Y _____

yeah
13:18 19:6 31:10,21
33:20 35:12 37:12,13
41:21 45:12 53:7

year
9:1
years
6:12
yelled
23:19
yelling
22:7
yep
43:24 49:23
youre
11:14 28:23 36:13 37:3
39:23
youve
36:1 46:3

_____ Z _____

_____ 0 _____

00
7:21,22 9:5 11:6 40:6
42:8 44:15 47:17
084003859
1:24

_____ 1 _____

1
3:11,15,23 35:18,22
42:13 45:20,24 46:1
46:23 47:6,10,24
10
29:8 38:14 46:1,18
54:3,3
11
1:21
12
9:1
13
7:4,17 8:8 9:3
13th
52:4
15
10:24,24 46:1 54:3
16
1:7 46:18 54:3
16th
56:10
180
2:5
1971
6:6

_____ 2 _____

2
3:16 7:21 9:4 43:16,20
43:21 44:19 46:11,17
46:18 47:23
20
10:10
2006
8:15
2014
7:4,17 8:8 9:3 29:16
52:4
2016
1:20 55:6 56:11
2019
6:8
2260
2:15
23
6:6,13

230
1:20 2:15 55:7
24
9:1
2600
2:5

_____ 3 _____

3
3:17 7:22 9:5 11:6,6
42:2,6,11,16 43:2
48:12
30
9:4 11:6
312
2:7,17
35
3:15

_____ 4 _____

4
3:4,18 48:8,14
42
3:17
43
3:16
45
1:21 3:11 16:18
48
3:18
49
3:19,20

_____ 5 _____

5
3:19 46:1,18 47:15
49:3,7 54:3,3
50
3:21
52
47:15
5788
1:7
59
8:4,6
5th
1:20 55:5

_____ 6 _____

6
3:20 40:6 42:8 44:15
47:17 49:17,21
60
16:18
60431
6:9
60601
2:6,16
6415944
2:7

_____ 7 _____

7
3:21 50:15,19
7020584
2:17
75th
8:6

_____ 8 _____

80s

7:13

9

## COSTCO WHOLESALE CORP.    WAREHOUSE LOC. #_____

### WITNESS REPORT OF INCIDENT
#### GENERAL LIABILITY
##### PLEASE PRINT
(To Be Completed Only By Witness To Incident)

1. Name: _Michael Mitts_    Member #: _____

2. Home Address: _2019 Providence Way_

3. Business Address: _____

4. Home Phone: _815-609-0120_    Business Phone: _630-824-6168_

5. Did you see the incident in whole or in part? _Yes_

6. When did incident occur?  Date: _7/13/14_   Time: _Approx 3:30_  AM (PM)

7. Where did incident occur? _Milk + Egg Cooler_

8. Where were you in relation to the incident?    State distance from scene, if view was obstructed and by what.
   _About 6-7 feet away facing into the cooler_

9. Was anyone injured? _Yes_   Name of person injured: _Rhonda Mitts_

10. Was there any property damaged? _No_  What was the extent of the damage? _Broken Forearm_

11. Do you know any of the parties involved? _Yes_  If so, how? _Spouse_

12. In your own words, what did you see, and what may have been the cause? _Rhonda went into cooler for milk + eggs. I was trailing about 6-7 feet behind her. As I entered the front of cooler she slipped and fell. There was a clear wet substance on the floor where and what she slipped on._

WITNESS SIGNATURE    DATE _7/13/14_    TIME _5:52 pm_

### TO BE FILLED OUT BY WAREHOUSE

Incident/Member Name: _____
After completion of this form, include with fax of Incident Report #SF02, and Member First Report #SF03, then forward originals to:
COSTCO GENERAL LIABILITY, 999 LAKE DRIVE, ISSAQUAH, WA 98027

FORM #SF22 3/99

DEFENDANT'S EXHIBIT
1
M. Mitts 10-5-15