DEFENDANT'S EXHIBIT K

Nancy Manzie 11/18/2016

IN THE UNITED STATES DISTRICT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

RHONDA MITTS,                        )

        Plaintiff,                   )

        -vs-                         )  No. 15 CV 5788

COSTCO WHOLESALE CORPORATION,  )

        Defendants.                  )

        The 30(b)(6) deposition of NANCY MANZIE, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Janet M. Stanton, a notary public within and for the County of DuPage and State of Illinois, at 1528 Cascade Court, Naperville, Illinois, on the 18th day of November, 2016, at the hour of 1:50 o'clock p.m.

Reported by:  Janet M. Stanton, CSR

License No.:  084-001905

---

I N D E X

WITNESS                          EXAMINATION

NANCY MANZIE

    By Mr. Kaczmarek                      4

    By Mr. Nahrstadt                     30

E X H I B I T S

NUMBER                        MARKED FOR ID

Manzie Deposition

    Exhibit No. 1..................... 14

    Exhibit No. 2..................... 19

    Exhibit No. 3..................... 25

---

APPEARANCES:

    BENJAMIN & SHAPIRO, LTD.

    BY:  MR. MICHAEL A. KACZMAREK

    180 North LaSalle Street, Suite 2600

    Chicago, IL  60601

    (312) 641-5944

    mkaczmarek@benshaplaw.com

        Representing the Plaintiff;

    LIPE LYONS MURPHY NAHRSTADT & PONTIKIS

    BY:  MR. BRADLEY C. NAHRSTADT

    230 West Monroe Street, Suite 2260

    Chicago, IL  60601

    (312) 448-6235

    bcn@lipelyons.com

        Representing the Defendant.

---

        (Witness duly sworn.)

    MR. KACZMAREK:  Let the record show this is the deposition of Nancy Manzie, taken pursuant to notice and the Federal Rules of Civil Procedure.

        NANCY MANZIE,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

        EXAMINATION

BY MR. KACZMAREK:

    Q.    Would you state your name for the record and spell your last name?

    A.    Nancy M. Manzie, M-a-n-z-as-in-zebra-i-e.

    Q.    What is your home address?

    A.    1528 Cascade Court, Naperville, 60565.

    Q.    And what is your date of birth?

    A.    8/1/50.

    Q.    What is the highest level of education you've obtained?

    A.    Two years of college.

    Q.    In what field?

    A.    It was some electronics and some business.

    Q.    All right.  And --

    A.    Should I turn the TV down? Is that interfering with any -- okay.

Q. Are you employed at this time?

A. I'm a contractor. I do work for two different companies. One is The Pet Firm of Phoenix and the other one is Advantage Research out of New Jersey.

Q. Can you say that name again?

A. Advantage --

Q. Advantage.

A. -- Research in New Jersey.

Q. What do you do for those two entities?

A. For The Pet Firm, most of the time it would be a sales assist, and it could be demo work, it might not be, it might just be a sales assist.

The other one would more often than not be some type of research demographics that can -- marketing.

Q. In what field?

A. Well, The Pet Firm, it would be mostly pet type products, foods, nutrition, and medications, things like that.

Advantage Research, really it's across the board. It might be Family Dollar, it might be Taco Bell, places like that. We're just looking at demographics. We're looking at marketing -- for

market research, shopping patterns, things like that. It's mostly done with an iPad and customer research while we're sitting and observing.

Q. All right. On July 13th of 2014 did you have occasion to be at a Costco store at 1320 South Route 59 in Naperville?

A. Yes.

Q. And who were you working for on that day?

A. Well, on behalf of The Pet Firm, who I'm employed by, we were representing I think Adams Flea & Tick.

Q. Okay. And did you have a display of some kind for a product?

A. A table.

Q. Okay. Did you have anything with it, like a video or some -- something to show people?

A. No.

Q. Did you have any dogs with you?

A. No, sadly.

You should have brought your dog, too.

Q. Yeah, I should have.

Okay. And Adams Flea & Tick, was that -- what, a spray-on or a chemical that was applied, or how did that work?

A. There -- it was a product line, and so it would go by weight. Most of the time it would be a concentrated drop sort of thing that you put between the shoulder blades every thirty days or so. There probably was some accompaniment in the line for collars. Sometimes they -- there are flea collars.

Honestly, it was a one-time -- I hadn't done Adams before. It's not one of the products I normally do. So I just educate myself, get in there and -- promptly forget half of it, I suppose, I don't know.

Q. Okay. What time did you get to the Costco --

A. Oh, boy.

Q. -- on July 13th, 2014?

A. Well, they're four-hour demos, so I would have gotten there thirty minutes early.

And, honestly, at this point I don't remember my arrival time, but normally they would ask us to do like 10:00 to 2:00, something like that, mid-day, it's, you know, busiest.

Everybody's got their own opinions about that, but --

Q. When you got to the Costco, did you have to report to anyone?

A. Yes.

Q. Who did you --

A. I went to customer service. They called someone up.

Q. Okay.

A. And someone took me back to the area where the product was.

Q. And was the table a Costco table --

A. No.

Q. -- that you had?

A. No, it was mine.

Q. You brought your own table?

A. Um-hum.

Q. What else did you bring?

A. Well, I would have brought literature. Possibly there was a coupon in there.

And the literature would describe the product, and then it would be a tablecloth and a table that's in a bag that's like a -- like a folding chair, if you've seen the bag chairs, it's that kind of thing.

Q. Okay. And Costco already had the product,

this --

A. Right.

Q. -- flea and tick product?

A. Right.

Q. Okay.

A. There was a competing product next to it.

Q. Okay. What would you do, say the -- theirs is better or -- what were you to do?

A. I call it body slamming, is that -- we -- you know -- excuse me.

Anybody who touches the product or is looking, can I answer some questions, do you have a pet?

Establish, you know, a conversation -- just start a conversation.

What's the age, what's the breed, have you used other flea and tick, do you know about Adams, and do you know about -- whatever product I'm doing. Trying to engage.

Q. Okay. From what it sounds like, you would have had no responsibility for the condition of the floor at the Costco, correct?

A. No.

Q. Okay.

9

A. No.

Q. You were being paid by The Pet Firm; is that correct?

A. Correct.

Q. Okay. You weren't paid anything by Costco for doing this demonstration on July 13th, correct?

A. No, no.

Q. Correct?

You're -- okay.

A. Our goal is to get in there and not be in anyone's way.

Q. All right. Do you remember who this person was who took you to the back?

A. No.

It was a younger man because we actually changed some displays that were out there and moved the product I was doing closer to the -- or closer to the store because we were kind of edging into it, almost like a storage area, where it had been shelved.

Q. Had you ever been to that Costco before?

A. As a customer.

Q. Okay. How long had you been going to that Costco as a customer?

10

A. I don't -- not very long. I don't -- as a member, probably a year or two maybe before that. I -- honestly -- I'm not a big shopper.

Q. Okay.

A. So --

Q. Had you ever gone into that dairy area before July 13th, 2014?

A. As a customer.

Q. Okay. How about on the July 13th, 2014 date; did you go into the dairy area at all?

A. It wasn't what I was doing, but it was immediately in the area that I would -- I was -- there's a -- there's a doorway, and as you're approaching the doorway, just to the left side of the doorway is where my table was. So I may have stepped in there because it was cool, to cool off because -- you know.

But I wasn't in the inside. I wasn't shopping in there. I wasn't -- none of my prospective customers would have been -- it wouldn't have been a -- a place to approach anyone.

Q. Okay. And is that dairy area refrigerated?

A. Yes.

11

It's got a lovely breeze. If you're warm, you can go stand there and -- take your cell phone.

Q. All right. Were customers allowed to bring their dogs into the Costco?

A. No.

That should change.

Q. Yeah. It's a warehouse.

A. Dogs should come to depositions.

Q. It's a warehouse, why not.

Okay. So you didn't see any customers with dogs in the Costco on July 13th, 2014, correct?

A. No.

Q. That is correct?

A. That is correct.

Q. All right. When you would be showing customers these -- this product, would you -- was there any way you could demonstrate how it would be put on the dog?

A. I think we probably -- I probably -- more with hand -- you know, like between the shoulder blades. I think most people that have dogs know flea and tick that's applied that way, snip off the end of the tube and, you know, just spread it

12

Nancy Manzie 11/18/2016

between the shoulder blades.

So it wouldn't have been -- I mean I wasn't -- I didn't have a dog to show them.

Q. Did you have any products other than this Adams flea and tick control?

A. That was the only product I was there for for that day.

Q. Now that door to the dairy area, could you see through that door and see inside the dairy area?

A. Rather than door proper, I was -- it's -- it's an opening --

Q. Okay.

A. -- and there's a wall and I -- and then I'm in a -- what I would call an outside corner as you enter. I was on the wall on the outside corner.

Q. All right. So there isn't actually a door that opens --

A. Not a --

Q. -- and closes, correct?

A. I think -- there are strips, plastic strips that kind of keep the breeze in a bit, but I think they're up high.

Q. Okay.

THE WITNESS: Okay, that TV is really annoying. I know you said it's okay, but I'm going to turn it off.

MR. KACZMAREK: While you're doing that I'll have this marked as Exhibit 1.

(Whereupon, Manzie Deposition Exhibit No. 1 was marked for identification.)

BY MR. KACZMAREK:

Q. All right. Showing you what has been marked as Manzie Deposition Exhibit 1, is this a witness report that you filled out?

A. Yes.

Q. And is it in your handwriting?

A. Yes.

Q. And did you --

A. That's also -- then I remembered that it was Adams.

Q. Okay.

A. I'm looking here. I'm confirming.

Q. All right. And would you have filled this out sometime after this incident occurred with Rhonda Mitts?

A. Yes.

Q. All right. And it says here: When did incident occur? 7/13/2014. Time: 3:40 p.m. Would that have been the approximate time?

A. Yes.

So I was possibly working 12:00 to 4:00. I don't -- that would be -- that's within the normal hours that we would be there.

Q. Okay. And in your own words it has: I did not see or hear the fall, nor anything from the woman involved.

Is that correct?

A. That is correct.

Q. All right. And: Her husband looked at me and said "Hey, can you get some help here?"

Is that what Michael Mitts said, or her husband said?

A. Yes.

Q. All right. Were you wearing any kind of a uniform; shirt, pants?

A. No, I usually just wear black clothing. For that I may have had an apron. I would have had probably a name tag that said Adams and my first name.

Q. All right. So -- I'm just wondering how -- how the husband would have known that you had something to do with the store and weren't --

A. It was a general --

Q. -- just another customer?

A. No, it was a general -- he came to the -- toward the front of the room, or whatever you call it, the cooler, whatever that room is, and he just sort of hollered: Can I get some help here?

You know, and when I heard that I came around the corner to see what kind of help he needed.

Q. All right. And did you see a woman on the floor or standing or -- where was the woman that was in the dairy area?

A. She -- I think she was in the process of -- there was a cart there, and I was quite distracted by him because he -- he hollered: Can I get some help here? But then he turned and he addressed her at some point.

And so I was distracted by him and went to her a little slower than I might have expected.

So, in other words, I did not see her on the floor. I saw her, you know, thirty, forty

seconds later, maybe getting up, maybe leaning over the cart, something along those lines.

Q. All right. Then when you saw her, was she standing, leaning on a cart or --

A. That's what I'm -- I'm unclear, honestly. He was -- I was focused on him calling for help and trying to figure out what happened.

And he was much more what I was aware of than her.

She was quiet and --

Q. Did you notice anything about her physical condition when you first -- when you finally noticed her?

A. Physical, meaning bleeding or something along those lines? No.

Q. Correct.

A. No.

Q. Okay. And then you did see a spot on the floor with a small amount of moisture; is that correct?

A. Not at that time.

Q. Okay. At some point did you notice this --

A. Later -- well, when the customer went to

the front of the store with several employees, another one came back and asked me what I had seen.

And when we backed up and looked at it sideways, we saw -- I can only describe it as moisture. It wasn't a puddle.

It was like a dinner plate sized bit of moisture.

Q. All right. If I show you -- would you be able to point out where that area of moisture is that you saw in that photograph?

And if not, I won't bother marking it, but if you can --

A. Yeah, I -- I think it was --

Q. Do you want to --

A. -- almost -- do you want me to --

Q. Put a -- yes, just put a circle or a star or something --

A. Okay. Somewhere in this area.

Q. All right.

A. Closer to the middle. More to that side.

So --

MR. KACZMAREK: All right. Why don't we mark this, then, as Manzie Deposition Exhibit 2, otherwise we won't have that marked.

(Whereupon, Manzie Deposition Exhibit No. 2 was marked for identification.)

BY MR. KACZMAREK:

Q. Now showing you what has been marked Manzie Deposition Exhibit 2, is that a photocopy of a photograph of the dairy area in the Costco?

A. Yes.

Q. And did you draw -- it looks like a star where you saw this --

A. Yes.

Q. -- puddle of moisture?

Now when you first saw this --

MR. NAHRSTADT: Objection, mischaracterization of what she testified to. She did not say puddle.

MR. KACZMAREK: Okay.

THE WITNESS: Oh. I didn't catch that he said puddle.

MR. KACZMAREK: All right.

Well, I guess --

THE WITNESS: Is that why you're here?

MR. NAHRSTADT: That's why I'm here.

THE WITNESS: I should listen more closely.

There was no puddle, no.

BY MR. KACZMAREK:

Q. So there was an area --

A. I saw people --

Q. So there was an area -- all right.

A. -- when I went in there. That's all I saw.

Q. Let me sneak in something else -- no, I'm kidding.

A. Time out. Get in the corner.

Q. So there was a star and there was this area of moisture, correct?

A. As I stated, I was aware of the people. The moisture I saw after they were up in the front of the store.

Q. All right.

A. I didn't see anything at that moment.

I was very aware of a very agitated man. He was doing a lot of yelling.

MR. KACZMAREK: Off the record.

(Discussion had off the record.)

MR. KACZMAREK: Let's go back on the record.

BY MR. KACZMAREK:

Q. When you first saw the woman, whom we know is Rhonda Mitts, where was she standing --

A.   Well, that's --

Q.   -- in relation to that area of moisture? Right there?

A.   Well, I didn't see moisture.

Q.   Okay.

A.   I only saw her and I saw -- she was sort of -- like I said, as you enter the -- she was to the left of the center, but not terribly.

And there was a cart, a shopping cart that was eschew, and it was to her -- she was facing me at the entrance, and the cart was to her left -- or I'm -- yeah, that would be her left.

Q.   So when you saw her, she would have been close to that area --

A.   Yes.

Q.   -- of moisture?

A.   Yes.

Well, I shouldn't --

Q.   Within --

A.   That's --

Q.   Within, say, a foot or two?

A.   But I didn't see the moisture then, so I didn't have a --

Q.   Well, not at the time.

21

A.   -- I didn't have anything relative -- right -- right.

Q.   All right. But when you had -- you did see it, and then, you know, you put it back in your mind, would she have been --

A.   It would have been in this general --

Q.   -- around a foot -- a foot or two of -- around that moisture?

A.   Yes.

It -- well -- in this general area. Let's just say more central.

Q.   Were there any safety cones or wet floor signs up on that day?

A.   Not until immediately following this incident. They came with --

Q.   What did they put up afterward?

A.   Cones, I think, that said Wet Floor, signs. I saw them -- I mean I wasn't -- again, my job was to be outside of there and --

Q.   Okay.

A.   But people from the store at some point immediately -- right away they started blocking that area off and there was -- activity, let's just say. I don't know.

22

Q.   On those prior occasions when you were a customer in the Costco, had you ever noticed a moist area on the floor in the dairy cooler area?

A.   No. I haven't.

Q.   Okay.

A.   I don't --

Q.   Okay. And on that day of July 13, 2014, did you ever notice this area of moisture until -- after the incident where the person fell and then you came back and looked at it later?

A.   No, I didn't.

Q.   And it says in here you cannot speculate on the cause.

Do you have any idea where that area of moisture might have come from?

A.   No. Not at all.

It was -- I don't in any way want to say that it was a puddle. It was clear moisture and it -- it was maybe the size of, like I said, a dinner plate.

Q.   Did you ever touch that area of moisture?

A.   I don't believe I did.

I think I might have run my foot over it and said -- well, my own personal impression and

23

maybe a comment that I made to an employee was: How do you slip on this, it doesn't feel slippery.

But that -- that would have been in private conversation.

I -- we looked at it to try to identify what -- where are they talking about.

Q.   Did you do anything to try and clean up that area?

A.   No.

Q.   At some point did Costco employees come and clean up that area?

A.   Oh, yeah. Oh, they -- they were like -- yes. They were like bees in a hive. They were everywhere.

Q.   So they came pretty fast after this?

A.   Well, managers came to help the customer and -- then people came -- then the guy came and we tried to figure out what they had been referring to, and then somebody came. So there were like three waves of people.

It was just a lot of chaos because he was so angry and she was -- I don't know, she might have been -- she was more quiet.

I mean I -- it was very -- I was just

24

trying to comfort, if somebody needed comfort, that was my only task.

MR. KACZMAREK: Here's one more, Exhibit 3.

(Whereupon, Manzie Deposition Exhibit No. 3 was marked for identification.)

BY MR. KACZMAREK:

Q. Showing you what has been marked as Manzie Exhibit 3, is that also a photograph of the dairy area in the Costco?

A. Well, based on seeing the milk here, I would say yes.

Q. Do you know what the floor is made of in that dairy area?

A. I would say painted concrete, maybe.

But I do dog products so --

Q. Okay.

A. -- what the hell do I know.

Q. All right. Were there anything like mats or rugs in the dairy area on July 13th, 2014?

A. Not to my knowledge.

Q. Did you ever talk to Rhonda Mitts, the woman who had fallen?

A. I did. I -- I went -- that was -- I tried

to go to her and I said: I'm so sorry, are you okay, what can I do.

I wanted to try to -- the way they say don't move people, don't let them walk around, and the only thing I could try was to let her sit on the milk, which was not helpful, and she didn't want to be there.

So I wasn't able to do much, but --

Q. Okay. Did she say anything to you?

A. No. We didn't have a conversation. They -- they weren't -- let's just say I did not feel that the comfort that I offered was anything they were interested in receiving.

Q. Have you --

A. Is that fair? I don't know how to say that and not sound like a judgmental person.

Q. And then did you fill out this incident report the same day?

A. I did.

Q. Okay. Have you been back to that Costco since?

A. Yes. As a customer. Not to work.

Q. Do you know of anyone who saw Rhonda Mitts fall?

A. No.

Q. Do you remember what kind of shoes Rhonda Mitts had on?

A. I don't remember anything like high heels or anything like that, but I can't say that I made a note of --

Q. Okay.

A. -- her footwear.

Q. Do you know what Crocs sandals are?

A. Yes. I wear them.

Q. Oh, okay.

Did Rhonda Mitts have Crocs sandals on?

A. She could have.

I don't wear them exclusively, but -- I -- you know, I didn't --

Q. Were there any other Costco customers in that dairy cooler area when you learned that Rhonda Mitts had fallen?

A. There were people. I was aware of customers.

I was actually hoping -- I was looking around, because sometimes when things happen in public, you know, people start falling apart, and I was much more along the lines of just trying to see

about general welfare.

Q. Were there any Costco employees in the dairy area when --

A. Not when it happened.

Q. -- you learned this person had fallen?

A. No.

They came, but not when she fell.

Q. All right. Did you have any conversation with Michael Mitts, Rhonda Mitts' husband, other than --

A. No.

Q. -- other than what you've told us already?

A. No conversations at all. He -- I -- like I said, I tried to provide some comfort or assure him that there were people coming.

I hollered -- I suppose his -- I think I went out and saw some of the stock people, 'cause they really are very present, like out in the aisles, and I might have said: Can we get a manager back here?

And they -- they responded right away, and I was just trying to reassure both of them that they were in good hands.

Q. When you went back and -- with the Costco

employee and you observed this area of moisture, was it hard to see?

A.   Actually, it was.  We backed up and looked, like you would sideways, sort of bent over from the waist and looked sideways to see the area that they had indicated.

Q.   Were there any products on the floor in the dairy area, like milk cartons or --

A.   No, no.

Against the wall only.  Kind of -- you have the one photo of the way it's shelved.  It's an open area.

Q.   Okay.  There were no loose products of milk cartons or items on the floor?

A.   Uhm-uhm.

Q.   That's a no?

A.   No.

No, I'm sorry.

(Interruption.)

MR. KACZMAREK:  If you need to get that -- that's okay.  I think I'm just --

THE WITNESS:  Just a minute.

MR. KACZMAREK:  Off the record.

(Discussion had off the record.)

29

the floor came from; is that right?

A.   No.  No.

Q.   You don't know where it came from?

A.   I do not know where it came from.

Q.   Do you know how it got there?

A.   I have no idea.

Q.   Do you know how long that moisture was on the floor before you saw it?

A.   No.

Q.   Do you know if anyone from Costco knew that that moisture was on the floor before the accident?

A.   No.

MR. NAHRSTADT:  I have nothing further.

MR. KACZMAREK:  Now you do have a right of signature.

If someone orders this deposition and it's typed up, then you have a right to read it and sign it and check it for accuracy.

Or you can waive your right as to signature and rely upon the court reporter to have gotten down everything correctly.

THE WITNESS:  Does she look reliable?

MR. NAHRSTADT:  She does.

31

BY MR. KACZMAREK:

Q.   I'm just about done.

Did you know any of the employees at the Costco by name prior to July 13th, 2014?

A.   No.

Q.   Okay.  And do you remember what the weather was like on July 13, 2014?

A.   Oh, my God.

Q.   Raining, dry?

A.   Oh, my, you're talking to the wrong person.  I -- no.  I don't remember anything dramatic.  So let's just say it was -- it must have been typical.

Q.   Okay.

A.   That's hilarious.  That's the story I'll tell.

MR. KACZMAREK:  Okay.  I don't have any other questions.  Do you have anything?

EXAMINATION

BY MR. NAHRSTADT:

Q.   Yes, Nancy, let me just ask you a couple things.

So I think you said before that you don't know where the moisture that you ultimately saw on

30

MR. KACZMAREK:  I'd say 95 percent of people waive their signature, but it's always up to the individual.

THE WITNESS:  No, I -- you know what, let's just all -- we just had this -- let's all do the right thing, let's all tell the truth, let's all be fair, that's -- I have no --

MR. KACZMAREK:  So we will put waive signature?

THE WITNESS:  I -- yeah.

MR. KACZMAREK:  Okay, waive signature, okay.

(The deposition concluded at 2:28 o'clock p.m.)

32

STATE OF ILLINOIS )

)  SS:

COUNTY OF DU PAGE )

I, JANET M. STANTON, an Officer of the Court, do hereby certify that heretofore, to-wit, on the 18th day of November, 2016, personally appeared before me, at 1528 Cascade Court, Naperville, Illinois, NANCY MANZIE, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois, wherein RHONDA MITTS is the Plaintiff and COSTCO WHOLESALE CORPORATION is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to digital format by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for

33

the respective parties.

I further certify that the taking of this deposition was pursuant to notice, and that there were present at the taking of said deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my verified digital signature this signature this 18th day of December, 2016.

_____

Illinois Certified Shorthand Reporter

34



**Exhibits**

Manzie Exhibit 1
3:14 14:6,8,12
Manzie Exhibit 2
3:15 18:23 19:2,6
Manzie Exhibit 3
3:16 25:3,5,8,9

**1**

1
14:6,8,12
10:00
7:21
12:00
15:6
13
23:7 30:7
1320
6:5
13th
6:4 7:16 10:6 11:7,9
12:11 25:20 30:4
1528
4:14

**2**

2
18:23 19:2,6
2014
6:4 7:16 11:7,9
12:11 23:7 25:20
30:4,7
2:00
7:21
2:28
32:13

**3**

3
25:3,5,9
3:40
15:3

**4**

4:00
15:6

**5**

59
6:6

**6**

60565
4:14

**7**

7/13/2014
15:3

**8**

8/1/50
4:16

**9**

95
32:1

**A**

accident
31:12
accompaniment
7:5
accuracy
31:19
activity
22:23
Adams
6:10,22 7:9 9:17
13:5 14:19 15:23
address
4:13
addressed
16:20
Advantage
5:4,7,8,21
afterward
22:16
age
9:16
agitated
20:17
aisles
28:19
allowed
12:3
amount
17:19
angry
24:22
annoying
14:3
anyone's
10:11
applied
6:23 12:23
approach
11:21
approaching
11:14
approximate
15:4
apron
15:22
area
8:8 10:19 11:6,10,
12,22 13:8,10 16:15
18:9,18 19:7 20:2,4,
11 21:2,14 22:10,23
23:3,8,14,21 24:8,11
25:10,14,20 27:17
28:3 29:1,5,8,12
arrival
7:20
assist
5:12,13
assure
28:14
aware
17:8 20:12,17 27:19

**B**

back
8:8 10:13 18:2 20:21
22:4 23:10 26:20
28:20,24
backed
18:3 29:3
bag
8:21,22
based
25:11
bees
24:13

behalf
6:9
Bell
5:23
bent
29:4
big
11:3
birth
4:15
bit
13:23 18:6
black
15:21
blades
7:4 12:22 13:1
bleeding
17:14
blocking
22:22
board
5:22
body
9:9
bother
18:11
boy
7:15
breed
9:16
breeze
12:1 13:23
bring
8:16 12:4
brought
6:20 8:14,17
busiest
7:22
business
4:21

**C**

call
9:9 13:15 16:7
called
4:6 8:5
calling
17:6
cart
16:17 17:2,4 21:9,11
cartons
29:8,14
Cascade
4:14
catch
19:17
cell
12:2
center
21:8
central
22:11
chair
8:22
chairs
8:22
change
12:6
changed
10:16
chaos
24:21
check
31:19
chemical
6:23
circle
18:16

Civil
4:4
clean
24:7,11
clear
23:18
close
21:14
closely
19:23
closer
10:17 18:20
closes
13:21
clothing
15:21
collars
7:6,7
college
4:19
comfort
25:1 26:12 28:14
comment
24:1
companies
5:3
competing
9:6
concentrated
7:3
concluded
32:12
concrete
25:15
condition
9:21 17:12
cones
22:12,17
confirming
14:21
contractor
5:2
control
13:5
conversation
9:14,15 24:4 26:10
28:8
conversations
28:13
cool
11:16
cooler
16:8 23:3 27:17
corner
13:15,17 16:11 20:9
correct
9:22 10:3,4,6,8
12:12,14,15 13:21
15:12,13 17:16,20
20:11
correctly
31:22
Costco
6:5 7:14 8:1,10,24
9:22 10:5,21,24
12:4,11 19:7 23:2
24:10 25:10 26:20
27:16 28:2,24 30:4
31:10
couple
30:21
coupon
8:18
court
4:14 31:21
Crocs
27:9,12
customer
6:2 8:5 10:22,24
11:8 16:5 17:24 23:2

24:16 26:22
customers
11:20 12:3,10,17
27:16,20

**D**

dairy
11:6,10,22 13:8,9
16:15 19:7 23:3
25:9,14,20 27:17
28:3 29:8
date
4:15 11:10
day
6:8 13:7 22:13 23:7
26:18
days
7:4
demo
5:12
demographics
5:15,24
demonstrate
12:18
demonstration
10:6
demos
7:17
deposition
4:3 14:7,12 18:23
19:1,6 25:4 31:17
32:12
depositions
12:8
describe
8:19 18:4
dinner
18:6 23:19
discussion
20:20 29:24
display
6:12
displays
10:16
distracted
16:18,21
dog
6:20 12:19 13:3
25:16
dogs
6:18 12:4,8,11,22
Dollar
5:22
door
13:8,9,11,18
doorway
11:13,14,15
dramatic
30:12
draw
19:9
drop
7:3
dry
30:9
duly
4:1,6

**E**

early
7:18
edging
10:18
educate
7:10
education
4:17

electronics
4:21
employed
5:1 6:10
employee
24:1 29:1
employees
18:1 24:10 28:2 30:3
end
12:24
engage
9:19
enter
13:16 21:7
entities
5:10
entrance
21:11
eschew
21:10
Establish
9:14
Everybody's
7:23
EXAMINATION
4:8 30:19
examined
4:7
exclusively
27:14
excuse
9:10
Exhibit
14:6,8,12 18:23
19:2,6 25:3,5,9
expected
16:22

**F**

facing
21:10
fair
26:15 32:7
fall
15:10 26:24
fallen
25:23 27:18 28:5
falling
27:23
Family
5:22
fast
24:15
Federal
4:4
feel
24:2 26:11
fell
23:9 28:7
field
4:20 5:17
figure
17:7 24:18
fill
26:17
filled
14:13,22
finally
17:12
Firm
5:3,11,18 6:9 10:2
flea
6:11,22 7:6 9:3,17
12:23 13:5
floor
9:22 16:14,24 17:19
22:12,17 23:3 25:13
29:7,14 31:1,8,11



Nancy Manzie 11/18/2016

focused
17:6
folding
8:22
foods
5:19
foot
21:21 22:7 23:23
footwear
27:8
forget
7:11
forty
16:24
four-hour
7:17
front
16:7 18:1 20:13

**G**

general
16:4,6 22:6,10 28:1
goal
10:10
God
30:8
good
28:23
guess
19:20
guy
24:17

**H**

half
7:11
hand
12:21
hands
28:23
handwriting
14:15
happen
27:22
happened
17:7 28:4
hard
29:2
hear
15:10
heard
16:10
heels
27:4
hell
25:18
helpful
26:6
Hey
15:15
high
13:24 27:4
highest
4:17
hilarious
30:15
hive
24:13
hollered
16:9,18 28:16
home
4:13
honestly
7:8,19 11:3 17:5
hoping
27:21
hours
15:8

husband
15:14,17 16:2 28:9

**I**

idea
23:14 31:6
identification
14:9 19:3 25:6
identify
24:5
immediately
11:12 22:14,22
impression
23:24
incident
14:23 15:3 22:15
23:9 26:17
individual
32:3
inside
11:18 13:9
interested
26:13
interfering
4:24
Interruption
29:19
involved
15:11
ipad
6:2
items
29:14

**J**

Jersey
5:5,9
job
22:19
judgmental
26:16
July
6:4 7:16 10:6 11:7,9
12:11 23:7 25:20
30:4,7

**K**

KACZMAREK
4:2,9 14:5,10 18:22
19:4,16,19 20:1,19,
21,22 25:3,7 29:20,
23 30:1,17 31:15
32:1,8,11
kidding
20:8
kind
6:13 8:23 10:18
13:23 15:19 16:11
27:2 29:10
knew
31:10
knowledge
25:21

**L**

leaning
17:1,4
learned
27:17 28:5
left
11:14 21:8,11,12
level
4:17
lines
17:2,15 27:24

listen
19:23
literature
8:17,19
long
10:23 11:1 31:7
looked
15:14 18:3 23:10
24:5 29:4,5
loose
29:13
lot
20:18 24:21
lovely
12:1

**M**

M-a-n-z-as-in-
zebra-i-e
4:12
made
24:1 25:13 27:5
man
10:15 20:17
manager
28:20
managers
24:16
Manzie
4:3,5,12 14:7,12
18:23 19:1,6 25:4,8
mark
18:22
marked
14:6,8,12 18:24
19:2,5 25:5,8
market
6:1
marketing
5:16,24
marking
18:11
mats
25:19
meaning
17:14
medications
5:19
member
11:2
Michael
15:16 28:9
mid-day
7:22
middle
18:20
milk
25:11 26:6 29:8,14
mind
22:5
mine
8:13
minute
29:22
minutes
7:18
mischaracterizatio
n
19:14
Mitts
14:24 15:16 20:24
25:22 26:23 27:3,12,
18 28:9
Mitts'
28:9
moist
23:3
moisture
17:19 18:5,7,9 19:12

20:11,13 21:2,4,16,
22 22:8 23:8,15,18,
21 29:1 30:24 31:7,
11
moment
20:16
move
26:4
moved
10:16

**N**

NAHRSTADT
19:14,22 30:20
31:14,24
Nancy
4:3,5,12 30:21
Naperville
4:14 6:6
needed
16:12 25:1
normal
15:8
note
27:6
notice
4:4 17:11,22 23:8
noticed
17:13 23:2
nutrition
5:19

**O**

Objection
19:14
observed
29:1
observing
6:3
obtained
4:18
occasion
6:5
occasions
23:1
occur
15:3
occurred
14:23
offered
26:12
one-time
7:8
open
29:12
opening
13:12
opens
13:19
opinions
7:23
orders
31:17

**P**

p.m.
15:3 32:13
paid
10:2,5
painted
25:15
pants
15:20
patterns
6:1
people
6:16 12:22 20:3,12

22:21 24:17,20 26:4
27:19,23 28:15,17
32:1
percent
32:1
person
10:13 23:9 26:16
28:5 30:11
personal
23:24
pet
5:3,11,18 6:9 9:13
10:2
Phoenix
5:4
phone
12:2
photo
29:11
photocopy
19:6
photograph
18:10 19:7 25:9
physical
17:11,14
place
11:21
places
5:23
plastic
13:22
plate
18:6 23:20
point
7:19 16:20 17:22
18:9 22:21 24:10
possibly
8:18 15:6
present
28:18
pretty
24:15
prior
23:1 30:4
private
24:4
Procedure
4:4
process
16:16
product
6:13 7:1 8:9,20,24
9:3,6,11,18 10:17
12:17 13:6
products
5:19 7:9 13:4 25:16
29:7,13
promptly
7:11
proper
13:11
prospective
11:20
provide
28:14
public
27:23
puddle
18:5 19:12,15,18,24
23:18
pursuant
4:3
put
7:3 12:19 18:16
22:4,16 32:8

**Q**

questions
9:12 30:18

quiet
17:10 24:23

**R**

Raining
30:9
read
31:18
reassure
28:22
receiving
26:13
record
4:2,10 20:19,20,21
29:23,24
referring
24:18
refrigerated
11:23
relation
21:2
relative
22:1
reliable
31:23
rely
31:21
remember
7:20 10:12 27:2,4
30:6,11
remembered
14:18
report
8:2 14:13 26:18
reporter
31:21
representing
6:10
research
5:4,9,15,21 6:1,3
responded
28:21
responsibility
9:21
Rhonda
14:24 20:24 25:22
26:23 27:2,12,17
28:9
room
16:7,8
Route
6:6
rugs
25:20
Rules
4:4
run
23:23

**S**

sadly
6:19
safety
22:12
sales
5:12,13
sandals
27:9,12
seconds
17:1
service
8:5
shelved
10:20 29:11
shirt
15:20
shoes
27:2



Nancy Manzie 11/18/2016

shopper
11:3
shopping
6:1 11:19 21:9
shoulder
7:4 12:21 13:1
show
4:2 6:16 13:3 18:8
showing
12:16 14:11 19:5
25:8
side
11:14 18:20
sideways
18:4 29:4,5
sign
31:18
signature
31:16,21 32:2,9,11
signs
22:13,18
sit
26:5
sitting
6:3
size
23:19
sized
18:6
slamming
9:9
slip
24:2
slippery
24:2
slower
16:22
small
17:19
sneak
20:7
snip
12:23
sort
7:3 16:9 21:6 29:4
sound
26:16
sounds
9:20
South
6:5
speculate
23:12
spell
4:11
spot
17:18
spray-on
6:23
spread
12:24
stand
12:2
standing
16:14 17:4 20:24
star
18:16 19:9 20:10
start
9:15 27:23
started
22:22
state
4:10
stated
20:12
stepped
11:16
stock
28:17

storage
10:19
store
6:5 10:18 16:3 18:1
20:14 22:21
story
30:15
strips
13:22,23
suppose
7:11 28:16
sworn
4:1,7

———— T ————

table
6:14 8:10,14,21
11:15
tablecloth
8:20
Taco
5:22
tag
15:23
talk
25:22
talking
24:6 30:10
task
25:2
terribly
21:8
testified
4:7 19:15
thing
7:3 8:23 26:5 32:6
things
5:20 6:1 27:22 30:22
thirty
7:4,18 16:24
tick
6:11,22 9:3,17 12:23
13:5
time
5:1,11 7:2,13,20
15:3,4 17:21 20:9
21:24
told
28:12
touch
23:21
touches
9:11
truth
32:6
tube
12:24
turn
4:23 14:4
turned
16:19
TV
4:23 14:2
type
5:15,19
typed
31:18
typical
30:13

———— U ————

Uhm-uhm
29:15
ultimately
30:24
Um-hum
8:15

unclear
17:5
uniform
15:20

———— V ————

video
6:16

———— W ————

waist
29:5
waive
31:20 32:2,8,11
walk
26:4
wall
13:14,16 29:10
wanted
26:3
warehouse
12:7,9
warm
12:1
waves
24:20
wear
15:21 27:10,14
wearing
15:19
weather
30:7
weight
7:2
welfare
28:1
wet
22:12,17
woman
15:11 16:13,14
20:23 25:23
wondering
16:1
words
15:9 16:23
work
5:2,12 6:24 26:22
working
6:8 15:6
wrong
30:10

———— Y ————

year
11:2
years
4:19
yelling
20:18
younger
10:15

_Kevin Rose_

ML3403185

**COSTCO WHOLESALE CORP.** WAREHOUSE LOC. #_____

EXHIBIT
_Manzie_
11-18-6

PENGAD 800-631-6989

## WITNESS REPORT OF INCIDENT
### GENERAL LIABILITY
PLEASE PRINT
(To Be Completed Only By Witness To Incident)

1. Name: _Nancy Manzie_  Member #: _1 1 1 8 2 9 3 7 7 2 1 1_

2. Home Address: _1528 Cascade Ct_

3. Business Address: _N/A_

4. Home Phone: _630 420 2801_  Business Phone (Cell): _630 913 2703_

5. Did you see the incident in whole or in part? _part_

6. When did incident occur? Date: _7/13/2014_ Time: _3:40_ AM (PM)

7. Where did incident occur? _Dairy (Walk in)_

8. Where were you in relation to the incident? State distance from scene, if view was obstructed and by what.
_around the corner - 5½ ft away (ADAMS Pentagon demo)_

9. Was anyone injured? _YES_ Name of person injured: _Not Known_

10. Was there any property damaged? _no_ What was the extent of the damage? _____

11. Do you know any of the parties involved? _no_ If so, how? _n/a_

12. In your own words, what did you see, and what may have been the cause? _I did not see or hear the fall, nor anything from the woman involved. Her husband looked at me and said "Hey, can I get some help here?" Then to his wife he asked "are you OK?" I can not speculate on the cause - there pointed to a spot on the floor with a very small amt of moisture._

WITNESS SIGNATURE _Nancy Manzie_  DATE _7/13/2014_ TIME _3:70 PM_

TO BE FILLED OUT BY WAREHOUSE

Incident/Member Name _Rhonda Smith_

After completion of this form, include with fax of Incident Report #SF02, and Member First Report #SF03, then forward originals to:
COSTCO GENERAL LIABILITY, 999 LAKE DRIVE, ISSAQUAH, WA 98027

FORM #SF22 3/99

D:\PrintImageBundler\Temp\481468\Originals\PHOTO.JPG



